# EXHIBIT A

**SUM-100**

## SUMMONS
### (CITACION JUDICIAL)

RECEIVED

~~MAR~~ 3 1 2015

AIG-GLCR

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

American International Group, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Pacific Investment Management Company LLC, for and on behalf of
PIMCO Funds (See Attachment 1)

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**03/27/2015** at 06:42:27 PM

Clerk of the Superior Court
By Sarah Loose,Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: |
| *(El nombre y dirección de la corte es):* The Superior Court of California, | *(Número del Caso):* |
| County of Orange, Central Justice Center, 700 Civic Center Drive West, | 30-2015-00779738-CU-SL-CXC |
| Santa Ana, CA 92701 | Judge Robert J. Moss |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Blair A. Nicholas, BLB&G, 12481 High Bluff Dr., Suite 300, San Diego, CA 92130; Tel: (858) 793-0070

| DATE: **03/27/2015** | Clerk, by | ALAN CARLSON, Clerk of the Court | , Deputy |
| *(Fecha)* | *(Secretario)* | *Sloose* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*    Sarah Loose

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* American International Group, Inc.

under: ☑ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)         ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Exhibit A Page 8

MC-025

| SHORT TITLE: PIMCO LLC, for and on behalf of PIMCO Funds v. AIG, Inc. | CASE NUMBER: |
|---|---|

ATTACHMENT *(Number):* 1
*(This Attachment may be used with any Judicial Council form.)*

Pacific Investment Management Company LLC, for and on behalf of PIMCO Funds:
PIMCO California Intermediate Municipal Bond Fund;
PIMCO Funds: PIMCO California Short Duration Municipal Income Fund;
PIMCO Combined Alpha Strategies Master Fund LDC;
PIMCO Global Credit Opportunity Master Fund LDC;
PIMCO Funds: Private Account Portfolio Series High Yield Portfolio;
PIMCO Funds: Private Account Portfolio Series Investment Grade Corporate Portfolio;
PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio;
PIMCO Absolute Return Strategy II Trust, a Sub-Trust of PIMCO Cayman Unit Trust;
PIMCO Absolute Return Strategy II Master Fund LDC;
PIMCO Absolute Return Strategy III Master Fund LDC;
PIMCO Absolute Return Strategy V Master Fund LDC;
PIMCO Bermuda Trust:  PIMCO Euro Total Return Fund;
PIMCO Bermuda Trust II:  PIMCO Bermuda Global Aggregate Ex-Japan Bond Fund (M);
PIMCO Bermuda Trust II: PIMCO Bermuda U.S. High Yield Fund II (M);
PIMCO Bermuda Trust II:  PIMCO Bermuda JGB Floater Foreign Strategy Fund;
PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund;
PIMCO Bermuda Trust IV: PIMCO Global High Yield Strategy Fund;
PIMCO Bermuda Trust II: PIMCO Bermuda U.S. High Yield Fund (M);
PIMCO Cayman Trust: PIMCO Cayman Australian Multi-Sector Fund;
PIMCO Cayman Trust: PIMCO Cayman Foreign Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Bond Fund II;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Income Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Credit Alpha Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Ex-Japan (Yen-Hedged) Bond Fund;
PIMCO Cayman Trust - PIMCO Cayman Global High Income Fund;
PIMCO Cayman Trust: PIMCO Cayman Global High Income (Yen-Hedged) Fund;
PIMCO Cayman Trust: PIMCO Cayman U.S. Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman U.S. Total Return Fund;
PIMCO Funds: PIMCO Convertible Fund;
PIMCO Funds: PIMCO Floating Income Fund;
PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged);
PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged);
PIMCO Funds: PIMCO Fundamental IndexPLUS® AR Fund;
Equity Trustees Limited as responsible entity for PIMCO Global Bond Fund;
PIMCO Funds: PIMCO Global Bond Fund (Unhedged);
PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged);
PIMCO Bermuda Trust IV: PIMCO Global Bond Strategy Fund;
PIMCO Funds: PIMCO High Yield Fund;
PIMCO Funds: PIMCO High Yield Municipal Bond Fund;
PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund;

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 1 of 2
*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

www.courtinfo.ca.gov

Exhibit A Page 9

MC-025

| SHORT TITLE: PIMCO LLC, for and on behalf of PIMCO Funds v. AIG, Inc. | CASE NUMBER: |
|---|---|

**ATTACHMENT** *(Number):* 1

*(This Attachment may be used with any Judicial Council form.)*

PIMCO Funds: PIMCO Long Duration Total Return Fund;
PIMCO Funds: PIMCO Mortgage-Backed Securities Fund;
PIMCO Funds: PIMCO Real Return Asset Fund;
PIMCO Funds: PIMCO Real Return Fund;
PIMCO Funds: PIMCO Small Cap StocksPLUS® AR Strategy Fund;
PIMCO Funds: PIMCO StocksPLUS® Long Duration Fund;
PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund;
PIMCO Funds: PIMCO StocksPLUS® AR Short Strategy Fund;
PIMCO Funds: PIMCO Total Return Fund;
PIMCO Variable Insurance Trust:  PIMCO Global Bond Portfolio (Unhedged);
PIMCO Variable Insurance Trust:  PIMCO High Yield Portfolio;
PIMCO Funds: Global Investors Series plc, Global Bond Ex-US Fund;
PIMCO Funds: Global Investors Series plc, Global Bond Fund;
PIMCO Funds: Global Investors Series plc, Global High Yield Bond Fund;
PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund;
PIMCO Funds: Global Investors Series plc, High Yield Bond Fund;
Fixed Income SHares: Series C;
Fixed Income SHares: Series M;
PIMCO Corporate & Income Opportunity Fund;
PIMCO Corporate & Income Strategy Fund; and
PIMCO High Income Fund

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 2 of 2

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

Exhibit A Page 10

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Blair A. Nicholas (Bar No. 178428)<br>Bernstein Litowitz Berger & Grossmann LLP<br>12481 High Bluff Drive, Suite 300<br>San Diego, CA 92130-3582<br>TELEPHONE NO.: (858) 793-0070   FAX NO.: (858) 793-0323<br>ATTORNEY FOR *(Name):* Plaintiffs (See Attachment 1) | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br>**03/27/2015** at 06:42:27 PM<br>Clerk of the Superior Court<br>By Sarah Loose, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Orange**
STREET ADDRESS: **700 Civic Center Drive West**
MAILING ADDRESS:
CITY AND ZIP CODE: **Santa Ana, CA 92701**
BRANCH NAME: **Central Justice Center**

CASE NAME:
**PIMCO LLC, for and on behalf of PIMCO Funds v. AIG, Inc.**

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 30-2015-00779738-CU-SL-CXC |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE: Judge Robert J. Moss<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [✓] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [✓] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve      in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary   b.[ ] nonmonetary; declaratory or injunctive relief   c.[ ] punitive
4. Number of causes of action *(specify):*  1: Violations of Section 11 of the Securities Act of 1933
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 3/27/15

Blair A. Nicholas
_____
(TYPE OR PRINT NAME)                          ▶ _____
                                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| PIMCO LLC, for and on behalf of PIMCO Funds v. AIG, Inc. | |

ATTACHMENT (Number): 1

*(This Attachment may be used with any Judicial Council form.)*

Pacific Investment Management Company LLC, for and on behalf of PIMCO Funds:
PIMCO California Intermediate Municipal Bond Fund;
PIMCO Funds: PIMCO California Short Duration Municipal Income Fund;
PIMCO Combined Alpha Strategies Master Fund LDC;
PIMCO Global Credit Opportunity Master Fund LDC;
PIMCO Funds: Private Account Portfolio Series High Yield Portfolio;
PIMCO Funds: Private Account Portfolio Series Investment Grade Corporate Portfolio;
PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio;
PIMCO Absolute Return Strategy II Trust, a Sub-Trust of PIMCO Cayman Unit Trust;
PIMCO Absolute Return Strategy II Master Fund LDC;
PIMCO Absolute Return Strategy III Master Fund LDC;
PIMCO Absolute Return Strategy V Master Fund LDC;
PIMCO Bermuda Trust:  PIMCO Euro Total Return Fund;
PIMCO Bermuda Trust II:  PIMCO Bermuda Global Aggregate Ex-Japan Bond Fund (M);
PIMCO Bermuda Trust II: PIMCO Bermuda U.S. High Yield Fund II (M);
PIMCO Bermuda Trust II:  PIMCO Bermuda JGB Floater Foreign Strategy Fund;
PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund;
PIMCO Bermuda Trust IV: PIMCO Global High Yield Strategy Fund;
PIMCO Bermuda Trust II: PIMCO Bermuda U.S. High Yield Fund (M);
PIMCO Cayman Trust: PIMCO Cayman Australian Multi-Sector Fund;
PIMCO Cayman Trust: PIMCO Cayman Foreign Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Bond Fund II;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Income Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Credit Alpha Fund;
PIMCO Cayman Trust: PIMCO Cayman Global Ex-Japan (Yen-Hedged) Bond Fund;
PIMCO Cayman Trust - PIMCO Cayman Global High Income Fund;
PIMCO Cayman Trust: PIMCO Cayman Global High Income (Yen-Hedged) Fund;
PIMCO Cayman Trust: PIMCO Cayman U.S. Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman U.S. Total Return Fund;
PIMCO Funds: PIMCO Convertible Fund;
PIMCO Funds: PIMCO Floating Income Fund;
PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged);
PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged);
PIMCO Funds: PIMCO Fundamental IndexPLUS® AR Fund;
Equity Trustees Limited as responsible entity for PIMCO Global Bond Fund;
PIMCO Funds: PIMCO Global Bond Fund (Unhedged);
PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged);
PIMCO Bermuda Trust IV: PIMCO Global Bond Strategy Fund;
PIMCO Funds: PIMCO High Yield Fund;
PIMCO Funds: PIMCO High Yield Municipal Bond Fund;
PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund;

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 1 of 2

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

www.courtinfo.ca.gov

Exhibit A Page 12

MC-025

| SHORT TITLE: PIMCO LLC, for and on behalf of PIMCO Funds v. AIG, Inc. | CASE NUMBER: |
|---|---|

**ATTACHMENT** *(Number):* 1 _____

*(This Attachment may be used with any Judicial Council form.)*

PIMCO Funds: PIMCO Long Duration Total Return Fund;
PIMCO Funds: PIMCO Mortgage-Backed Securities Fund;
PIMCO Funds: PIMCO Real Return Asset Fund;
PIMCO Funds: PIMCO Real Return Fund;
PIMCO Funds: PIMCO Small Cap StocksPLUS® AR Strategy Fund;
PIMCO Funds: PIMCO StocksPLUS® Long Duration Fund;
PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund;
PIMCO Funds: PIMCO StocksPLUS® AR Short Strategy Fund;
PIMCO Funds: PIMCO Total Return Fund;
PIMCO Variable Insurance Trust:  PIMCO Global Bond Portfolio (Unhedged);
PIMCO Variable Insurance Trust:  PIMCO High Yield Portfolio;
PIMCO Funds: Global Investors Series plc, Global Bond Ex-US Fund;
PIMCO Funds: Global Investors Series plc, Global Bond Fund;
PIMCO Funds: Global Investors Series plc, Global High Yield Bond Fund;
PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund;
PIMCO Funds: Global Investors Series plc, High Yield Bond Fund;
Fixed Income SHares: Series C;
Fixed Income SHares: Series M;
PIMCO Corporate & Income Opportunity Fund;
PIMCO Corporate & Income Strategy Fund; and
PIMCO High Income Fund

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page  2  of  2

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

Exhibit A Page 13

1  BERNSTEIN LITOWITZ BERGER
      & GROSSMANN LLP
2  BLAIR A. NICHOLAS   (Bar No. 178428)
   TIMOTHY A. DELANGE (Bar. No. 190768)
3  DAVID R. KAPLAN (Bar No. 230144)
   LUCAS E. GILMORE (Bar No. 250893)
4  BRANDON MARSH (Bar No. 268316)
   12481 High Bluff Drive, Suite 300
5  San Diego, CA 92130
   Tel:   (858) 793-0070
6  Fax:   (858) 793-0323
7
   *Counsel for Plaintiffs*
8

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**03/27/2015** at 08:42:27 PM

Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF ORANGE

11  Pacific Investment Management Company        Case No. _____
    LLC, for and on behalf of PIMCO Funds:       30-2015-00779738-CU-SL-CXC
12  PIMCO California Intermediate Municipal
    Bond Fund; PIMCO Funds: PIMCO California      Judge Robert J. Moss
13  Short Duration Municipal Income Fund;
    PIMCO Combined Alpha Strategies Master       **COMPLAINT FOR VIOLATIONS OF**
14  Fund LDC; PIMCO Global Credit Opportunity    **THE SECURITIES ACT OF 1933**
    Master Fund LDC; PIMCO Funds: Private
15  Account Portfolio Series High Yield Portfolio;
    PIMCO Funds: Private Account Portfolio Series  <u>JURY TRIAL DEMANDED</u>
16  Investment Grade Corporate Portfolio; PIMCO
    Funds: Private Account Portfolio Series
17  Mortgage Portfolio; PIMCO Absolute Return
    Strategy II Trust, a Sub-Trust of PIMCO
18  Cayman Unit Trust; PIMCO Absolute Return
    Strategy II Master Fund LDC; PIMCO Absolute
19  Return Strategy III Master Fund LDC; PIMCO
    Absolute Return Strategy V Master Fund LDC;
20  PIMCO Bermuda Trust:  PIMCO Euro Total
    Return Fund; PIMCO Bermuda Trust II:
21  PIMCO Bermuda Global Aggregate Ex-Japan
    Bond Fund (M); PIMCO Bermuda Trust II:
22  PIMCO Bermuda U.S. High Yield Fund II (M);
    PIMCO Bermuda Trust II:  PIMCO Bermuda
23  JGB Floater Foreign Strategy Fund; PIMCO
    Bermuda Trust IV: PIMCO Bermuda Global
24  Bond Ex-Japan Fund; PIMCO Bermuda Trust
    IV: PIMCO Global High Yield Strategy Fund;
25  PIMCO Bermuda Trust II: PIMCO Bermuda
    U.S. High Yield Fund (M); PIMCO Cayman
26  Trust: PIMCO Cayman Australian Multi-Sector

27

28

---

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Fund; PIMCO Cayman Trust: PIMCO Cayman
Foreign Bond Fund; PIMCO Cayman Trust:
PIMCO Cayman Global Aggregate Ex-Japan
(Yen-Hedged) Bond Fund II; PIMCO Cayman
Trust: PIMCO Cayman Global Aggregate Bond
Fund; PIMCO Cayman Trust: PIMCO Cayman
Global Aggregate Ex-Japan Bond Fund;
PIMCO Cayman Trust: PIMCO Cayman Global
Aggregate Ex-Japan Income Fund; PIMCO
Cayman Trust: PIMCO Cayman Global Credit
Alpha Fund; PIMCO Cayman Trust: PIMCO
Cayman Global Ex-Japan (Yen-Hedged) Bond
Fund; PIMCO Cayman Trust - PIMCO Cayman
Global High Income Fund; PIMCO Cayman
Trust: PIMCO Cayman Global High Income
(Yen-Hedged) Fund; PIMCO Cayman Trust:
PIMCO Cayman U.S. Bond Fund; PIMCO
Cayman Trust: PIMCO Cayman U.S. Total
Return Fund; PIMCO Funds: PIMCO
Convertible Fund; PIMCO Funds: PIMCO
Floating Income Fund; PIMCO Funds: PIMCO
Foreign Bond Fund (Unhedged); PIMCO
Funds: PIMCO Foreign Bond Fund (U.S.
Dollar-Hedged); PIMCO Funds: PIMCO
Fundamental IndexPLUS® AR Fund; Equity
Trustees Limited as responsible entity for
PIMCO Global Bond Fund; PIMCO Funds:
PIMCO Global Bond Fund (Unhedged);
PIMCO Funds: PIMCO Global Bond Fund
(U.S. Dollar-Hedged); PIMCO Bermuda Trust
IV: PIMCO Global Bond Strategy Fund;
PIMCO Funds: PIMCO High Yield Fund;
PIMCO Funds: PIMCO High Yield Municipal
Bond Fund; PIMCO Funds: PIMCO Investment
Grade Corporate Bond Fund; PIMCO Funds:
PIMCO Long Duration Total Return Fund;
PIMCO Funds: PIMCO Mortgage-Backed
Securities Fund; PIMCO Funds: PIMCO Real
Return Asset Fund; PIMCO Funds: PIMCO
Real Return Fund; PIMCO Funds: PIMCO
Small Cap StocksPLUS® AR Strategy Fund;
PIMCO Funds: PIMCO StocksPLUS® Long
Duration Fund; PIMCO Funds: PIMCO
StocksPLUS® Absolute Return Fund; PIMCO
Funds: PIMCO StocksPLUS® AR Short
Strategy Fund; PIMCO Funds: PIMCO Total
Return Fund; PIMCO Variable Insurance Trust:
PIMCO Global Bond Portfolio (Unhedged);
PIMCO Variable Insurance Trust:  PIMCO

1 | High Yield Portfolio; PIMCO Funds: Global
Investors Series plc, Global Bond Ex-US Fund;
2 | PIMCO Funds: Global Investors Series plc,
Global Bond Fund; PIMCO Funds: Global
3 | Investors Series plc, Global High Yield Bond
Fund; PIMCO Funds: Global Investors Series
4 | plc, Global Investment Grade Credit Fund;
PIMCO Funds: Global Investors Series plc,
5 | High Yield Bond Fund; Fixed Income SHares:
Series C; Fixed Income SHares: Series M;
6 | PIMCO Corporate & Income Opportunity Fund;
PIMCO Corporate & Income Strategy Fund;
7 | and PIMCO High Income Fund,
8 |
9 |                    Plaintiffs,
10 |        v.
11 | American International Group, Inc.,
12 |                    Defendant.
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

## TABLE OF CONTENTS

Page

I.      NATURE OF THE ACTION ................................................................... 1

II.     INTRODUCTION ................................................................................... 1

III.    JURISDICTION AND VENUE ............................................................. 11

IV.     PARTIES ................................................................................................ 12

        A.      Plaintiffs ....................................................................................... 12

        B.      Defendant ...................................................................................... 14

        C.      Relevant Non-Parties .................................................................... 14

V.      BACKGROUND ................................................................................... 16

        A.      History Of AIG And AIGFP ........................................................ 16

        B.      AIG's Prior Accounting Scandals ................................................ 18

        C.      AIG Turns To Exotic Securities As A Result
                Of Its Ratings Downgrade ........................................................... 19

        D.      AIGFP's Decision To Stop Writing New CDSs ........................... 23

        E.      AIG's Massive Exposure To Subprime
                Mortgages Through Its CDS Portfolio ......................................... 26

        F.      AIG Chases Profits Through Risky
                Investments In Its Securities Lending Program ............................ 30

        G.      AIG Weakens Risk Controls On AIGFP ...................................... 31

        H.      AIG Fails To Properly Mark Down Its
                CDS Portfolio As The Subprime Mortgage Crisis Escalates ........ 34

        I.      AIG Fails To Adjust The Valuation Of Its
                CDS Portfolio Despite Goldman Sachs' Collateral Demands ...... 36

        J.      AIGFP Excludes Key Personnel From
                The CDS Valuation Process ......................................................... 41

        K.      PwC Informs AIG Of A Potential Material
                Weakness In Controls At AIGFP ................................................. 43

        L.      AIG Falsely Reassures Investors At
                The December 5, 2007 Investor Meeting ..................................... 45

        M.      AIG Admits To Misstatements Concerning
                The Valuation Of Its CDS Portfolio ........................................... 47

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 17

N.      The OTS Advises AIG Of Material
        Weaknesses Due To Lack Of Access To AIGFP ...........................................50

O.      AIG Reports First Quarter 2008 Results,
        Raises $20 Billion In Additional Capital,
        And Is Investigated By The SEC And DOJ.............................................51

P.      The Collapse Of AIG's CDS and RMBS
        Portfolios Results In Huge Losses For
        Investors And Requires An Unprecedented
        Bailout By The U.S. Government..........................................................53

Q.      AIG Ultimately Requires Over $180 Billion
        In Government Assistance To Stay Afloat .............................................58

R.      Extensive Information Is Revealed After
        AIG's Bailout That Further Confirms The
        Falsity Of AIG's Representations To Investors......................................59

VI.     SUMMARY OF AIG'S FALSE AND MISLEADING SECURITIES
        OFFERINGS.............................................................................................68

        A.      The Registration Statements .......................................................69

        B.      Plaintiffs' Purchases Under The Registration Statements ................70

        C.      Materials Incorporated By Reference Into The Registration Statements ...........71

VII.    FALSE AND MISLEADING STATEMENTS IN THE OFFERING
        MATERIALS.............................................................................................74

        A.      False Statements In Incorporated SEC Filings For Fiscal 2005 ...........74

        B.      False Statements In Incorporated SEC Filings For Fiscal 2006 ...........82

        C.      False Statements In Incorporated SEC Filings For Fiscal 2007 ...........89

        D.      False Statements In Incorporated SEC Filings For Fiscal 2008 ...........109

VIII.   AIG VIOLATED GAAP AND SEC RULES.............................................115

IX.     FACTS RELEVANT TO AIG'S KNOWLEDGE FOR STATEMENTS
        CONCERNING MATTERS OF "OPINION" OR "BELIEF"...........................124

X.      NO SAFE HARBOR ................................................................................134

XI.     TOLLING OF THE STATUTE OF LIMITATIONS...................................135

XII.    CLAIMS FOR RELIEF .............................................................................137

XIII.   PRAYER FOR RELIEF ............................................................................138

XIV.    JURY TRIAL DEMAND ..........................................................................139

-ii-

I.      NATURE OF THE ACTION

This action is brought by Pacific Investment Management Company LLC ("PIMCO"), for and on behalf of 63 investment funds managed and/or advised by PIMCO in Orange County, California (collectively, "Plaintiffs"), to recover damages for losses Plaintiffs have suffered on certain securities issued by American International Group, Inc. ("AIG" or the "Company") that Plaintiffs purchased in or traceable to offerings (the "Offerings") between October 18, 2006 and May 12, 2008 (the "Offering Period").[1]

Plaintiffs assert claims solely for violations of Section 11 of the Securities Act of 1933 (the "Securities Act"). Pursuant to the Securities Act, AIG is strictly liable for the material misstatements and omissions in the Registration Statements for the Offerings, including the Offering Materials (as defined herein) incorporated by reference in those Registration Statements. The claims herein specifically exclude any allegations of knowledge or scienter, except for statements concerning matters of opinion or belief made in connection with the Offerings or Offering Materials, which are alleged to have been materially misleading and misstated statements of opinion or belief when made.

II.     INTRODUCTION

1.      This action concerns AIG's failure to disclose, and misrepresentations to investors concerning, the Company's massive accumulated exposure to the U.S. housing and subprime mortgage markets. AIG's colossal bets on unregulated credit default swaps and residential mortgage-backed securities for which the Company claimed its exposure was "remote, even in severe recessionary market scenarios" lay at the heart of the financial crisis and carried AIG, once the world's largest insurance company, to the brink of insolvency. Were it not for an emergency bailout by the federal government, AIG would have been forced to file for bankruptcy protection, triggering cascading losses and collapses throughout the global financial system. While AIG was rescued by the federal government, its investors suffered significant harm, including Plaintiffs and other investors in the

---

[1] Plaintiffs have opted out of the class in *In re American International Group, Inc. 2008 Securities Litigation*, Master File No. 1:08-cv-04772 (LTS) (S.D.N.Y.) (the "Class Action") and bring the claims asserted herein in their individual capacities.

Company's securities offerings between 2006 and 2008 pursuant to which AIG raised more than $27 billion in violation of the federal securities laws.

2.      AIG is a multinational insurance and financial services company, founded in 1919, with operations in more than 100 countries.  AIG went public in 1969 and, by 2004, became one of thirty companies listed in the Dow Jones Industrial Average.

3.      Beginning in 1962, AIG focused its U.S. insurance business on high-margin corporate coverage.  The Company also built an enviable reputation for conservative and prudent stewardship and investment, managing risk and building shareholder and bondholder value.  Indeed, for decades, AIG enjoyed near-perfect credit ratings – "AAA" from Standard & Poor's since 1983 and "Aaa" from Moody's since 1986 – which enabled AIG to borrow cheaply and earn significant returns deploying those funds in prudent, well-managed investments.

4.      However, beginning in 2004, AIG departed from its traditional conservatism and turned to exotic securities in an attempt to capitalize on the housing bubble and booming mortgage securitization industry.  Through a small and little known subsidiary, AIG Financial Products ("AIGFP"), the Company began investing in risky derivatives, including credit default swaps that essentially assumed the risk of default on tens of billions of dollars in subprime mortgage loans.  In particular, these swap contracts assumed the risk of default on collateralized debt obligations ("CDOs"), complex and opaque financial instruments that were collateralized by different forms of securities, including loans backed by mortgages, automobile loans, and credit card receivables. Because AIG enjoyed the highest credit ratings, AIGFP was able to issue these credit default swaps without depositing *any* collateral with its trading counterparties or establishing *any* loss reserves.  As an AIGFP manager would later tell the Financial Crisis Inquiry Commission ("FCIC"), "rule Number 1 at AIGFP" was to never post collateral.

5.      In early 2005, as the U.S. housing and mortgage securitization markets were soaring, AIGFP dramatically increased its swap business.  In the ten-month period between March and December 2005, AIGFP wrote more swaps than it had previously written in its entire eighteen-year history.  The size of AIGFP's swap portfolio dramatically increased the Company's exposure to the residential and subprime mortgage markets, especially after 2003 as the CDOs began to lose their

multi-sector attributes and became increasingly weighted with subprime debt.  As 2005 drew to a close, AIGFP had amassed a portfolio of credit default swaps that totaled nearly *$80 billion* – or 75% of AIG's equity base – mostly on subprime mortgage-backed CDOs.  This massive swap portfolio made AIG, essentially, the world's largest owner of subprime mortgage bonds.

6.      The flood of credit default swaps written by AIGFP exposed the Company to three types of financial risk.  First, under the terms of the swaps, AIG promised to make large payments to its counterparties if the underlying CDO securities defaulted.  Second, even without a default, if the market value of the CDO securities declined in value or AIG's own credit rating was downgraded, AIG was required to post large amounts of collateral to its counterparties as assurance that AIG would be able to meet its obligations under the swap contracts.  Third, in such circumstances, AIG would also be required to "mark-to-market" the declining value of the swap assets on the Company's balance sheet.  These risks are known, respectively, as "credit risk," "collateral risk," and "valuation risk."

7.      Compounding these interrelated risks was the fact that, unlike traditional insurance, swap counterparties were not required to own the underlying debt instruments.  Instead, AIGFP wrote multiple "naked" swaps on the same referenced CDO, repeatedly insuring the same underlying package of increasingly toxic assets against default.  Moreover, when the flow of new subprime mortgages was insufficient to generate new credit default obligations, AIGFP used securities issued by other CDOs as backing for new "synthetic" CDOs.  And while AIGFP sold protection only on the highest level or "tranche" of a CDO, the entire debt pool was composed of the same types of subprime mortgage assets, thus exposing the "super senior" tranche to the same qualitative risk of a market-wide downturn in housing as the lowest-rated "mezzanine" tranche.

8.      AIGFP's swap business was directly contrary to the traditional function of insurance companies – *i.e.*, to diversify risk across policyholders.  AIG was able to take on such colossal, systemic risk without being required to post a single dollar of initial collateral or make any other provision for loss because its credit default swap business was unregulated by state and federal agencies. As Federal Reserve Chairman Benjamin Bernanke later acknowledged, *"AIG exploited a*

*huge gap in the regulatory system. . . . This was a hedge fund basically that was attached to a large and stable insurance company."* [2]

9.      By the end of 2005, AIG faced significant risk in continuing to insure such CDOs, particularly given industry-wide deterioration in underwriting standards for subprime mortgage loans. In the spring of 2005, certain senior AIGFP executives, including its President, Joseph Cassano ("Cassano"), began looking more closely into the subprime market and the risks that it posed to AIG through AIGFP's swap portfolio.  These executives recognized that lending standards had been declining throughout the subprime mortgage industry, that many of the subprime loans underlying the CDO securities were bound to default or lose value, and that when that occurred the CDOs would almost inevitably lose value and/or default.  In particular, the AIGFP executives realized that the model they were using to evaluate the risk involved with the swaps was inadequate to deal with the declining underwriting standards and the large percentage of underlying subprime mortgage debt.  The AIGFP model was also incapable of assessing valuation risks and collateral risks presented by the credit default swap portfolio.  As a result, according to the FCIC's 662-page "Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States" ("FCIC Report"), when the swap assets would later experience volatility, AIG was forced to "learn of its own problems from counterparties who did have the ability to mark their own positions to market prices and then demand collateral from AIG."

10.      In the fall of 2005, the manager of AIGFP's credit derivative portfolio analyzed the swap portfolio and was shocked to find that the supposedly diversified piles of consumer loans underlying the swaps now consisted almost entirely of U.S. subprime mortgages. The AIGFP manager determined that the underwriting practices associated with these subprime loans had become so shoddy that they could default at any time, regardless of the geographic area in which the loans were made. His concerns were so deeply held that he refused a promotion to take over as AIGFP's liaison to Wall Street in the marketing of the swaps.  About the same time, AIG's mortgage lending arm, American General Financial Services ("American General"), stopped approving subprime loans

---

[2] All emphasis added unless otherwise stated.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

altogether because it was so concerned about the state of the industry. Word spread from American General to AIGFP that the subprime business was *"a minefield."* Consequently, at the end of 2005, AIGFP executives decided to stop writing new swaps on CDOs backed by subprime mortgage debt because the risks were too great. Nonetheless, according to the FCIC Report, AIGFP "continued to work on deals that were in the pipeline" and "completed 37 deals between September 2005 and July 2006—one of them on a CDO backed by *93% subprime assets*."

11.     Remarkably, although the decision was made at the end of 2005 to stop writing new swap contracts on subprime mortgage debt, AIGFP did not seek to divest or otherwise hedge the $80 billion credit default swap portfolio it had saddled upon the Company. Nor did AIG convey to investors the significant financial risks it faced as a result of the massive subprime-linked swap portfolio. To the contrary, Cassano and other senior AIGFP management rejected suggestions from other AIGFP personnel to hedge the swap portfolio, and represented to investors that all was well and that hedging was unnecessary given the portfolio's purportedly conservative profile. According to the FCIC Report, the credit default swap business was the *only unhedged business* that AIG ran.

12.     The Company also failed to subject its enormous swap portfolio to proper risk control procedures. In fact, AIGFP weakened or eliminated risk management procedures the Company had previously employed in underwriting swap contracts and excluded key risk management personnel from meetings where risk management issues at AIGFP, including swap-related risks, were discussed. Additionally, AIG did not apply the same rigorous risk management procedures to the swap portfolio that the Company applied to other divisions, and executives restricted the flow of material information to others within the Company when they made valuation and risk management decisions concerning the swap portfolio.

13.     For example, in the fall of 2007, AIG's internal auditor, Joseph St. Denis ("St. Denis"), a former Assistant Chief Accountant at the Securities and Exchange Commission ("SEC") Enforcement Division who was specifically hired to address accounting issues at AIGFP, was forced out of the Company after he began probing the portfolio of credit default swaps. As St. Denis testified to Congress, after he became concerned about the valuation of the swap portfolio, he was told by AIGFP's President Cassano: *"I have deliberately excluded you from the valuation [of the credit*

*default swaps] because I was concerned that you would pollute the process."* St. Denis informed the General Counsel of AIGFP that his exclusion from the swap portfolio placed AIG at great risk. St. Denis also informed AIG's Chief Auditor of his concerns, who agreed that St. Denis had been "painted into a corner" by Cassano, and had no choice but to resign. The Chief Risk Officer, Robert Lewis, then relayed the information from St. Denis to AIG's Audit Committee.

14. After his resignation, St. Denis was contacted by AIG's outside auditor, PricewaterhouseCoopers ("PwC") regarding the reasons for his departure. After learning of St. Denis' exclusion from the valuation of swap portfolio, PwC proceeded to inform top AIG executives that the Company had a material weakness over internal controls relating to the valuation of its swaps. Internal AIG documents, including Audit Committee meeting minutes, show that AIG's Chief Executive Officer, Chief Financial Officer, and Chief Risk Officer (Martin J. Sullivan, Steven J. Bensinger, and Robert Lewis, respectively) were all actively involved in meetings and discussions with PwC on precisely this issue. Approximately one week before a special investor meeting was held on December 5, 2007 to reassure the market about AIG's subprime exposure, PwC specifically warned AIG of *"significant deficiencies, and a possible material weakness, in the valuation process concerning the CDS portfolio."*

15. AIG's massive unhedged exposure to the housing and subprime mortgage markets was amplified by billions of dollars in bad bets made by AIG through another subsidiary, AIG Investments. About the same time that AIGFP decided to stop writing swaps on subprime mortgage-backed CDOs because the risks were too great, AIG Investments began *accumulating* its own outsized portfolio of residential mortgage-backed securities through the Company's securities lending business. In this traditionally conservative business line, the Company lent securities to banks and brokerage firms in exchange for cash collateral, which was historically parked in conventional short-term, low-risk, fixed-income investments, such as Treasury bills and high grade commercial paper. In late 2005, however, in an attempt to make an extra $1 billion in annual profits, AIG Investments plowed up to 75% of the cash collateral into residential mortgage-backed securities. By mid-2007, the value of AIG's securities lending portfolio surpassed *$94 billion*, and consisted mostly of risky subprime mortgage bonds.

16.     In addition to the greater investment risk posed by residential mortgage-backed securities, AIG Investments' forays in mortgage-backed securities presented the risk that a freeze in the market for these securities would precipitate a liquidity crunch for the Company as borrowers demanded the return of their cash collateral.  The securities lending program obligated AIG to repay or roll over most of its loans every thirty days while, in contrast, much of the residential mortgage-backed securities amassed by AIG Investments matured in two to five years.  In addition, using funds deposited by its parent company, AIG Investments had been secretly purchasing a greater amount of mortgage-backed securities than the borrowed collateral and internal guidelines allowed.  Significantly, AIG needed the funds invested through the securities lending program for statutory and other capital requirements of its insurance subsidiaries.  In short, AIG Investments' aggressive bets in residential mortgage-backed securities, like AIGFP's portfolio of credit default swaps, presented an enormous amount of risk to the Company – unrelated to its traditional insurance business – that was not adequately disclosed to Plaintiffs and other investors in the Offerings.

17.     Despite the significant risks associated with AIGFP's swap business and AIG Investments' "double down" bets in residential mortgage-backed securities, these activities were *barely mentioned* in many of AIG's public securities filings, including those incorporated into the Offering Materials.  For example, in AIG's 2005 and 2006 annual reports, AIG did little more than provide a generalized description of its "credit derivatives transactions."  The Company did not use the term "credit default swap" in this description and, more importantly, it did not describe the types of CDOs being insured or the fact that a significant portion of the CDOs exposed the Company to subprime debt.  Similarly, AIG's references to the securities lending business did little more than provide a bland description of the invested collateral along with the account balances and amounts payable.  Instead, AIG represented to the market that it faced relatively little exposure to subprime mortgage debt, that its swap portfolio had been carefully constructed and closely managed so as to avoid losses, and that any losses that did occur would be immaterial.  These representations were false.

18.     As the housing market spiraled downward in 2007 and 2008, the risks of the credit default swap and residential mortgage-backed securities portfolios materialized.  In mid-2007, as the value of mortgage-related securities continued to drop, AIG was faced with increasing demands by its

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933    Exhibit A Page 25

1   swap counterparties to post billions of dollars in collateral on the referenced CDOs and residential

2   mortgage-backed securities, including relentless, daily demands by Goldman Sachs.  At the same time,

3   AIG was obligated to mark down the values of its swap assets and investments in mortgage-related

4   securities on the Company's balance sheet, taking billions in charges for "unrealized market losses"

5   that wiped out profits from the Company's other businesses.  As a result, AIG lost its superlative credit

6   ratings, which, in turn, required AIG to post billions in additional collateral.

7         19.    Nonetheless, AIG assured investors that the Company would not suffer any adverse

8   effects.  Instead of acknowledging that AIG's massive exposure to subprime debt could easily place

9   the Company in a liquidity vise, AIG falsely portrayed itself to investors as a "very safe haven in

10   stormy times," with "active and strong risk management processes [that] helped contain the exposure"

11   and a "balance sheet [that] remains strong with the financial resources to weather continued

12   uncertainty."  With respect to the Company's $80 billion portfolio of toxic credit default swaps, AIG

13   falsely reassured investors that its exposure was *"remote," "not expected to be material,"* and that it

14   was *"highly unlikely"* the Company would be required *"to make any payments with respect to these*

15   *derivatives."*  To investors, the Company dismissed counterparties' collateral demands as nothing more

16   than "drive by[s]" that could be made to go away simply by contesting their valuation figures.  So

17   strong were the Company's assurances that, as credit markets began to collapse across the globe, AIG

18   issued an annual report declaring that unrealized losses would ultimately be reversed and *"[t]here is*

19   *currently no probably and reasonably estimable realized loss in this portfolio."*  AIG's false and

20   misleading statements deceived investors regarding the true extent of AIG's housing and subprime

21   related liabilities and the grave threats they posed to the Company, thereby propping up the price of

22   AIG's equity and debt securities.

23         20.    As the losses mounted on AIG's portfolios of swaps and mortgage-backed securities,

24   and demands for the posting (or return) of collateral grew, the Company was faced with a liquidity

25   crisis.  In May 2008, after reporting a quarterly net loss of approximately $8 billion – largely the result

26   of $15 billion in pre-tax charges relating to additional declines in the value of its portfolios of credit

27   default swaps and residential mortgage-backed securities – AIG announced a plan to raise $12.5

28   billion in new capital through a secondary offering of common stock and an initial offering of Equity

Units.  AIG publicly represented that the purpose of the capital raise was to "fortify" its "fortress balance sheet" and take advantage of opportunities in emerging markets.  In reality, the money was required to satisfy collateral calls.  By June of 2008, AIG's swap counterparties were demanding more than *$15 billion* in collateral.  Multiplying AIG's problems were attendant downgrades and negative warnings in the Company's credit rating (triggering calls for additional collateral), as well as the announcement of investigations by the SEC and U.S. Department of Justice ("DOJ") for materially overstating the value of the swap portfolio.

21.     In the first two weeks of September 2008, AIG's executives and Board of Directors examined the Company's balance sheet and found that it had only $9 billion in cash available, which was not nearly enough to meet liabilities coming due in the near future.  Indeed, AIG was facing collateral calls in excess of $23 billion – including over $7 billion from Goldman Sachs alone – and Standard & Poor's and Moody's had both warned of potential downgrades that would expose the Company to at least a further $10 billion in additional collateral calls.

22.     On Friday, September 12, 2008, AIG executives met with bankers to determine how much money the Company would need to remain solvent.  The outside advisors first determined that AIG would need *$20 billion*, which *doubled* the next day to $40 billion.  One day later, the bankers determined that AIG would need as much as *$20 billion more* to fill a crippling hole left by the Company's securities lending business.  On Saturday, September 13, 2008, AIG officials met with officials from the Federal Reserve Bank of New York.  At the meeting, AIG's Treasurer estimated that AIG and AIGFP had *"5-10 days before they are out of liquidity."*  AIG's fate was sealed on September 15, 2008, when all three major rating agencies downgraded AIG's credit rating below "AA" levels.  The following day, AIG received an unprecedented, $85 billion emergency bailout by the federal government.  Ultimately, the federal government would commit more than *$180 billion* in assistance to keep AIG afloat.

23.     The bad bets by AIGFP and AIG Investments exposed AIG and its investors to a tremendous unhedged concentration of risks.  These risks were of such an enormity as to jeopardize the entire Company and, critically, AIG lacked sufficient internal financial controls and procedures to responsibly deal with them.  The Company nonetheless falsely represented to investors that the

1  situation was under control, even as AIG faced a liquidity crisis and a failure that threatened to topple
2  the entire financial system.

3          24.     AIG's role in *"contributing significantly"* to the global financial crisis has been well-
4  documented. For example, as set forth in the 662-page FCIC Report:

> The Commission concludes AIG failed and was rescued by the government primarily
> because its enormous sales of credit default swaps were made without putting up initial
> collateral, setting aside capital reserves, or hedging its exposure—a profound failure in
> corporate governance, particularly its risk management practices.

8  The Commission found that in the run-up to the financial crisis, AIG accumulated a "one-half trillion
9  dollar position in credit risk through the OTC market without being required to post one dollar's worth
10  of initial collateral or making any other provision for loss." Then, "when the housing bubble popped
11  and crisis followed, [these] derivatives were in the center of the storm."

12          25.     Senior government officials have also issued scathing public rebukes of the Company.
13  For example, speaking on the March 15, 2009 broadcast of CBS's "60 Minutes," Federal Reserve
14  Chairman Bernanke stated:

> Of all the events and all of the things we've done in the last 18 months . . . the single one
> that makes me the angriest, that gives me the most angst, is the intervention with AIG.
> *Here was a company that made all kinds of unconscionable bets. Then, when those
> bets went wrong, they had a — we had a situation where the failure of that company
> would have brought down the financial system.*

19          The following day, President Barack Obama stated that, *"[t]his is a corporation that finds
20  itself in financial distress due to recklessness and greed."*

21          26.     As the truth emerged about AIG's portfolios of credit default swaps and mortgage-
22  backed securities, the resulting liabilities, and the fact that risks attendant to these portfolios had not
23  been managed or hedged, AIG common stock lost nearly all of its value, thus eliminating a critical
24  "debt cushion" for a variety of AIG bonds, notes, debentures and preferred securities. On September
25  17, 2008, the first trading day after the federal government's emergency bailout of the Company was
26  announced, AIG shares, which reached as high as $72.54 per share during the Offering Period, closed
27  at a mere $2.05 per share – a 93% fall in just six weeks, and a 97% drop overall. This represented an
28  astounding loss in market capitalization of nearly *$180 billion*. AIG's other publicly traded equity and

debt securities also suffered precipitous declines following their respective offerings, including each of the AIG securities that form the basis of Plaintiffs' claims. For instance, the price of AIG Equity Units issued on May 9, 2008, fell from a high of $77.85 per share on May 19, 2008, to $5.50 on September 17, 2008, a stunning *93% fall* in just four months. Likewise, AIG's 5.60% Notes, 5.85% Notes, Floating Rate Notes, 4.875% Debentures, and 6.25% Debentures (each defined below), each suffered losses of between *40% and 90%* as the truth emerged.

27. AIG has wiped out tens of billions of dollars in shareholder and bondholder value through its misconduct, and is liable for such damages under the federal securities laws. In this Complaint, Plaintiffs assert strict liability claims under Section 11 of the Securities Act to recover substantial damages incurred in connection with their investments in AIG securities.

III. JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, § 10, because this case is a cause not given by statute to other trial. This case is not removable. The claims asserted herein arise under Section 11 of the Securities Act, 15 U.S.C. §§ 77k. Jurisdiction is conferred pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, which explicitly states that "[e]xcept as provided in Section 16(c) of this title [15 U.S.C. § 77p(c)], no case arising under this Act and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) of the Securities Act refers to "covered class actions." This action asserts claims exclusively under the Securities Act and is not a "covered class action" within the meaning of Section 16(c). Therefore, pursuant to Section 22(a) of the Securities Act, this action is not removable to federal court.

29. This Court has personal jurisdiction over AIG because AIG conducted business in and/or resided in California at the time of the Offerings and the events described herein. AIG has sufficient contacts with California or property in California, or otherwise purposefully availed itself of the privilege of conducting business in California, including in connection with the Offerings, so as to render the California court system's exercise of jurisdiction over AIG in this case consistent with traditional notions of fair play and substantial justice.

30.     The amount in controversy exceeds the jurisdictional minimum of this Court, and the total amount of damages sought exceeds $25,000.

31.     Venue is proper in this Court because liabilities alleged herein arose in this County and injuries alleged herein occurred in this County.

## IV.   PARTIES

### A.   Plaintiffs

32.     PIMCO is a global investment solutions provider headquartered in Newport Beach, California, that manages investments for various entities and individuals, including public and private pension and retirement plans, companies, central banks, educational institutions, financial advisors, foundations, and endowments.  PIMCO brings this action for and on behalf of the following sixty three investment funds managed and/or advised by PIMCO in Orange County, California (collectively, the "PIMCO Funds"): PIMCO California Intermediate Municipal Bond Fund; PIMCO Funds: PIMCO California Short Duration Municipal Income Fund; PIMCO Combined Alpha Strategies Master Fund LDC; PIMCO Global Credit Opportunity Master Fund LDC; PIMCO Funds: Private Account Portfolio Series High Yield Portfolio; PIMCO Funds: Private Account Portfolio Series Investment Grade Corporate Portfolio; PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio; PIMCO Absolute Return Strategy II Trust, a Sub-Trust of PIMCO Cayman Unit Trust; PIMCO Absolute Return Strategy II Master Fund LDC; PIMCO Absolute Return Strategy III Master Fund LDC; PIMCO Absolute Return Strategy V Master Fund LDC; PIMCO Bermuda Trust:  PIMCO Euro Total Return Fund; PIMCO Bermuda Trust II:  PIMCO Bermuda Global Aggregate Ex-Japan Bond Fund (M); PIMCO Bermuda Trust II: PIMCO Bermuda U.S. High Yield Fund II (M); PIMCO Bermuda Trust II:  PIMCO Bermuda JGB Floater Foreign Strategy Fund; PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund; PIMCO Bermuda Trust IV: PIMCO Global High Yield Strategy Fund; PIMCO Bermuda Trust II: PIMCO Bermuda U.S. High Yield Fund (M); PIMCO Cayman Trust: PIMCO Cayman Australian Multi-Sector Fund; PIMCO Cayman Trust: PIMCO Cayman Foreign Bond Fund; PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Bond Fund II; PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Bond Fund; PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Bond Fund; PIMCO Cayman

Trust: PIMCO Cayman Global Aggregate Ex-Japan Income Fund; PIMCO Cayman Trust: PIMCO Cayman Global Credit Alpha Fund; PIMCO Cayman Trust: PIMCO Cayman Global Ex-Japan (Yen-Hedged) Bond Fund; PIMCO Cayman Trust - PIMCO Cayman Global High Income Fund; PIMCO Cayman Trust: PIMCO Cayman Global High Income (Yen-Hedged) Fund; PIMCO Cayman Trust: PIMCO Cayman U.S. Bond Fund; PIMCO Cayman Trust: PIMCO Cayman U.S. Total Return Fund; PIMCO Funds: PIMCO Convertible Fund; PIMCO Funds: PIMCO Floating Income Fund; PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged); PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged); PIMCO Funds: PIMCO Fundamental IndexPLUS® AR Fund; Equity Trustees Limited as responsible entity for PIMCO Global Bond Fund; PIMCO Funds: PIMCO Global Bond Fund (Unhedged); PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged); PIMCO Bermuda Trust IV: PIMCO Global Bond Strategy Fund; PIMCO Funds: PIMCO High Yield Fund; PIMCO Funds: PIMCO High Yield Municipal Bond Fund; PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund; PIMCO Funds: PIMCO Long Duration Total Return Fund; PIMCO Funds: PIMCO Mortgage-Backed Securities Fund; PIMCO Funds: PIMCO Real Return Asset Fund; PIMCO Funds: PIMCO Real Return Fund; PIMCO Funds: PIMCO Small Cap StocksPLUS® AR Strategy Fund; PIMCO Funds: PIMCO StocksPLUS® Long Duration Fund; PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund; PIMCO Funds: PIMCO StocksPLUS® AR Short Strategy Fund; PIMCO Funds: PIMCO Total Return Fund; PIMCO Variable Insurance Trust: PIMCO Global Bond Portfolio (Unhedged); PIMCO Variable Insurance Trust: PIMCO High Yield Portfolio; PIMCO Funds: Global Investors Series plc, Global Bond Ex-US Fund; PIMCO Funds: Global Investors Series plc, Global Bond Fund; PIMCO Funds: Global Investors Series plc, Global High Yield Bond Fund; PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund; PIMCO Funds: Global Investors Series plc, High Yield Bond Fund; Fixed Income SHares: Series C; Fixed Income SHares: Series M; PIMCO Corporate & Income Opportunity Fund; PIMCO Corporate & Income Strategy Fund; and PIMCO High Income Fund.

33.    The PIMCO Funds purchased the following AIG securities pursuant and/or traceable to the Registration Statement for the Offerings of such securities, and were damaged thereby: (1) Equity units (CUSIP No. 026874115) ("Equity Units"); (2) 5.60% Medium-Term Notes, Series G, issued

October 18, 2006 (CUSIP No. 02687QBC1) ("5.60% Notes"); (3) 5.85% Medium-Term Notes, Series G, issued December 7, 2007 (CUSIP No. 02687QDG0) ("5.85% Notes"); (4) Floating Rate Medium-Term Notes, Series MP, issued October 18, 2006 (CUSIP No. 02687QBD9) ("Floating Rate Notes"); (5) 4.875% Series A-3 Junior Subordinated Debentures issued March 15, 2007 (CUSIP No. 026874BG1) ("4.875% Debentures"); and (6) 6.25% Series A-1 Junior Subordinated Debentures issued March 13, 2007 (CUSIP No. 026874BE6) ("6.25% Debentures").

**B.**   **Defendant**

34.    Defendant AIG is a Delaware corporation with its principal executive offices located in New York, New York.  AIG is an international insurance and financial services organization serving commercial, institutional and individual customers in numerous countries.  During the Offering Period, AIG equity and debt securities were listed and traded on the NYSE.  As of September 16, 2008, AIG had approximately 2.7 billion shares of common stock outstanding, and approximately $50 billion worth of debt securities outstanding.

35.    During the Offering Period, AIG's general insurance business was concentrated in the State of California, including all lines of commercial property and casualty insurance, reinsurance, workers compensation, mortgage guaranty, and various personal lines of insurance.  Additionally, the mortgage loans underlying AIG's massive portfolio of credit default swaps ("CDS") and residential mortgage-backed securities ("RMBS") were concentrated in California.  To sell the securities at issue in this case, AIG used underwriters who had their principal place of business in California and/or who directed their sales of the securities at California residents.  For instance, AIG used Banc of America Securities LLC, which is incorporated and headquartered in California, to market and sell the 6.25% Debentures, 5.85% Notes, and Equity Units at issue in this litigation, including to California residents. Other underwriters used by AIG in connection with the Offerings also directed their marketing and sales of the securities at issue in this litigation to California residents, and sold these securities to California residents.

**C.**   **Relevant Non-Parties**

36.    Martin J. Sullivan ("Sullivan") was the President and Chief Executive Officer ("CEO") of AIG from March 2005 until his ouster on June 15, 2008.  In addition, Sullivan served as a director

of the Company from May 2002 until June 15, 2008. Sullivan signed the 2003, 2007, and 2008 Registration Statements at issue herein, and signed and certified AIG's annual reports for 2005, 2006 and 2007, and AIG's interim quarterly reports from the first quarter of 2006 through the first quarter of 2008, which were filed with the SEC on Forms 10-K and 10-Q, respectively, and incorporated in the Offering Materials.

37.   Steven J. Bensinger ("Bensinger") was an Executive Vice President and the Chief Financial Officer ("CFO") of AIG from March 2005 until October 2008. In May 2008, AIG announced that Bensinger had been appointed Vice Chairman-Financial Services of AIG. Bensinger resigned from AIG on October 9, 2008. Bensinger signed the 2007 and 2008 Registration Statements, and signed and certified AIG's annual reports for 2005, 2006 and 2007, and AIG's interim quarterly reports from the first quarter of 2006 through the first quarter of 2008, which were filed with the SEC on Forms 10-K and 10-Q, respectively, and incorporated in the Offering Materials.

38.   Joseph Cassano ("Cassano") began working at AIGFP in 1987 and was the President of AIGFP from 2001 until he was forced to resign on February 29, 2008 – the day after AIG posted its worst quarterly loss in the Company's 89-year history due in large part to substantial losses suffered by AIGFP. Cassano's retirement was made effective March 31, 2008. Cassano was retained by AIG as a consultant through the end of 2008 at a salary of $1 million per month. AIG terminated Cassano's exorbitant consulting contract on October 6, 2008, the day before the congressional hearing on AIG – as news of it came to light.

39.   Andrew Forster ("Forster") was an Executive Vice President of Asset Trading & Credit Products ("Assets/Credit") of AIGFP, in which capacity he was responsible for running AIGFP's global credit division in charge of selling the CDS contracts at issue herein.

40.   Alan Frost ("Frost") was a marketing executive and an Executive Vice President of AIGFP, and reported directly to Cassano. According to the FCIC Report, Frost was the "principal swap salesman" of AIGFP and "the AIG salesman primarily responsible for the company's booming credit default swap business."

41.   David L. Herzog ("Herzog") was a Senior Vice President, Comptroller and the Principal Accounting Officer of AIG from June 2005 until October 2008. In October 2008, Herzog

1    replaced Bensinger as CFO of AIG and continues to serve in that capacity. Herzog signed the 2007

2    and 2008 Registration Statements.

3        42.    Robert Lewis ("Lewis") was a Senior Vice President and Chief Risk Officer of AIG

4    from 2004 until he left AIG in October 2010. Lewis signed off on each of the CDS contracts at issue

5    herein and participated in investor presentations concerning the Company's exposure to mortgage-

6    related assets.

7        43.    Robert B. Willumstad ("Willumstad") was a member of the Board of Directors from

8    1996 to 2008. In 2006, Willumstad became Chairman of the Board of Directors. In his capacity as

9    Chairman, Willumstad served as an *ex officio* member of each of the standing committees of the

10   Board. Willumstad also served as AIG's Chief Executive Officer from June 15, 2008 until September

11   2008. Willumstad signed the 2007 and 2008 Registration Statements and AIG's annual reports for

12   2005, 2006 and 2007, which were filed on Forms 10-K with the SEC and incorporated in the Offering

13   Materials.

14       44.    Sullivan, Bensinger, Cassano, Forster, Frost, Herzog, Lewis, and Willumstad are

15   referred to collectively herein as the "AIG Executives."

16       45.    As alleged herein, the AIG Executives had direct involvement in the everyday business

17   of AIG or AIGFP, including the content, approval, and dissemination of the Registration Statements

18   and SEC filings that Plaintiffs allege were false and misleading.

19   V.    **BACKGROUND**

20       A.    <u>History Of AIG And AIGFP</u>

21       46.    AIG traces its roots to a general insurance company founded in Shanghai, China in

22   1919. The Company moved its headquarters to New York in 1939 after Mao Zedong and the

23   communist party rose to power in China. After World War II, AIG resumed or began operations in

24   markets worldwide, including in Europe, Australia, Latin America, the Middle East, and across Asia.

25   By 1962, the Company had shifted its focus from personal insurance to corporate insurance, and

26   formed AIG as a unifying umbrella organization for its global operations. In 1969, under longtime

27   chairman and CEO Hank Greenberg's ("Greenberg") leadership, AIG became a publicly held company

28   and quickly grew into one of the world's largest insurance and financial services companies. As of

1  2004, AIG had $850 billion in assets, 116,000 employees in 130 countries, and over 200 subsidiaries.
2  The Company regularly received the highest ratings from credit rating agencies.  Before its collapse in
3  2008, AIG was the largest insurance company in the world by market capitalization.

4     47.    In 1987, AIG branched out of its core insurance business by entering into a joint
5  venture with three traders from the defunct Wall Street investment bank, Drexel Burnham Lambert.
6  The joint venture, called AIG Financial Products, focused on creating complex derivative trades that
7  took advantage of AIG's AAA credit rating.  In particular, AIGFP created innovative "swap" contracts
8  that enabled clients (or "counterparties") to shift various types of financial risk in exchange for
9  premiums.  For example, a company that had sales in foreign countries might wish to eliminate the
10  risk of fluctuations in currency values by engaging in an exchange rate swap, which would guarantee it
11  a constant value for the currency received as a result of foreign sales transactions.

12     48.    Using statistical and mathematical models, AIG Financial Services identified attractive
13  financial transactions and used various hedging techniques in an attempt to minimize or eliminate the
14  joint venture's actual economic risk from the swap transactions.  Each transaction was carefully
15  scrutinized by senior management and subjected to rigorous review.  The joint venture was highly
16  successful, generating tens of millions of dollars in revenues per month, and soon opened offices in
17  London and Tokyo.  Between 1987 and 1992, AIGFP generated more than $1 billion in profits.  In
18  1993, the joint venture became a division of AIG and was renamed AIGFP.

19     49.    AIGFP's revenues and profits continued to increase.  By 1995, AIGFP was generating
20  nearly $150 million in profits per year.  By 1998, AIGFP's annual profits soared to $323 million on
21  annual revenues of $550 million.

22     50.    In 1998, AIGFP began writing a new type of financial insurance that came to be known
23  as a "credit default swap" or "CDS."  In these early CDS contracts, in exchange for a stream of
24  premium-like payments from its clients, AIGFP agreed to accept the risk of default on certain
25  corporate debt instruments.  If the collateral underlying the debt securities failed to perform as
26  expected and did not generate sufficient cash to allow the securities to meet their interest payment
27  obligations, AIGFP would, in effect, buy the securities from the swap counterparty at the initial
28  offering price, thereby assuming the risk that the securities would not perform.

-17-
COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 35

51.     CDSs are often compared to insurance, but when an insurance company sells a policy, regulations require it to set aside a reserve in case of a loss.  Because CDSs were not regulated insurance contracts, no such requirement was applicable.  Instead, AIGFP capitalized on the sterling credit rating of its parent AIG, which guaranteed the deals. Relying on AIG's guarantee, AIGFP grew to become a major over-the-counter derivatives dealer, eventually having a portfolio of $2.7 trillion in notional amount.  Among other derivatives activities, AIGFP began offering CDS to corporate clients, which used the contracts as a way to hedge the risks they faced in owning securities.

52.     Though the downside risk in a CDS is often staggering given the amount of debt insured, AIGFP determined that the likelihood of its having to pay was so remote that it failed to make any provisions whatsoever for declines in value or unrealized losses.  Accordingly, rather than posting collateral when it wrote the contracts, AIG agreed to post collateral only if the value of the underlying securities declined, or if AIG's long-term debt ratings were downgraded.

53.     Furthermore, the type of securities that AIGFP insured through CDS contracts materially changed over time.  Initially, AIGFP insured debt issued by investment-grade companies in different countries and different industries.  In the early 2000s, however, AIGFP began insuring consumer credit risk, including credit card debt, student loans, auto loans, and prime loans.  Beginning at the end of 2004, AIGFP changed the CDS model even further by accepting highly concentrated exposure to the U.S. subprime market. According to Michael Lewis's book on the financial crisis, *The Big Short*, by the end of 2004, student loans and auto loans were being replaced "with bigger piles consisting of nothing but U.S. subprime mortgage loans." As Lewis reported:

> The deals, by all accounts, were simply rubber-stamped inside AIGFP, and then again by AIG brass.  Everyone concerned apparently assumed they were being paid insurance premiums to take basically the same sort of risk they had been taking for nearly a decade. They weren't. They were now, in effect, *the world's biggest owners of subprime mortgage bonds. . . .* In a financial system that was rapidly generating complicated risks, AIGFP became a *huge swallower of those risks.*

**B.    AIG's Prior Accounting Scandals**

54.     Prior to 2005, AIG was plagued by a series of accounting scandals that required AIG to pay millions in fines.  In 2004 and 2005, for example, the SEC, DOJ, and the New York Attorney General each launched investigations into AIG's accounting and financial reporting practices.  The

Company paid $80 million in fines and forfeited $46 million in fees in connection with a 2001 transaction involving PNC Financial Services Group, in which AIG helped PNC disguise losses through the establishment of a special purposes entity.  A second scandal involved 2000 and 2001 sham transactions with Gen Re, in which AIG improperly booked a $500 million loan as insurance premiums.

55.     Following these investigations, AIG restated its financial results for each of the years 2000 through 2004, and in March 2005 Greenberg was forced to resign.  The Company admitted that it had overstated its income by nearly $4 billion as a result of inadequate internal controls.  In the restatement, AIG acknowledged not only that its accounting for certain transactions had been improper, but also that the purpose behind certain transactions was to improve financial results, conceding that certain transactions "appear to have had the purpose of achieving an accounting result that would enhance measures important to the financial community and that may have involved documentation that did not accurately reflect the true nature of the arrangements . . . [and] misrepresentations to members of management, regulators and AIG's independent auditors."

C.     <u>AIG Turns To Exotic Securities As A Result Of Its Ratings Downgrade</u>

56.     Sullivan took Greenberg's place as AIG's CEO in March 2005.  Within days after the announcement of Greenberg's departure, Fitch Ratings, followed soon thereafter by Moody's and Standard & Poor's, lowered AIG's rating from its exalted AAA status.  AIG's lowered credit rating was a blow to AIGFP, which relied on the holding company's sterling credit to attract swap business.

57.     AIG's ratings downgrade had serious consequences not only for AIG, but also for securities "wrapped" in AIG insurance.  Because AIG guaranteed the securities it serviced against default, the ratings agencies would rate the protected securities at the same level as AIG.  When AIG lost its AAA rating, AIGFP's financial products were similarly negatively impacted.

58.     As a result of the downgrade, AIGFP initially was unable to grow its corporate debt swap business at the same pace it maintained prior to 2005.  However, one source of swap business still available to AIGFP despite its ratings downgrade were CDSs on securitized consumer debt, particularly high-risk consumer debt, such as subprime mortgages.  Between 1998 and February 2005, AIGFP wrote approximately 200 CDS contracts.  In just ten months, however, from March to

December 2005, AIGFP wrote a total of approximately 220 new CDS contracts. Because the majority of these new CDS contracts related to CDOs, and because the CDOs referred primarily to mortgages, the net effect was to dramatically increase AIG's exposure to the U.S. residential mortgage market and specifically subprime mortgage loans. In 2005, AIG underwrote approximately *$80 billion* in CDOs, most of which were backed by subprime mortgages.

59.     As described above, CDS can function much like insurance policies for debt securities. In exchange for premiums paid over a period of time, the issuer of the CDS is obligated to pay the counterparty the par value of the referenced debt security in the event of default. As originally conceived, CDS were written on securities owned by the counterparty, which used the CDS as a way of hedging the risk in owning the securities. These CDS operated like put options, permitting the counterparty to force the swap issuer to purchase the underlying security in the event of default. Later, however, AIG began writing CDS on securities that were not owned by the counterparty, but merely "referenced" by the swap contract. Unlike traditional insurance, the referenced securities could be owned by a third party, who may be unrelated to either of the swap counterparties. These so-called "naked" CDS provided additional exposure to the performance of the referenced security.

60.     The CDS written by AIGFP primarily referenced CDOs. These CDOs consisted of asset-backed securities purchased by a CDO "manager" with funds supplied by an underwriter, typically a large investment bank or commercial bank. The underwriter obtained the funds it provided to the manager by structuring the CDO in layers or "tranches" and selling securities backed by a particular tranche of the CDO.

61.     The CDOs were designed to create high quality, highly-rated securities out of lower-rated collateral by allocating risk among a hierarchy of securities purchasers. The lowest tranche, or "equity" portion of the CDO, bore the entire risk of default for a certain percentage of the collateral in the pool. Once the amount of CDO collateral in default exceeded a defined percentage, the next lowest tranche bore the risk of the next default, again up to a defined percentage of the pool, and so on. By allocating the risk among the tranches in this manner, each tranche had its own risk profile, with each more senior tranche being less risky than those subordinated to it. Each tranche was purportedly designed to pay an interest rate commensurate with the level of risk assigned to it, which permitted

each tranche to be rated independently.  An investor in a CDO could choose from among differently rated securities issued by the CDO, each paying an interest rate purportedly commensurate with the risk level the investor would take on.

62.     When the stream of new subprime mortgages was insufficient to generate new RMBS to package together into CDOs, managers often turned to issuing "synthetic" CDOs, where the underlying assets are simply tranches of other CDOs.

63.     Because counterparties did not have to own the CDO on which they purchased a CDS, AIG was able to write multiple "naked" swaps insuring against the default of the same referenced CDO.  As *Time* magazine observed in an article published on March 19, 2009, entitled "How AIG Became Too Big To Fail," this practice resulted in AIG taking on "colossal" risk on a "systemic" basis:

> Although a CDS is, in its simplest form, an insurance policy, AIG was selling something far more exotic. Say you buy a house and insure it. The insurer doesn't offer the same policy on your house to everyone else in the neighborhood; if it did and your house went up in flames, the insurer could get wiped out. In its CDS contracts, though, AIG wrote multiple insurance policies covering the same underlying package of increasingly toxic assets. *In essence, it was underwriting systemic risk. This is the opposite of what insurance companies are supposed to do: diversify risk across the universe of policyholders.* "One thing about the insurance model: it relies on diversification as its means to exist," says a top exec at an AIG competitor. "If an insurance company plays in a field where they underwrite systemic risk, that's a totally different experience." Is it ever. Insurance companies can handle catastrophic risk but not systemic risk. That's why you can buy hurricane insurance from private companies but not terrorism insurance. Only a government can take on that risk. *At its most basic, AIG took on colossal risks that it could not afford.*

64.     In 2005, AIG dramatically expanded its CDS business on CDOs.  According to Greenberg, between the time AIGFP began writing CDSs in 1998 and the time he left AIG in March of 2005, AIGFP had written a total of about $200 billion in CDSs, which were housed in approximately 200 CDS contracts.  Most of these CDS contracts were based on underlying corporate debt.  From March to December 2005, AIGFP wrote approximately 220 new CDS contracts, the bulk of which related to CDOs.  Because the CDOs referred primarily to mortgages, the effect of this expansion was to increase AIG's exposure to the U.S. residential mortgage market dramatically – and specifically, the subprime mortgage market.  In 2005, AIG was obligated to cover approximately $80 billion in CDOs, most of which were backed by subprime mortgages.

65.     Despite the substantial risk shifting involved in the issuance of CDS, the swaps are not regulated insurance contracts and the swap issuer is not required to put aside reserves in case of a loss. In 2000, Congress reinforced the unregulated nature of CDS by passing the Commodity Futures Modernization Act, which, among other things, pre-empted state gaming laws from regulating CDSs and exempted them from the definition of a "security" under SEC regulations. Consequently, AIG was not required to put aside capital reserves as a cushion for the CDSs it was selling. As the former head of AIGFP's North American corporate credit derivative portfolio would later testify to the FCIC, "'*rule Number 1 at AIG FP*' was to *never post collateral*. This was particularly important in the credit default swap business, [the former AIGFP executive] said, because it was the '*only unhedged business that AIG ran*.'"

66.     In his March 3, 2009 testimony before the House Ways and Means Committee, U.S. Treasury Secretary Timothy Geithner highlighted the lack of regulatory oversight of AIGFP's CDS business. "AIG is a huge, complex, global insurance company attached to a very complicated investment bank *hedge fund that was allowed to build up without any adult supervision*," the Treasury Secretary testified. The same sentiment was expressed by Federal Reserve Chairman Ben Bernanke that day in testimony before the Senate Budget Committee: "AIG exploited a huge gap in the regulatory system . . . *this was a hedge fund basically that was attached to a large and stable insurance company.*"

67.     The upsurge in AIG's CDS business in 2005 was largely driven by the rapid expansion of the housing market and the increased demand for mortgage financing, which was spurred by interest rates that had fallen to their lowest levels in more than 40 years. The innovation of structured financial products like CDOs, where highly rated and seemingly low risk financial products that paid relatively high interest rates were created from poorer quality, higher risk collateral, generated massive amounts of capital available in the financial markets. Moreover, because the booming securitization industry allowed the risk of default on mortgage loans to be passed along to investors, mortgage lenders had a powerful incentive to relax underwriting standards, which enabled them to seize upon the greater availability of capital and the high demand caused by rapidly increasing housing prices to churn out greater and greater numbers of mortgages – especially to subprime borrowers.

68.     The *Wall Street Journal* has summarized the mortgage securitization process as follows:



Follow the Mortgage  What happens to your mortgage after you sign on the dotted line

D.     **AIGFP's Decision To Stop Writing New CDSs**

69.     According to the FCIC Report, during the spring of 2005, certain AIGFP executives began to question the surge in volume in the Company's credit default business.  The executives were particularly concerned with the underlying subprime mortgage market.   Included among these executives was Forster, AIGFP's London-based head of Asset Finance.  In private conversations and in emails, Forster tried to persuade Cassano that the U.S. subprime mortgage market was a big problem that was only going to get worse.  On July 21, 2005, Forster arranged a conference call with Frost (who reported directly to Cassano), Professor Gary Gorton ("Gorton"), an outside consultant used by AIGFP to construct the model used to manage CDS risk, and others to discuss these concerns.  Prior to the conference call, Forster circulated an email framing possible agenda topics, which noted:  *"We are taking on a huge amount of subprime mortgage exposure here and it is clearly a fast evolving . . . Everyone we have talked to says they are worried about deals with huge amounts of [high-risk mortgage] exposure yet I regularly see deals with 80% [high-risk mortgage] concentrations currently.  Are these really the same risk as other deals?"*  In testimony before the FCIC, Greenberg stated succinctly that "it would have been logical for AIG to have exited or reduced its business of writing credit default swaps."   Instead, AIGFP doubled-down on its subprime bets by writing an additional $36 billion in CDS on CDOs in 2005, and, according to the FCIC Report, "continued to

-23-
COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933    Exhibit A Page 41

work on deals that were in the pipeline" well into 2006, including, for example, CDOs backed by over *90% subprime assets.*

70.     AIG also received warnings from outside sources about the unacceptable risks posed by its CDS contracts on subprime mortgage-backed CDOs.  According to *The Big Short*, in late 2005 a Deutsche Bank trader named Greg Lippmann, who had built up a large portfolio of CDSs, gave a presentation called "Shorting Mezzanine Home Equity Tranches" to Tom Fewings, an AIGFP employee who reported directly to Cassano.  This presentation discussed in explicit detail the acute risks of CDS referencing subprime assets.  Lippmann hoped that by convincing AIGFP to stop selling CDS contracts on CDOs, he could hasten a sharp decline in CDO values and thereby increase the value of his short positions.

71.     By late 2005, other units of AIG also recognized that subprime mortgage lending was out of control and that the Company's increased exposure to the subprime mortgage market carried greater risks than previously realized.  Executives at an AIG division in the mortgage lending business called American General Financial Services ("American General") had become alarmed by the rapidly growing use of subprime mortgages in the industry and decided to stop approving subprime loans.  According to *The New Republic,* and based upon its interviews with AIG executives, "word spread from American General to AIG-FP that the subprime business was a *minefield.*"

72.     In the fall of 2005, Frost, the AIGFP executive charged with marketing CDSs and serving as a liaison with Wall Street investment banks, was promoted.  Eugene Park ("Park"), head of AIGFP's North American corporate credit derivative portfolio, was initially offered Frost's position.  After analyzing AIGFP's CDS portfolio, and becoming shocked to find that the supposedly diversified piles of consumer loans now consisted almost entirely of U.S. subprime mortgages, Park "*wanted no part of it*" and declined the offer, as reported in *The Big Short.*  According to *The Washington Post,* which interviewed Park and other AIGFP personnel in connection with a series it ran in late December 2008 on AIG's collapse, Park had examined the annual report of a company involved in the subprime business and, as related by Park's colleagues, Park told them he "was stunned" by what he found.  Park concluded that the subprime loans underlying many CDOs formed too large a part of the packaged debt, increasing the risk to unacceptable levels.  He further concluded that the underwriting

1   process had been so frighteningly poor that the subprime loans could default at any time, regardless of

2   geographic area.   Thus, one of the factors cited by AIG as mitigating risk - that the CDOs were

3   "diversified" or "multi-sector" CDOs insofar as they pooled loans from different geographic areas -

4   was illusory.   According to *The Washington Post*, Park concluded that if the housing bubble burst, the

5   subprime loan market would immediately collapse.

6       73.     According to *The Big Short*, Park "put two and two together" and recognized that "if

7   U.S. homeowners began to default in sharply greater numbers, *AIG didn't have anywhere near the*

8   *capital required to cover the losses.*"   After bringing this up at a meeting, however, Park was "*hauled*

9   *into a separate room*" and "*screamed at*" by Cassano, as Lewis reported.   Only later, after a series of

10   meetings and conversations with colleagues over the course of several weeks, did Cassano instruct

11   AIGFP executives to further analyze the subprime market and the risks it posed to AIG.   After further

12   analyzing AIG's subprime market exposure, senior executives at AIGFP confirmed that their risk

13   model for CDSs failed to adequately account for the large amounts of subprime mortgage debt

14   underlying the insured CDOs.   In addition, according to Professor Gorton (the developer of the

15   model), AIGFP executives realized that "the model was not going to be able to handle declining

16   underwriting standards."   Moreover, as Lewis reported, after meeting with "all the big Wall Street

17   firms" (including Deutsche Bank, Goldman Sachs, and others) to "discuss the logic of their deals" –

18   *i.e.*, "how a bunch of shaky loans could be transformed into triple-A-rated bonds" – Cassano, Park and

19   AIGFP traders "were shocked by how little thought or analysis seemed to underpin the subprime

20   mortgage machine: *It was simply a bet that home prices would never fall.*"

21       74.     Accordingly, Cassano decided in December 2005 to stop writing new CDSs for CDOs

22   backed by subprime mortgage debt.   As Professor Gorton explained in testimony to the FCIC, in late

23   2005, AIGFP concluded that the assets securitized in the CDS portfolio, which were low quality given

24   the declining underwriting standards, would likely default in a systemic rather than isolated manner.

25   The model AIGFP used did not support continued reliance on the subprime mortgage market given

26   these declining standards and the systemic risk they presented.   As reported in *The Big Short*, Park

27   asked Gorton to estimate the percentage of subprime mortgages in the supposedly diversified bundles

28   of loans that AIGFP was insuring.   Gorton guessed that the bundles consisted of no more than 10%

subprime loans, when the true figure was around *95%*.  According to the FCIC Report, on February 28, 2006, Park drafted an email memorandum that would be sent to dealers summarizing AIG's new thinking on the issue: "We feel that the CDO of ABS [asset-backed securities] market has increasingly become less diverse over the past year or so and is *currently at a state where deals are almost entirely reliant on subprime/non prime residential mortgage collateral. . . ."*

75.     Although the decision was made at the end of 2005 to stop writing CDS contracts referencing subprime mortgage assets, AIGFP *continued* to work on deals that were in the pipeline and "completed 37 deals between September 2005 and July 2006—one of them on a CDO backed by *93% subprime assets,*" according to the FCIC Report.

76.     AIG did not publicly disclose its decision to stop underwriting CDS providing protection on subprime-backed CDOs until August 2007.  By that time, the market was highly concerned about the impact subprime mortgage-backed debt was having on large financial institutions and was demanding information about the composition of these institutions' asset portfolios.  Even then, however, as discussed below, AIG failed to disclose significant facts about why AIGFP decided to cease writing such CDS contracts, and thereby misled the market about the actual risks to AIG's overall financial condition posed by its existent massive subprime-linked CDS portfolio.

E.     **AIG's Massive Exposure To Subprime Mortgages Through Its CDS Portfolio**

77.     Despite AIGFP's decision to stop writing new CDS on subprime-related assets, it did not attempt to extricate itself from the CDS contracts it had already written, which remained on its books and imposed continuing obligations on AIG for the length of the contracts.  The CDS that AIG had insured, and would continue to insure, posed three types of principal risk to the Company: credit risk, collateral risk, and valuation risk.

78.     The par value, or "notional" amount of the CDOs insured by the CDS written by AIGFP was significant because, if any of these CDOs defaulted, AIG could be obligated to pay up to the full notional amount of the defaulted CDO, in effect purchasing the CDO at full value.  However, as noted, "credit risk" or the risk of default was only one type of significant risk created by AIG's CDS portfolio.

79. Next, because a CDS contract is a form of guarantee, which, under certain conditions can require the swap issuer to pay the counterparty up to the notional amount of the CDO, the swap contracts often contained provisions requiring the swap issuer to post collateral as an assurance that the issuer of the swap will be able to perform its obligation in the event of a default. Due to AIG's sterling debt rating, however, AIG could write a virtually unlimited number of CDSs – and issue similar types of financial instruments – without having to post collateral. AIGFP's phenomenal growth from a fledgling operation when it was founded in 1987 to a multi-billion dollar operation by 2005 was due, in large measure, to AIGFP's ability to draw on the AAA credit rating of the AIG holding company and thus avoid the expense and liquidity constraints faced by less highly rated competitors. Nevertheless, as noted in the FCIC Report, it was "standard" for AIGFP's CDS contracts to contain a provision requiring AIGFP to post collateral if AIG's credit rating fell, or if certain other events occurred that might call into question AIGFP's ability to perform its obligations.

80. Indeed, as AIG and AIGFP senior executives were aware, and as detailed in the FCIC Report, AIGFP's risk model for CDS utilized data relevant to predicting the likelihood of default, but was not able to assess the risks associated with potential downgrades of AIG, downgrades in the ratings of counterparties, or declines in CDO valuations or ratings, any and all of which were contingencies that could be used by CDS counterparties to require AIG to post collateral on their CDS contracts.

81. Moreover, as detailed in the FCIC Report, the posting provisions in many of the CDS contracts written by AIGFP designated the counterparty bank as the calculation agent for determining the value of the referenced CDO for purposes of ascertaining when collateral had to be posted. Thus, the banks were empowered to determine the market value of CDO-referenced assets and demand collateral from AIG. However, that feature of the Company's CDS contracts was never made known to investors - even when AIG and AIGFP executives spoke of receiving collateral calls from CDS counterparties, and later, when AIGFP executives criticized the use of the Government bailout money to post collateral on AIGFP's multi-sector CDOs.

82. Even though AIG decided to stop writing new CDS on subprime-backed CDOs by the end of 2005, approximately half of the CDS of this type previously written contained provisions

permitting the manager of the CDO to substitute new collateral for RMBSs in which the underlying mortgages had been paid down or refinanced. This enabled the manager to ensure a sufficient level of cash flow to service the securities backed by the CDO. However, as underwriting standards in the home mortgage origination industry continued to deteriorate during 2006 and 2007, and mortgage companies increasingly promoted risky types of mortgages such as adjustable rate mortgages ("ARMs"), many of the CDOs insured by CDSs with AIGFP became more risky over time than they were when the CDS was written.

83.   In addition to credit risk and collateral risk, the CDS portfolio presented a third significant financial risk to AIG – valuation risk. A decline in the value of the CDO securities can occur even though the collateral underlying the CDO securities has not defaulted due to concern in the market about the *possibility* of such a default. The percentage of collateral in the pool that must default before any loss is borne by the super senior tranche of a CDO is called the "attachment point" for that tranche. The higher the amount of default in the pool, and the closer that default level gets to the attachment point, the more the market will discount the value of the super senior tranche due to the increasing possibility of the super senior tranche defaulting.

84.   As discussed in more detail below, except in circumstances not relevant here, Generally Accepted Accounting Principles ("GAAP") requires a writer of a CDS to carry the value of the swaps on its balance sheet at "fair value." Thus, GAAP required AIG to reassess the value of its CDS on a regular basis and, when their value changed materially, AIG had to reflect that change by adjusting its balance sheet and income statement. The fair value of the CDS written on CDOs was determined by the value of the CDOs themselves, because of the possibility that AIG would have to swap positions with the holder of the CDO in the event of default. Accordingly, AIG was required to value the CDS as though it represented a contingent interest in the CDO itself. Any decline in the fair value of the CDO represented a decline in the value of AIG's contingent interest, and AIG was required to record this adjustment as a charge against income on its financial statements.

85.   Compounding these interrelated risks was the fact that, unlike traditional insurance, it was not necessary for a swap counterparty to own the underlying CDO on which it purchased a CDS. Instead, as discussed above, multiple CDSs could be, and were, underwritten by AIG insuring against

the default of the same "referenced" CDO, *i.e.*, the same underlying package of increasingly toxic assets. Moreover, when the flow of new subprime mortgages was insufficient to generate new RMBSs to package together into new CDOs, securities issued by *other* CDOs were used as backing for new "synthetic" CDOs. These practices were the opposite of what insurance companies are supposed to do: diversify risk across all policyholders. At bottom, AIG was underwriting systemic risk that it could not afford.

86.     Moreover, although it is possible (and prudent) for a financial institution to hedge the risk involved in writing CDSs, AIG did not hedge the risks created by those that it wrote on subprime-backed CDOs. As Park explained to the FCIC, AIG saw hedging as "unnecessary." Forster confirmed AIG's corporate view regarding hedging at a May 2007 investor conference, where he told investors that AIGFP did not have to hedge its CDS portfolio because of the "conservatism" in the way it constructed the portfolio, that AIGFP could handle "the worst recession I can imagine," and that "it's actually fairly easy for us to hedge any of the risks that we perceive."

87.     According to the FCIC Report, attempts to hedge AIG's exposure to CDSs were consistently overruled by Forster and Cassano. For example, Park told the FCIC that AIG executives at one point considered purchasing a hedge on its CDSs from UBS, but that Forster rejected the idea because it would cost more than the fees that AIGFP was receiving to write the CDS protection. Similarly, Park told the FCIC that Cassano put a halt to a $150 million hedge, in which AIG had taken a short position in the ABX index – created to track the value of CDSs issued on securities backed by subprime mortgages. As Park explained to the FCIC, "Joe stopped that because after we put on the first 150 . . . the market moved against us . . . we were losing money on the 150 million . . . . Joe said, 'You know, I don't think the world is going to blow up . . . *I don't want to spend that money. Stop it.*'" Thus, while AIGFP was generating millions in profits from its CDS business, AIG was potentially exposed to losing the full notional amount of the multi-sector CDOs it was insuring - approximately $80 billion, of which at least $63 billion was backed by subprime mortgage debt.

F.    **AIG Chases Profits Through Risky Investments In Its Securities Lending Program**

88.    At the same time that AIGFP ceased its CDS business on securitized subprime mortgage loans, a different unit of AIG, AIG Investments, sought to boost its profits by *increasing* its exposure to the U.S. residential housing and subprime mortgage market.

89.    Through AIG's securities lending business, AIG Investments invested heavily in RMBS, including risky subprime mortgage debt.  In this business line, AIG lent securities to banks and brokerage firms in exchange for cash collateral, which AIG poured into RMBS. Ordinarily, a securities lender (like AIG Investments) would invest the collateral it received from its borrowers in conventional fixed-income investments such as Treasury bonds and high grade commercial paper. However, AIG made the unusual decision to invest up to 75% of this collateral in RMBS by late 2005. As *Time* magazine reported in a March 19, 2009 article, the securities lending program made investments in "*crap*":

> Securities-lending is supposed to be a sort of Christmas club of high finance. Companies like insurers, which own tons of equities and Treasury bonds that they are holding long term, lend them out short term, often overnight, to borrowers who need the shares to fulfill other commitments. For instance, if hedge funds want to sell shares short, they borrow them, putting up cash collateral that includes a small spread to the lender. Typically, the owner of the shares takes that collateral and invests it in something with low risk and of short duration, like commercial paper. The lender is exposed to some risk, but it usually isn't catastrophic. However, AIG took the collateral and invested in longer-term, higher-risk mortgage- and asset-backed securities. "Crap," as a portfolio lending expert describes them. When those securities crashed in value, so did AIG.

90.    Win J. Neuger, the former head of AIG's asset management unit who also served as AIG's Chief Investment Officer until January 2009, and AIG's Chief Credit Officer, Kevin McGinn, loosened the guidelines for AIG's securities lending program and increased the total amount invested. A February 5, 2009 *Wall Street Journal* article entitled, "An AIG Unit's Quest to Juice Profit: Securities-Lending Business Made Risky Bets. They Backfired on Insurer," explained how Neuger set a goal in 2005 for a massive expansion of this business.  As stated in the article, "a close look at the 2,000-employee AIG Investments unit shows how this part of the conglomerate made gambles that helped cripple the firm." Neuger's goal, called "10-cubed," was to produce $1 billion more in annual profit from AIG Investments. This investment group included investment funds of AIG's global

insurance subsidiaries and a third-party asset management company that managed money for institutional investors such as pension funds.

91.     Contrary to traditional securities lending businesses that would invest their cash collateral in fixed-income investments, such as Treasury bonds or short-term corporate debt, in or about December 2005, Neuger and McGinn also approved a proposal to invest 75 percent of the cash collateral in asset-backed securities, including securities that were backed by subprime mortgages and credit-card debt. Because of these relaxed guidelines, the *Wall Street Journal* article reports that "money managers at AIG Investments ramped up purchases of subprime-mortgage bonds in 2006 and 2007, as the securities-lending portfolio expanded to $94 billion in mid-2007." While this temporarily increased the profits of AIG Investments and AIG, it also compromised AIG's long-term security and financial condition. Most of the subprime mortgage-backed securities did not mature for two to five years, but the securities lending division was required to repay or roll over most of its loans every 30 days. When the subprime mortgage bonds "plummeted as loan delinquencies increased and credit markets froze," this created a hole for the Company from which it would never recover.

92.     The February 5, 2009 *Wall Street Journal* article further described the lack of AIG senior management's oversight of the AIG Investments unit. As the article reported, in a November 2007 note to AIG Investments' staff, Chief Credit Officer McGinn wrote: "Senior management was clearly caught off guard by the size of [AIG Investments'] subprime, first-lien [residential mortgage-backed securities] portfolio despite the portfolio's high ratings and credit quality." And, as the article further noted, the problem caused by this unit did not end with the Government bail-out in September 2008, because, in early October 2008, "many dealers returned the securities they had loaned from AIG, demanding their cash back, further straining AIG's finances."

G.     **AIG Weakens Risk Controls On AIGFP**

93.     In the wake of the accounting fraud investigations between 2000 and 2004, AIG implemented stringent procedures and systems of internal controls company-wide, particularly in the area of risk management, which gave the Company's central risk management function clear access to, and understanding of, any risk management issues as they arose. AIG touted these procedures and

1  systems in its public statements and reports. There was, however, one notable exception to AIG's

2  stringent internal controls: the Asset/Credit Group headed by Cassano.[3]

3      94.    During his tenure as CEO of AIG, Greenberg insisted on close supervision of AIGFP by

4  AIG's senior management.  After Greenberg retired, however, the holding company's control over

5  AIGFP weakened substantially, and it did not monitor or evaluate effectively the level of risk that

6  AIGFP had taken on. Greenberg told the U.S. House of Representatives Committee on Government

7  Oversight that "the risk controls my team and I put in place were weakened or eliminated after my

8  retirement.  For example, it is my understanding that the weekly meetings we used to conduct to

9  review all AIG's investments and risks were eliminated. These meetings kept the CEO abreast of

10  AIGFP's credit exposure."

11      95.    Greenberg's testimony is corroborated by a September 28, 2008 article in *Portfolio*

12  magazine, entitled "AIG's House of Cards."  The article reports that Martin Sullivan "had even

13  eliminated a twice-a-month meeting to assess the work of the [AIGFP] unit . . . . 'He wasn't really

14  interested in the business . . . .'" The *Portfolio* article quotes Randall K.C. Kau, a former senior

15  executive at AIGFP, as stating: "'Within A.I.G., F.P. had a cult status.'" Kau continued: "'Under Hank

16  [Greenberg], F.P. was always on its toes. . . . [Greenberg] didn't have a derivatives background, but he

17  was always vigilant about reading the reports.'"

18      96.    An April 15, 2009 *New Republic* article, "Top Down" quotes a former AIG official as

19  saying that Sullivan "'didn't have the ability to figure out what was going on there [at AIGFP].'"

20  Sullivan, who took over the helm of AIG in the midst of multiple governmental investigations and

21  related litigation, did not consider AIGFP a priority according to the former AIG official.  Instead,

22  Sullivan "saw his role as going around, meeting every state regulator in the country, and saying, 'We

23

24

_____

25  [3] AIGFP operates in a number of business groups, including a Commodity Trading Group, a Foreign
Exchange Trading Group, a Foreign Exchange Prime Brokerage Group, an Equity Trading Group, a
26  Fixed Income Trading Group, a Transaction Development (private equity) Group, and a Corporate
Marketing Group. The CDS business was run out of both the London and Wilton, Connecticut offices
27  by the Assets/Credit Group. This business was headed by Cassano, who, along with Forster,
supervised the London Asset/Credit Group operations, and the U.S. Asset/Credit Group operations
28  were headed by Adam Budnick, Frost, and others, who were headquartered in Wilton.

-32-
COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 50

intend to cooperate fully with all investigations of [the] company.'" Similarly, according to *The New Republic*, AIG's Chief Financial Officer, Bensinger, was completely preoccupied by the on-going restatement of four years' worth of AIG's financial statements.

97.     While Cassano technically reported to William N. Dooley, a senior vice president of AIG, according to *The New Republic* interviews of former AIG colleagues, Cassano refused to follow Dooley's directions and often belligerently dismissed him.   According to a *New York Times* article based upon interviews with current and former AIG employees, Cassano directed AIGFP *"with almost complete autonomy, and with an iron hand."*

98.     As reflected by AIGFP executive vice president Jason DeSantis' ("DeSantis") highly publicized March 2009 resignation letter, which appeared in the op-ed section of *The New York Times* on March 24, 2009, the CDS business was isolated from AIGFP's other businesses and closely managed by Cassano and only a few other senior executives. DeSantis, who served as head of business development for AIGFP's commodities trading business, confirmed that not more than a "handful" of AIGFP's employees were involved with the CDS business.

99.     Further corroboration that AIGFP's CDS business was isolated from other AIGFP businesses and closely managed by Cassano and a few other senior executives is contained in Roddy Boyd's ("Boyd") *Fatal Risk: A Cautionary Tale of AIG's Corporate Suicide*.   Boyd reports that "[i]n 2009, in a visit to C. V. Starr, [Gorton] told Greenberg, Howie Smith, and others that much of the risk-management problems at [AIG]FP were because Cassano forbade AIG corporate risk managers from having much input or oversight of the CDS portfolio."

100.     Finally, AIG's outside auditors, PwC, reported to Sullivan and others in November 2007, approximately a week before a December 5, 2007 investor meeting, that there were significant deficiencies, and possibly a material weakness in AIG's risk management and internal controls with respect to AIGFP's CDS portfolio. According to the audit committee minutes from a later March 11, 2008 meeting, PwC found that this was due to a *"lack of timely elevation of key data . . . to the AIG level, and the fact that AIGFP had designed a valuation process that did not allow the involvement of [AIG Corporate] Enterprise Risk Management and the AIG Finance function."* As a result, not only were AIGFP's valuation and risk management processes faulty, AIG was incapable of verifying

the information provided by AIGFP. Moreover, AIG's financial statements and public disclosures did not accurately reveal the true value of the assets acquired by AIGFP and the type or amount of risk that AIGFP had taken on.

**H.  AIG Fails To Properly Mark Down Its CDS
Portfolio As The Subprime Mortgage Crisis Escalates**

101.  In early 2006, housing prices started to decline, which led to an increase in subprime mortgage defaults.  In many instances, borrowers took on adjustable rate mortgages they could not afford based on the assumption that the market value of their properties would continue to increase, enabling them to either sell their homes before the rates reset or to refinance at lower rates based upon better loan-to-value ratios.

102.  An August 21, 2006 *Barron's* article, titled "The No-Money Down Disaster," provided the following statistics:

- 32.6% of new mortgages and home-equity loans in 2005 were interest only, up from 0.6% in 2000;

- 43% of first-time home buyers in 2005 put no money down;

- 15.2% of 2005 buyers owe at least 10% more than their home is worth;

- 10% of all home owners with mortgages had no equity in their homes [as of August of 2006; and]

- $2.7 trillion dollars in loans will adjust to higher rates in 2006 and 2007.

103.  By fall 2006, it was evident that the real estate bubble was bursting and, as a result, default rates for subprime mortgages were rapidly increasing. During the first half of 2006, the California subprime originator Acoustic Home Loans went out of business. Several other subprime originators closed their doors in early 2007, including Secured Funding Corp. (a California subprime lender focused on home equity loans with $1.3 billion in originations in 2005), which closed on January 8, 2007; Bay Capital ($800 million in originations during 2005), which closed on January 12, 2007; Lenders Direct Capital Corp., which ended its wholesale operations on February 8, 2007; and Maribella Mortgage LLC of Minnesota ($900 million in subprime originations in 2005), which closed on March 9, 2007.  Likewise several subprime mortgage originators filed bankruptcy petitions at the

end of 2006 and in early 2007, including Ownit Mortgage Solutions, Inc. (Chapter 11 petition filed December 28, 2006); ResMAE Mortgage Corp. (Chapter 11 petition filed on or about February 12, 2007); Mortgage Lender's Network USA, Inc. (Chapter 11 petition filed on February 4, 2007); and People's Choice Home Loan, Inc. (Chapter 11 petition filed on March 20, 2007).

104.    By mid-February 2007, in response to the reported rise of default rates on subprime mortgages and the announced bankruptcy of several subprime mortgage originators, the ABX indices – created to track the value of CDSs issued on securities backed by subprime mortgages – had declined, and the mezzanine ABX indices had declined by 15% or more.[4]  On February 22, 2007, *Bloomberg* quoted an asset manager as stating that the ABX BBB values were "going to zero."  By July 2007, the ABX had declined even further.  While the decline in the mezzanine portions of the ABX was more precipitous than the higher rated portions, all of the sub-indices were trending downward, and the portions tracking high grade CDSs fell significantly.  The TABX similarly fell significantly over this time period.  By the end of the first quarter of 2007, the TABX index for mezzanine super senior CDOs had declined to approximately 85%.  By the end of the second quarter of 2007, the TABX index for senior CDO tranches had fallen by about 40%.

105.    Despite the decline in indices reflecting the actual market values of subprime-based super senior CDOs, which were the same type of CDO tranches in AIG's investment portfolio and referenced by AIGFP's CDS portfolio, AIG failed to mark its CDO and CDS portfolios down to the current market value, as required by GAAP.  During the period from February 2007 to the end of February 2008, at minimum, AIG reported false and inflated assets and income in its publicly filed financial statements.

106.    In April 2007, it was widely reported that two hedge funds operated by Bear Stearns had experienced losses in CDO investments, which triggered margin calls. In June 2007, it was again

---

[4] In January 2006, a group of sixteen of the largest investment banks created the ABX Index, an index administered by Markit Group (a London-based company that specializes in credit derivative pricing) to track the value of CDSs issued on securities backed by subprime mortgage loans.  The ABX has a number of sub-indices, each one tracking a different basket of swaps with similar ratings and underlying risk profiles.  In February 2007, the same group of investment banks launched a companion index, called the TABX, to follow mezzanine subprime CDOs.

1  widely reported that these hedge funds could not meet their margin calls and had collapsed. Certain of
2  the CDO assets of the hedge funds were seized by creditors and sold at deep discounts, and in some
3  cases collateral auctions were cancelled after it became apparent that there were no buyers for the
4  CDOs.

5  **I.    AIG Fails To Adjust The Valuation Of Its CDS
        Portfolio Despite Goldman Sachs' Collateral Demands**

7      107.   As noted above, throughout the first half of 2007, AIG ignored evidence in the market
8  indicating a probable decline in the value of CDOs backed by subprime debt and failed to record any
9  valuation adjustment for its CDSs written on its multi-sector CDOs.  This included declines in the
10 ABX and TABX indices in the first half of 2007, which were direct evidence of the declining value of
11 the Company's massive CDS portfolio.

12     108.   On July 10, 2007, the major credit rating agencies issued comprehensive rating
13 downgrades and credit watch warnings on an array of RMBS.  These announcements foreshadowed
14 the actual losses to come.  S&P announced that it had placed 612 tranches backed by U.S. subprime
15 collateral, or some $7.35 billion in securities, on negative watch. S&P promised to review every deal
16 in its ratings database for adverse effects. In the afternoon, Moody's downgraded 399 mortgage-
17 backed securities issued in 2006 backed by U.S. subprime collateral and put an additional 32 tranches
18 on watch.  These Moody's downgrades affected about $5.2 billion in securities. The following day,
19 Moody's placed 184 tranches of CDOs, with original face value of about $5 billion, on watch for
20 possible downgrade. Two days after its original announcement, S&P downgraded 498 of the 612
21 tranches it had placed on negative watch. Fitch Ratings, the smallest of the three major credit rating
22 agencies, announced similar downgrades.

23     109.   The rating agencies' actions did not go unnoticed at AIGFP.  According to the FCIC
24 Report, in a phone call made on July 11, 2007, the day after the downgrades, Forster, the head of credit
25 trading at AIGFP, told Frost, the executive vice president of AIGFP's Marketing Group, that he had to
26 analyze exposures because "[e]very f***ing . . . rating agency we've spoken to . . . [came] out with
27 more downgrades" and that he was increasingly concerned:

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 54

*About a month ago I was like, you know, suicidal . . . . The problem that we're going to face is that we're going to have just enormous downgrades on the stuff that we've got. . . .* Everyone tells me that it's trading and it's two points lower and all the rest of it and *how come you can't mark your book.* So it's definitely going to give it renewed focus. *I mean we can't . . . we have to mark it. It's, it's, uh, we're . . . f\*\*\*ed basically.*

Nevertheless, AIG declined to mark down its CDO and CDS portfolios.

110.    As further noted in the FCIC Report, Forster's grave concerns regarding the rating agencies' actions stemmed from the fact that most of AIG's CDOs required that collateral be posted to the purchasers, should the market value of the referenced securities decline by a certain amount, or should rating agencies downgrade AIG's long-term debt. That is, collateral calls could be triggered even if there were no actual cash losses in, for example, the super senior tranches of CDOs upon which the protection had been written.  Furthermore, as the FCIC Report stated, AIG lacked its own models capable of assessing the market value of CDO-referenced assets until the third quarter of 2007, well after the bulk of the swap contracts in its CDS portfolio had been written.  As stated in the FCIC Report, PwC prompted AIG to develop such a model, however belatedly: "[W]ith the collateral demands piling up, PwC prompted AIG to begin developing a [valuation] model of its own." As explained below, in the absence of such a model, until the third quarter of 2007, AIG relied on its counterparties' valuations for information regarding its exposure to valuation risks and collateral risks, which would materialize in collateral calls when the CDO-referenced assets experienced volatility. As the FCIC Report states, "[O]ne of AIG's risk management tools was to learn of its own problems from counterparties who did have the ability to mark their own positions to market prices and then demand collateral from AIG."

111.    As  the subprime mortgage crisis continued to escalate and with substantial losses looming, AIG adopted a strategy to allay investor fears by making a series of presentations to investors on the subject of AIG's exposure to the U.S. residential housing market, and particularly the subprime market. One presentation was made during the second quarter 2007 investor call on August 9, 2007; another was made during the third quarter 2007 investor call on November 7, 2007; and a third presentation was made at a special investor meeting held on December 5, 2007.  During each of these conferences, AIG conveyed the false impression that it was not vulnerable to the losses experienced by

other firms that held large amounts of RMBS.  For example, on the August 9 call, Sullivan stated, "AIG is a very safe haven in stormy times."

112.   In furtherance of this strategy, AIG senior executives focused the presentations on the purported strengths of AIG's CDS portfolio and investment portfolio, and sought to assure investors and analysts that whatever perceptions they had about AIG based on overall market conditions did not match the reality within the Company.  Indeed, on the same August 9, 2007 investor conference call, Cassano stated that "[I]t is hard for us, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those [CDS] transactions."  Cassano added that: "[W]e see no issues at all emerging. We see no dollar of loss associated with any of [the CDS] business. Any reasonable scenario that anyone can draw – and when I say reasonable, I mean a severe recession scenario that you can draw out for the life of those securities." Lewis, AIG's Senior Vice President and Chief Risk Officer, seconded Cassano's reassurance: "[W]e believe that it would take declines in housing values to reach Depression proportions, along with default frequencies never experienced, before our AAA and AA investments would be impaired."

113.   During AIG's presentations and in accompanying SEC filings that were incorporated into the Offering Materials, AIG stressed the remoteness of risk of the CDS portfolio and the strength of the underlying CDO assets. For example, AIG made the following representations:

- AIGFP's CDS portfolio consisted of extremely risk remote, Super Senior credit protection on highly diversified pools of assets, noting that the Super Senior portion of the CDOs is the least likely to incur any losses and AIG had very favorable attachment points.

- Every transaction was carefully structured and screened as to collateral, manager and structure to ensure that AIG received the maximum protection.

- The risk analysis and underwriting for each individual transaction was approved by the credit trading team, AIGFP credit officers and AIG's Credit Risk Committee.

- AIG had "strengthened" the position of Chief Risk Officer, who worked to "quantify, manage, and mitigate the risks incurred by AIG."

- AIG had "active and strong" risk management processes and AIG's exposures to residential mortgages were understood and well- managed.

- AIG's exposure to sub-prime residential mortgages was relatively small and none of the AIGFP CDS contracts had experienced any significant collateral deterioration, which risk was "very remote."

- AIGFP's "credit derivatives transactions" had a risk of loss that was "remote, even in severe recessionary market scenarios."

- AIG's financial statements recorded its derivative financial instruments at fair value.

- AIGFP stopped writing CDS contracts after 2005, and therefore its CDS portfolio was not subjected to the more-risky mortgages in the 2006 and 2007 vintages.

- Based on the uniqueness of the CDS portfolio, AIG foresaw no dollar of loss associated with any part of the CDS business, even under severe recessionary conditions and the value of the CDOs it insured were not subject to being written down based on well-accepted indices.

- AIG was "very comfortable with [its] exposure to the U.S. residential mortgage market."

- Any credit impairment losses which may emerge over time at AIGFP would not be material to AIG's consolidated financial condition.

114. As described more fully below, these presentations were materially misleading because, among other things, they were intended to mislead and distract investor attention away from AIG's collateral risk and valuation risk – material and substantial risks that AIG was aware of at the time of these presentations. Indeed, by the time these representations were made, Goldman Sachs in particular had made demands on AIG for substantial collateral payments. According to the FCIC Report, Goldman Sachs' pursuit of the collateral payments was relentless; between July 2007 and September 2008, Goldman Sachs sent a formal demand letter *every single business day to AIG*. Moreover, indices for the very type of CDOs that were insured through the CDS contracts showed significant deterioration and diminished market prices.

115. As set forth in the FCIC Report, on the evening of July 26, 2007, Goldman Sachs, which held $21 billion of AIG's super-senior CDSs, made a collateral call to AIG in the form of an email from Goldman Sachs' salesman Andrew Davilman to Frost:

> Davilman: Sorry to bother you on vacation. Margin call coming your way. Want to give you a heads up.
> Frost, *18 minutes later*: On what?
> Davilman, *one minute later*: *20bb [$20 billion] of supersenior.*

Frost never responded to Davilman's email. And when Frost returned from vacation, he was instructed to not have any involvement in the issue.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

116.    On July 27, 2007, Goldman Sachs made the collateral call to AIG official by forwarding an invoice, requesting $1.8 billion. AIG disputed Goldman Sachs' marks. According to the FCIC Report, AIG's Forster stated that he would not buy the bonds from Goldman Sachs at even 90 cents on the dollar, because values might drop further. Additionally, AIG would be required to value its own portfolio of similar assets at the same price. Forster said,

> "In the current environment I still wouldn't buy them . . . because they could probably go low . . . *we can't mark any of our positions, and obviously that's what saves us having this enormous mark to market*. If we start buying the physical bonds back then any accountant is going to turn around and say, well, John, you know you traded at 90, you must be able to mark your bonds then."

117.    Hard-fought negotiations between AIG and Goldman Sachs representatives ensued. According to Tom Athan, a managing director at AIGFP, Goldman Sachs "was not budging" on its collateral demands. In describing to the FCIC a conference call with Goldman Sachs executives on August 1, 2007, Athan stated, "I played almost every card I had, legal wording, market practice, intent of the language, meaning of the [contract], and also stressed the potential damage to the relationship and GS said that this has gone to the 'highest levels' at GS and they feel that . . . this is a 'test case.'"

118.    In an attempt to stave off Goldman Sachs relentless pursuit for collateral payments, on August 10, 2007, one day after the August 9, 2007 conference call, AIG posted $450 million in cash to Goldman Sachs as a "good faith deposit." AIG, however, did not adjust its valuation of its CDS portfolio to reflect that *all* of its CDOs were impaired due to increasing defaults in underlying subprime mortgages.

119.    Despite the rosy picture painted by key AIG Executives on the August 9, 2007 conference call, AIG knew internally that additional collateral calls from counterparties on its CDOs were forthcoming, thereby jeopardizing AIG's liquidity, or presenting the risk that AIG would be forced to take an "enormous mark" on its existing books. As detailed in the FCIC Report, on August 16, 2007, Frost in an email to Forster stated: "Trust me. This is not the last margin call we are going to debate." Forster's prediction proved correct. According to the FCIC Report, by September 11, 2007, Société Générale S.A. ("SocGen") demanded $40 million in collateral on CDS it had purchased from AIGFP, UBS had demanded $67 million, and Goldman Sachs had upped its demand by $300 million.

120.    In the second week of October 2007, the rating agencies announced hundreds of additional downgrades affecting tens of billions of dollars of subprime mortgage-backed securities and CDOs. By November 2, 2007, Goldman Sachs' demand had almost doubled, to $2.8 billion. On November 6, 2007, Bensinger informed AIG's Audit Committee that AIGFP had received margin calls from five counterparties, Goldman Sachs, Merrill Lynch, Calyon, Bank of Montreal, and SocGen.

121.    Consistent with AIG's strategy to allay investor concerns, however, on a November 7, 2007 conference call with investors concerning AIG's third-quarter earnings, Sullivan stated "AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives." Cassano added that AIG had "more than enough resources to meet any of the collateral calls that might come in." Substantively similar statements were made in AIG's SEC filings incorporated by reference in the Offering Materials.

122.    On November 23, 2007, Goldman Sachs demanded an additional $3 billion in cash. AIG protested, but paid $1.55 billion, bringing the total posted to $2 billion.

**J.    AIGFP Excludes Key Personnel From The CDS Valuation Process**

123.    In response to concerns regarding the remediation of entity-wide material weaknesses at AIG, in June 2006, AIG hired Joseph St. Denis ("St. Denis"), a former Assistant Chief Accountant at the SEC Enforcement Division, to serve as Vice President of Accounting Policy at AIGFP. AIG created St. Denis' position as part of a company-wide effort to address material weaknesses previously cited by PwC, to provide AIG's Financial Services Division ("FSD") and Corporate Office of Accounting Policy ("OAP") with greater visibility and control over the operations and accounting policy practices of AIGFP, and to provide an on-site resource for AIGFP business people as they developed proposed transactions.

124.    As Vice President of Accounting Policy at AIGFP from June 2006 through October 1, 2007, and as a member of AIGFP's Transaction Review Panel (which was responsible for evaluating and documenting the accounting for proposed transactions by customers of AIGFP), St. Denis was responsible for documenting the accounting for AIGFP's proposed transactions, and building consensus around that proposed accounting with his accounting policy counterparts at FSD and OAP. As part of this process, for material and/or unusual transactions, St. Denis was supposed to meet with

1    the business people at AIGFP to understand the proposed transaction, draft a memorandum for the

2    CFO of FSD, and ultimately share the revised draft with OAP and PwC, the company's auditors.

3         125.    In early September 2007, St. Denis learned that AIGFP had received a multi- billion

4    dollar margin [collateral] call on certain super senior CDSs. Having not even known that the CDOs

5    contained collateral call provisions, St. Denis told the FCIC that he was so "*stunned*" when he got the

6    news of the collateral calls and potential enormous exposures that he "*had to sit down*." St. Denis

7    became gravely concerned that the valuation model of at least one of AIGFP's counterparties indicated

8    that AIGFP was in a material liability position, and he sought to participate in the process of valuing

9    AIGFP's CDS portfolio.   However, during the final week of September 2007, in a meeting that

10    included the newly hired CFO of AIGFP and an AIG quantitative risk expert, Cassano told St. Denis,

11    *"I have deliberately excluded you from the valuation of the Super Seniors because I was concerned*

12    *that you would pollute the process."*   As St. Denis later testified through a letter to Congress dated

13    October 4, 2008, the "pollution" Cassano mentioned was, in reality, the transparency that St. Denis

14    sought to bring to AIGFP's accounting policy process.

15         126.    St. Denis resigned twice before actually leaving AIGFP.   He first resigned on Sunday,

16    September 9, 2007, because on multiple occasions Cassano took actions designed to prevent St. Denis

17    from performing his duties.   For example, during a meeting in August 2007, that was also attended by

18    AIGFP's General Counsel, Cassano berated St. Denis for several minutes for bringing up accounting

19    problems to FSD, and told St. Denis that he worked for Cassano, not FSD and OAP.

20         127.    Upon his September 9, 2007 resignation, AIGFP Chief Administrative Officer William

21    Kolbert contacted St. Denis, advising that nobody at AIGFP or AIG was trying to control or interfere

22    with his communications with FSD and OAP.   However, on September 25, 2007, Cassano once again

23    berated St. Denis for his close interactions with OAP, and St. Denis became convinced that he could

24    no longer work at AIGFP and perform the functions for which he had been hired.

25         128.    On October 1, 2007, St. Denis called the General Counsel of AIGFP, and re-submitted

26    his resignation, forfeiting his bonus. St. Denis told the General Counsel that he had lost faith in the

27    senior-most management of AIGFP and could not accept the risk to AIG and himself of being isolated

28    from corporate accounting policy personnel, especially given the situation with the super senior CDS

portfolio. St. Denis also relayed his concerns to AIG's Chief Auditor Michael Roemer confirming that the reason for his resignation was Cassano's attempts to exclude him from discussions regarding the valuation of super senior CDSs. Roemer agreed that St. Denis had been "*painted into a corner*" by Cassano, and had no choice but to resign. Roemer further relayed the information from St. Denis to the AIG Audit Committee.

129.   After his resignation, St. Denis was contacted as well by the PwC engagement partner to inquire as to the reasons for his departure. St. Denis relayed the same concerns to the PwC engagement partner about Cassano's attempts to impede his communications with his counterparts at the parent organization.

130.   The circumstances giving rise to St. Denis' resignation from AIGFP placed AIG on notice of the problems at AIGFP, and specifically Cassano's decision to exclude St. Denis and others from the valuation process of the CDS portfolio. St. Denis' resignation further placed AIG's senior executives and Audit Committee on notice (if they did not know already) that AIGFP's methodology for valuation of its super senior CDSs was problematic, and not subject to the types of internal controls that the Company was publicly representing were in place.

131.   In a letter to Congress dated October 4, 2008, St. Denis wrote:

> I believe that certain statements made by Mr. Cassano and other AIG senior managers in the early stages of the SSCDS [super senior CDSs] crisis were ill-advised. Specifically, statements made at the December 5, 2007 Investor Meeting that characterized margin calls that AIGFP had received from its SSCDS counterparties as lacking a legitimate basis, especially given the apparent state of AIGFP's valuation models, were statements that I would not have made or condoned. I believed at the time of the Investor Meeting and continue to believe that full disclosure of margin calls by, and resulting collateral postings to, AIGFP's SSCDS counterparties was of critical importance.

**K.    PwC Informs AIG Of A Potential Material Weakness In Controls At AIGFP**

132.   In or about the time of the Goldman Sachs' collateral calls and St. Denis' resignation, PwC became concerned about "material misstatements or omissions in the disclosures" in AIG's Second Quarter 2007 Form 10-Q. As a result, Bensinger and Sullivan began meeting regularly with PwC in the third quarter of 2007 to discuss concerns PwC had with regard to potential material weaknesses in internal controls, relating to, among other things, AIGFP's CDS portfolio.

133.    In one of these meetings, PwC learned that AIG intended to hold an investor meeting on December 5, 2007, and, as a result, met with senior management at AIG to warn them of significant deficiencies, and a possible material weakness, in the valuation process concerning the CDS portfolio.

134.    On November 29, 2007, PwC auditors met with senior executives from AIG and AIGFP to discuss the valuation process for the CDS portfolio. According to PwC meeting notes, AIG reported to PwC that disagreements with Goldman Sachs continued, and AIG did not have data to dispute Goldman Sachs' marks, which if used to value AIG's super senior books would result in a $5 billion valuation loss that would wipe out AIG's third quarter profits. According to the FCIC Report, Sullivan told Forster that he was *"going to have a heart attack"* when he learned that using Goldman Sachs' marks would eliminate the quarter's profits. At the November 29, 2007 meeting, PwC warned Sullivan and Bensinger that AIG had deficiencies with respect to its risk management of the CDS portfolio which could rise to the level of a "material weakness." As later documented in Audit Committee meeting minutes dated January 15, 2008:

> Mr. Ryan [of PwC] reported that in light of AIG's plans to hold the investor conference on December 5, PwC had raised their concerns with Mr. Sullivan and Mr. Bensinger on November 29, informing them that *PwC believed that AIG could have a material weakness relating to the risk management* of these areas.

The January 15, 2008 Audit Committee minutes further state that "[PwC] said that Management and PwC had agreed to gather more information, and that numerous meetings and much analysis had taken place among PwC and Management, including Messrs. Sullivan, Bensinger, Lewis, Roemer, and Habayeb."

135.    This notification by PwC, and the "numerous meetings and much analysis" that resulted, further placed AIG on notice of the severe problems with respect to the valuation of AIGFP's CDS portfolio.

136.    According to the FCIC Report, after meeting with PwC, James Bridgewater, AIGFP's Executive Vice President responsible for models, came up with a solution for valuing AIG's super senior book. Convinced that there was a calculable difference between the value of the underlying bonds and the value of the swap protection AIG had written on those bonds, Bridgewater suggested using a "negative basis adjustment" which would reduce the unrealized loss estimate from $5.1 billion

-44-

1 (Goldman Sachs' mark) to about $1.5 billion. With their auditor's knowledge, Cassano and others

2 agreed to employ the negative basis adjustment.

3      **L.      AIG Falsely Reassures Investors At The December 5, 2007 Investor Meeting**

4      137.    On December 5, 2007, AIG held an investor meeting to discuss its exposures to the

5 U.S. residential housing market. During this meeting – which was held just six days after receiving

6 PwC's warnings – AIG falsely represented that the value of its CDS portfolio had declined by $1.05

7 billion to $1.15 billion since September 30, 2007. Adding these losses to those previously disclosed in

8 the third quarter Form 10-Q, the Company led investors to believe that the total decline in value of its

9 CDS portfolio through November 30, 2007 was between $1.4 and $1.5 billion. AIG confirmed these

10 materially understated figures in its Form 8-K filed with the SEC on December 7, 2007, which was

11 incorporated into the 2008 Offering Materials.

12      138.    During the December 5, 2007 investor meeting, Sullivan boasted about AIG's risk

13 management systems and the Company's oversight of the subprime exposure: "[The] risk we have

14 taken in the U.S. residential housing sector [is] supported by sound analysis and a risk management

15 structure . . . . *[W]e believe the probability that it will sustain an economic loss is close to zero. . . .*

16 [W]e are confident in our marks and the reasonableness of our valuation methods." Sullivan also told

17 investors that AIG had a "high degree of certainty in" the losses that AIG had "booked to date."

18 Sullivan added that the Company's U.S. residential housing market exposure levels *are manageable*

19 *given [AIG's] size, financial strength and global diversification."* Sullivan concluded that the

20 "bottom line" was that "AIG has accurately identified all areas of exposure to the U.S. residential

21 housing market."

22      139.    Moreover, when asked about the collateral calls that had been received from

23 counterparties on CDS contracts, Cassano falsely reassured investors that "we have from time to time

24 gotten collateral calls from people and then we say to them, *well, we don't agree with your numbers.*

25 *And they go, oh, and they go away . . .* It's like a *drive by* in a way." Significantly, AIG did not reveal:

26 (1) the $2 billion collateral the Company had already posted to Goldman Sachs, (2) the several

27 hundred million dollars posted to other counterparties, (3) the daily demands from Goldman Sachs and

28 others for the additional cash, the (4) legitimate issues raised about AIG's valuation model, and (5) the

CDS contracts' posting provisions designating the counterparties as the presumptive prevailing party in terms of setting marks for the underlying CDOs. In addition, neither Cassano, Sullivan, nor anyone else at AIG publically disclosed the "negative basis adjustment" used to derive the announced $1.5 billion maximum potential exposure, and therefore investors did not know that AIG's earnings were overstated by $3.6 billion. The market would not learn that information until February 11, 2008.

140.    As detailed in the FCIC Report, discrepancies between AIGFP and its counterparties arose with regard to collateral because AIGFP's valuation models were based on theoretical default rates for the underlying CDOs, whereas the counterparties relied on actual market data. Even though the market for CDOs was not highly liquid, there was trading among hedge funds and the large investment banks, and therefore, the banks had the ability to price the underlying CDOs based on market data.

141.    AIGFP's valuation models were intended only to predict whether the level of defaults in the underlying collateral would rise to the point where AIGFP's obligation to make payments to the counterparties would be triggered. They were not intended to predict whether or when the referenced CDOs would decline in value or whether the collateral posting triggers would be reached. Thus, the models did not effectively measure or predict important asset valuation and liquidity risks posed by the CDS portfolio.

142.    By shielding AIGFP's valuation process from meaningful review by AIG's corporate Enterprise Risk Management and accounting functions, as described above, Cassano was able to manipulate the valuation process to conceal the dramatic decline in values of the CDS portfolio by the third quarter of 2007, as the accelerating rate of subprime defaults began to affect the values of an increasing number of CDOs. This manipulation was subsequently exposed by PwC and admitted by the Company in a February 11, 2008 SEC filing.

143.    The market embraced the false statements made by Sullivan, Cassano and others at the December 5, 2007 investor meeting. While AIG's stock had fallen approximately 23% in the previous six months, following the December 5, 2007 investor meeting, AIG stock opened at $58 per share, an increase of 4.6% or $2.55 from the prior day's close. AIG stock was "was the leading Dow component out of the gate," as reported that day by *The Wall Street Journal*'s blog *MarketBeat*, which noted that

1   "[t]he rally was bolstered by statements from company executives during today's session that its
2   exposure to housing is 'manageable,' and that it has no exposure to structured investment vehicles,
3   which hold a big load of the odorous mass known as collateralized debt obligations."

4   **M.**   **AIG Admits To Misstatements Concerning The Valuation Of Its CDS Portfolio**

5         144.   On February 6, 2008, PwC auditors met with Willumstad, AIG's Chairman, and
6   informed him that the "negative basis adjustment" used to reach the $1.5 billion estimate disclosed on
7   the December 5, 2007 investor call had been improper and unsupported, and was a sign that *"controls*
8   *over the [AIGFP] super senior credit default swap portfolio valuation process and oversight thereof*
9   *were not effective."* PwC concluded that *"this deficiency was a material weakness as of December*
10  *31, 2007."* The following day, PwC met with the entire AIG Audit Committee and repeated the
11  analysis presented to Willumstad. The auditors said they could complete AIG's audit, but only if
12  Cassano "did not interfere in the process." According to PwC, retaining Cassano was a "management
13  judgment, but the culture needed to change at [AIG]FP."

14        145.   On February 11, 2008, AIG admitted in a Form 8-K filed with the SEC that the
15  Company had previously provided the market with inaccurate, materially understated losses for its
16  CDS portfolio. In the February 11, 2008 Form 8-K, AIG reported that its gross cumulative decline in
17  valuation for its CDS portfolio was actually *$5.96 billion or $4 billion more than what AIG had*
18  *reported to shareholders two months earlier.* The 8-K explained that through "cash flow diversion
19  features" and "negative basis adjustments," the figures provided during the December 5, 2007 investor
20  meeting were altered as $5.96 billion dollars in "gross" losses had been reduced to losses of only
21  approximately $1.4 to $1.5 billion.

22        146.   AIG further admitted in the February 11, 2008 8-K that over half of the "cash flow
23  diversion features" it used to reduce its reported CDS losses were improper. According to the 8-K, this
24  was the first time AIG utilized "cash flow diversion features" to lower the losses it reported to the
25  public from its CDS portfolio. When previously calculating the value of its CDS portfolio as of
26  September 30 and October 31, 2007, AIG stated that it could not reliably estimate the value of the
27  "cash flow diversion features," and therefore did not utilize them in its calculations.

28

-47-

147.   AIG also admitted in its February 11, 2008 8-K that the December 2007 disclosures were the first time that AIG utilized "negative basis adjustments" to net its losses in the CDS portfolio. AIG claimed the "negative basis adjustments" were intended to reflect the spread differential between the spreads implied from cash CDO prices and credit spreads implied from the pricing of CDSs on the CDOs.  However, AIG admitted in the 8-K filing that it did not have grounds to use the $3.63 billion "negative basis adjustment," which it had previously used in its December disclosures - along with the use of "cash flow diversion features" - to drastically reduce its reported CDS losses.

148.   The February 11, 2008 8-K also acknowledged that the CDS portfolio losses reported in AIG's third quarter 2007 10-Q were incorrect.   Those losses were calculated using a modified Binomial Expansion Technique ("BET") that incorporated "generic" valuation inputs, as opposed to observed market-based inputs which AIG later adopted to calculate losses on the CDS portfolio.   The widely accepted market-based inputs include "cash bond prices provided by the managers of the underlying CDO collateral pools, or, where not provided by the managers, prices derived from a price matrix based on cash bond prices that were provided."   AIG admitted that this type of generic valuation methodology used to compute its losses in the 3Q07 10-Q, and the December 5, 2007 investor meeting, resulted in significantly lower losses as compared to the market-based valuation typically used in the industry.   The February 11, 2008 8-K stated that use of the generic valuation methodology would have led to a 57% smaller reported gross loss through November 30, 2007 had AIG continued to inappropriately rely on that method.

149.   The February 11, 2008 8-K also disclosed for the first time that AIG had been informed by PwC that it had *"concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the [CDS] portfolio."*   Notably, AIG senior executives had been warned of just this possibility on November 29, 2007, but nevertheless reaffirmed the Company's confidence in its valuation models at the December 5, 2007 investor meeting.

150.   On February 28, 2008, AIG filed its annual report on Form 10-K for 2007.   In the 2007 10-K, AIG announced that the cumulative value of its CDS portfolio had actually dropped by *$11.5 billion*, and reported that the Company had suffered its largest quarterly loss ever – $5.3 billion in the

1    fourth quarter of 2007. AIG repeated in the 10-K that it did not have a basis to apply the $3.63 billion

2    in "negative basis adjustments" that had been used in the presentations made at the December 5, 2007

3    investor meeting, and reduced or eliminated these offsets from its loss calculation. On a conference

4    call on February 29, 2008, Bensinger admitted that "AIG concluded that recording a negative basis

5    adjustment at this time is *not consistent with GAAP fair value requirements.*"

6         151.   AIG also disclosed, for the first time, in its 2007 10-K that its CDS portfolio included

7    $6.5 billion in liquidity puts written on CDOs linked to the subprime mortgage market. These puts

8    were significant near-term liabilities, as they allowed purchasers of the subprime CDOs to force AIG

9    to buy them back at the original price, despite the fact that they had substantially declined in value,

10   and would likely be exercised if it became apparent that a default on the underlying collateral would

11   occur. In that event, AIG would be required to take back the underlying assets in exchange for the

12   CDS price, which was set when the credit quality of the assets was much higher. Market conditions

13   made it likely that many of these liquidity puts would be exercised in the short term.

14        152.   In addition to disclosing the existence of the liquidity puts, the 2007 Form 10-K

15   reported that AIG had, in fact, repurchased $754 million of these securities in 2007, and that the

16   Company had provided third-parties with $3 billion in liquidity facilities (presumably due to collateral

17   demands by CDS counterparties) in case AIGFP was required to repurchase additional CDOs over the

18   next three years. However, AIG did not reveal the identity of the counterparties that had made

19   collateral demands, or the range of differences between AIG's valuations of CDS contracts and the

20   counterparties' valuations of their CDS contracts.

21        153.   Finally, the 2007 Form 10-K included a letter from PwC confirming that AIG's internal

22   controls relating to the AIGFP CDS portfolio valuation process had a material weakness and were

23   ineffective, and an acknowledgement by AIG that its internal controls and procedures were ineffective

24   as of December 31, 2007. AIG admitted, specifically with respect to the CDS portfolio valuation

25   process and AIG's oversight of that business line, that it had *"insufficient resources to design and*

26   *carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a*

27   *timely basis with respect to the processes and models introduced in the fourth quarter of 2007."*

28   AIG further stated:

As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information. Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. *As a result, controls over the AIGFP super senior default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis,* resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements.

While disclosing a significant amount of information to investors, these statements were still materially misleading because, among other reasons, they omitted to disclose that the material weaknesses occurred because key personnel at AIG and AIGFP had been deliberately excluded from the process of valuing the CDS portfolio, and that AIG's most senior executives had been warned by PwC before the December 5, 2007 investor meeting that there were significant deficiencies, and possible material weaknesses, in its internal controls relating to the reporting functions for the CDS portfolio.

154. On February 29, 2008, the day after AIG filed its 2007 Form 10-K, it was reported that Cassano had retired from the Company. However, it was not disclosed that the Company had agreed to retain Cassano as a consultant at a salary of $1 million per month.

N.   **The OTS Advises AIG Of Material Weaknesses Due To Lack Of Access To AIGFP**

155. On March 3, 2008, the Office of Thrift Supervision ("OTS") met with AIG senior management and discussed significant supervisory problems concerning disclosures in AIG's Form 8-K filed December 7, 2007 and AIG's unsatisfactory handling of Enterprise Risk Management Relationships with AIGFP.

156. On March 10, 2008, the OTS voiced another warning to AIG, stating in a letter to AIG's General Counsel that the recent disclosures and its discussions with PwC and AIG management had raised concerns regarding "the corporate oversight of key AIG subsidiaries," particularly with respect to AIGFP. The OTS letter further noted that, "Recent discussions also indicate that these concerns are shared by other functional supervisors of AIG." The letter was presented to AIG management in March 2008. It included statements regarding the material weaknesses in AIG's financial reporting, oversight and accounting, such as:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 68

A material weakness exists within corporate management's oversight of AIGFP's super senior Credit Default Swap (CDS) valuation process and financial reporting. *Recent supervisory review work and discussions with PwC indicate that AIGFP was allowed to limit access of key risk control groups while material questions relating to the valuation of super senior CDS portfolio were mounting.* . . .

The super senior CDS valuations reviewed by corporate management lacked the accuracy and granularity necessary to understand the impact of key valuation components on AIG's accounting and financial reporting disclosures. Corporate management did not obtain sufficient information to completely assess the applicability of the negative basis adjustment, a critical component of the valuation method. In view of this occurrence and the observed similarity in reporting by other key subsidiaries, we are concerned that risk metrics and financial reporting provided to corporate management by AIGFP and other key subsidiaries may lack the independence, transparency, and granularity needed to provide effective risk management oversight.

Risk management practices need improvement to ensure that management and the board are fully able to identify, monitor, and control all significant risks. . . . [T]he significant negative impact to earnings from the super senior CDS portfolio valuation adjustment, combined with the portfolio's potential to significantly impact future earnings, are of increased supervisory concern.

**O.    AIG Reports First Quarter 2008 Results, Raises $20 Billion In Additional Capital, And Is Investigated By The SEC And DOJ**

157.    On May 8, 2008, after the market closed, AIG reported a quarterly net loss of *$7.8 billion* – the worst-performing quarter in the Company's history – which was attributed to a $9.1 billion single-quarter valuation decline in the CDS portfolio, and disclosed that cumulative CDS losses had skyrocketed to $20 billion. This disclosure meant the Company's net losses were much larger than previously represented. Further, AIG reversed its earlier position that the valuation fluctuations in the CDS portfolio did not reflect any actual economic impact and admitted that actual losses on the CDS portfolio were now estimated to be up to $2.4 billion.

158.    According to the Company's May 8, 2008 press release, "[i]ncluded in the first quarter 2008 net loss and adjusted net loss was a pre-tax charge of approximately $9.11 billion ($5.92 billion after tax) for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) [CDS] portfolio." That same day, AIG also disclosed that it had sustained "capital losses of $6.09 billion ($3.96 billion after tax) primarily from other-than-temporary impairment charges . . . result[ing] primarily from the severe, rapid declines in market values of certain residential mortgage

backed securities and other structured securities in the first quarter for which AIG concluded it could not reasonably assert that the recovery period would be temporary."

159.   Also on May 8, 2008, AIG announced its intention to raise $12.5 billion in new capital. In explaining the need for $12.5 billion in new capital, Sullivan stated: "The capital raise is a response to the events of the last two quarters and its effect on our capital position. It will fortify the fortress balance sheet you expect us to maintain and provide us with increased financial flexibility in these turbulent times. It will also position us well for the future." When specifically asked what the new capital would be used for, Sullivan unequivocally responded that it would be used for "general purposes," including "to fortify the fortress balance sheet" and to give AIG the ability to "continue to grow" in the face of short term volatility:

> On the capital our plan, obviously is to use it for general purposes. What we've said, clearly, is that we want to *fortify the fortress balance sheet that we have*. Obviously from our standpoint, we want the ability to *continue to grow* while maintaining strength to withstand potential short term market volatility that we're, obviously, the financial services sector is facing at the present moment. So at the present time it's for general proposes to fortify the fortress balance sheet and to give us the ability to grow in certain areas and, obviously, withstand any potential short term volatility.

160.   On May 9, 2008, the day after AIG announced its first quarter 2008 results and plan to raise $12.5 billion in new capital, Standard & Poor's downgraded AIG's credit rating from AA to AA-.

161.   On May 20, 2008, AIG announced that it had raised over $20 billion in new capital, a substantial increase from its initial plan announced less than two weeks before. AIG raised the $20 billion through public offerings of common stock and Equity Units, and private placements of various debt securities. The same day, during an investor conference sponsored by Lehman Brothers, AIG reinforced that the purpose of the capital raise was to fortify its balance sheet and use it to take advantage of opportunities in emerging markets. Sullivan stated:

> So, why did AIG raise capital? As you are aware, we announced plans to raise capital through the issuance of common stock [convertible and higher-grade] securities. *The strategic decision by the Board of Management to raise additional capital at this time reflects both complimenting AIG's strong balance sheet and the desire to position AIG with enhanced flexibility to take advantage of opportunities as conditions warrant.*
>
> *We view the capital we are raising as allowing AIG to continue to invest in and support the growth of our businesses, while maintaining AIG's opportunistic starts during a period of likely continued volatility. In fact, we believe it was the most intelligent thing*

-52-

1    *to do to be proactive, reassure the market, fortify our fortress balance sheet, enable us*
2    *to take advantage in a lot of the attractive emerging markets that we're in,* as well as
obviously be well-positioned for any continued volatility in the credit markets.

3 In response to a question about the purpose of the capital raise, Sullivan stated, "what we decided . . .

4 was to be proactive, get out in front, reinforce that fortress balance sheet to make sure that we had the

5 availability to continue to invest in the opportunities that we have around the world and to absorb any

6 market volatility that may still be out there." AIG did not disclose that it would use the capital to

7 satisfy collateral calls. Indeed, just days earlier, on May 8 and 9, 2008, the debt rating agencies

8 downgraded AIG's rating and CDOs it had insured were placed on a negative ratings watch. By June

9 of 2008, counterparties were demanding $15.7 billion and AIG posted $13.2 billion.

10      162. On June 6, 2008, *The Wall Street Journal* reported that AIG was under investigation by

11 the SEC, DOJ and U.S. Attorney's Office in Brooklyn, New York for overstating the value of its CDS

12 portfolio. On these reports, AIG's stock price dropped from $36.41 on June 5 to $33.93 on June 6,

13 2008, a decline of 6.8%. AIG's Equity Units and 4.875% Debentures also declined in value.

14      163. On June 13, 2008, *The Wall Street Journal* reported that a key focus of AIG's regulators

15 were the presentations of Sullivan and Cassano at the December 5, 2007 investor meeting, which were

16 characterized as trying to "assure investors that losses would be minimal."

17      164. On Sunday, June 15, 2008, AIG's Board of Directors convened a special meeting and

18 ousted Sullivan from his position as CEO at AIG. Sullivan was replaced by Willumstad. Two weeks

19 later, on July 1, 2008, it was reported that Sullivan received a severance payment of $15 million, a

20 bonus of $4 million, and the continued vesting of outstanding equity and long-term cash awards

21 valued at approximately $28 million.

22      **P.    The Collapse Of AIG's CDS and RMBS Portfolios**
                **Results In Huge Losses For Investors And**
23                 **Requires An Unprecedented Bailout By The U.S. Government**

24      165. With Sullivan no longer running the Company, on August 6, 2008, AIG filed its Form

25 10-Q for the second quarter of 2008, which disclosed additional losses in the CDS portfolio and

26 significant losses and issues in the Company's securities lending business. In the 10-Q, AIG

27 announced unrealized market valuation losses on its CDS portfolio of *$5.6 billion* for the second

28 quarter, and *$14.7 billion* for the first six months of 2008. AIG also announced that it had incurred

pre-tax realized capital losses of *$6.08 billion* arising primarily from non-temporary impairment charges on its investment portfolio, which resulted largely from declines in fair market values of RMBS. For the quarter, AIG reported a net loss of $5.36 billion or $2.06 per diluted share.

166.    With respect to AIG's securities lending program, the 10-Q stated that the invested securities had substantial realized and unrealized losses and that AIG had agreed to deposit into the securities pool an amount equal to the investment losses realized on the sale of impaired assets up to $5 billion. The 10-Q also revealed prior misstatements concerning the Company's securities lending program. In earlier statements, AIG had represented that counterparties in the securities lending program were required to deposit 102 percent in cash collateral to borrow securities from AIG. However, in the second quarter 2008 10-Q, AIG disclosed that it did not, in fact, always receive 102 percent of cash collateral on loaned securities, and that the parent company (AIG) had agreed to deposit funds into the collateral pool to maintain the collateral received at 102 percent for the benefit of its insurance subsidiaries.

167.    Further, in the second quarter 2008 10-Q, AIG commented on the continuing decline in the valuation of the CDS portfolio and the impairment charges realized in its investment portfolio. The Company stated that the results of its operations with exposure to the U.S. residential mortgage market "will be highly dependent on future market conditions." However, the Company did not disclose that collateral calls on the CDS portfolio and losses in the securities lending program (which resulted from AIG Investments' decision in late 2005 to dramatically increase investments in RMBS) could and would lead to an imminent need for more than $80 billion in additional liquidity.

168.    By August 2008, AIG had received multi-billion dollar collateral calls from its CDS counterparties, and had posted billions in collateral. Further ratings cuts of AIG and further deterioration in the U.S. residential housing market, including the subprime market, would trigger even larger collateral calls from counterparties on the CDS contracts and further payments resulting from the Company's securities lending program.

169.    On August 7, 2008, AIG held its 2008 second quarter earnings conference call. During the call, Willumstad admitted that AIG had severely overexposed itself to the risks of the U.S. housing market, "you see, again in retrospect, much of the problems that have come about have been a

1    concentration of risk in the US housing market," Willumstad stated, "both in the investment portfolio
2    and the credit default swap book."

3          170.    According to the FCIC Report, on August 11, 2008, OTS regulators met with Federal
4    Reserve Bank of New York Officials to discuss AIG.  After the meeting, Kevin Coffey, an analyst from
5    the Financial Sector Policy and Analysis Unit, wrote that despite raising $20 billion earlier in the year,
6    AIG was still under increasing capital and liquidity pressure and needed to raise substantial additional
7    funds.   Coffey listed six concerns: (1) $26.5 billion in mark-to-market losses on AIGFP's CDS
8    portfolio and related margin calls for which AIG had posted $16.5 billion in collateral by mid-August;
9    (2) AIG's significant losses on RMBS investments through its securities lending activities; (3)
10   commitments to purchase CDOs due to liquidity puts; (4) credit rating-based triggers that could cause
11   additional collateral calls if AIG's credit rating were downgraded; (5) significant near-term liabilities;
12   and (6) limited standby credit facilities to manage sudden cash needs.

13         171.    In the first two weeks of September 2008, according to the FCIC Report, AIG's
14   executives and Board examined the Company's balance sheet and found that it had only $9 billion in
15   cash available, which was not nearly enough to meet liabilities that were due in the near future.  AIG
16   needed to fund $4.6 billion of its own commercial paper because traditional investors no longer
17   wanted even short-term exposure to AIG. Moreover, AIG was facing collateral calls of $23.4 billion –
18   including $7.6 billion from Goldman Sachs alone – and Standard & Poor's and Moody's had both
19   warned of potential downgrades that would expose the Company to a further $10 billion or more in
20   additional collateral calls.  Additionally, by the end of June 2007, AIG's investment of $75 billion in
21   RMBS had declined in value to $59.5 billion.

22         172.    On Friday, September 12, 2008, AIG executives met with bankers from JP Morgan and
23   a Blackstone consulting group to determine how much money the Company would need, and by the
24   next day, their initial $20 billion estimate had *doubled to $40 billion*.  On Saturday, September 13,
25   2008, AIG officials met with officials at the Federal Reserve Bank of New York. According to the
26   FCIC Report, the Federal Reserve recounted that, "[AIG's] Treasurer estimates that parent and
27   [AIGFP] have 5-10 days before they are out of liquidity."  According to a September 18, 2008 *Wall*
28   *Street Journal* article, "Bad Bets and Cash Crunch Pushed Ailing AIG to Brink," on Sunday morning,

September 14, 2008, "AIG's advisers made a worrying discovery.  One of the insurer's regulated subsidiaries, its securities lending business, needed a separate injection of as much as $20 billion."

173.    Further, according to the *Wall Street Journal* article, on Monday, September 15, 2008, AIG informed Eric Dinallo, Superintendent of the New York State Insurance Department, that it needed as much as *$70 billion* to avoid failing.  Mr. Dinallo responded that the state would not act unless there was a plan in place to provide the rest of the funds AIG required to remain solvent.  The same day, personnel from JP Morgan and Goldman Sachs met at the office of the Federal Reserve and, together with Morgan Stanley personnel, evaluated AIG's liquidity needs and the viability of a private sector solution.  They concluded that "AIG needed about $80 billion."

174.    On Monday, September 15, 2008, AIG's credit rating was downgraded two and three notches by Moody's, Standard & Poor's, and Fitch Rating.  Consequently, AIG had to post an additional $14.5 billion in collateral, above and beyond its previous postings. Standard & Poor's explained that the downgrade was due to AIG's portfolios of CDS and RMBS credit default swaps.

175.    On September 16, 2008, after it became clear that no private financing would be offered and an AIG collapse was imminent, the Federal Reserve agreed to an $85 billion bailout of AIG in exchange for a 79.9% equity stake.

176.    Without this extraordinary action by the Federal Reserve, AIG would have been insolvent and would have been forced to file for protection under the bankruptcy laws.

177.    In response to these disclosures, which revealed the conditions and risks that AIG misstated and omitted to adequately disclose to investors – in particular, the Company's true financial condition and massive exposures to U.S. residential housing and subprime mortgage market (and the lack of controls in place to adequately manage these risks) – the price of AIG's securities declined significantly, causing Plaintiffs to suffer substantial losses.

178.    As reflected in the chart below, AIG Equity Units, which had closed at a high of $77.85 per share on May 19, 2008, lost nearly all of their value following the above revelations, and closed on September 17, 2008, the first trading day after the federal government's emergency bailout of the Company was announced, at a mere $5.50 per share – a 93% fall in just four months.



179.   AIG's debt securities also experienced steep price declines in response to these corrective disclosures and revelations, including each of the AIG securities that form the basis of Plaintiffs' claims in this action.  For example, AIG's (i) 5.60% Notes; (ii) 5.85% Notes; (iii) Floating Rate Notes; (iv) 4.875% Debentures; and (v) 6.25% Debentures (each defined above), suffered losses of between 40% and 90% following the corrective disclosures and revelations, as set forth in the chart below:



-57-

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933    Exhibit A Page 75

180.   AIG common stock, which had traded at a high of $72.65 per share during the Offering Period, also plummeted in value following the revelation of the conditions and risks that AIG had misrepresented and failed to disclose to investors, closing at just $2.05 on September 17, 2008, a 93% fall in just six weeks, and a 97% drop overall.  Significantly, this near total collapse in value of AIG common stock eliminated the "equity cushion" that had protected the value of AIG's other securities and served to absorb negative information before it affected the prices of AIG bonds, notes, debentures, and Equity Units.  Moreover, this valuation cushion had itself been artificially "thickened" by false and misleading statements disseminated to the market by AIG and its senior executives, including additional misrepresentations in the Company's 2007 Form 10-K (filed in February 2008) and further misrepresentations continuing through August 2008.  The equity cushion was further thickened by the nearly $20 billion in capital that the Company raised in the May 2008 offering.

181.   The price declines in AIG securities directly and proximately resulting from the above-referenced disclosures were not caused by market conditions, industry news, randomness, or by Company information unrelated to the alleged misrepresentations and omissions.  As the Court concluded in denying defendants' motions to dismiss in the Class Action, the foregoing allegations amply demonstrate a causal link between AIG's misconduct and the economic harm Plaintiffs ultimately suffered.

## Q.   AIG Ultimately Requires Over $180 Billion In Government Assistance To Stay Afloat

182.   The U.S. Government's $85 billion emergency bailout of AIG was not enough to keep AIG afloat.  In the ensuing months, nearly $100 billion in *additional* government aid was extended to the Company, as summarized, in part, below.  In total, the Treasury Department and the Federal Reserve committed a total of $182.3 billion to stabilize AIG during the financial crisis.

183.   On October 8, 2008, following the initial $85 billion credit facility provided to AIG, the Federal Reserve committed an additional $37.8 billion to AIG in the form of a securities borrowing facility.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 76

184.    On November 10, 2008, AIG disclosed that as "of September 30, 2008, AIGFP had either agreed to post or posted collateral based on exposures, calculated in respect of super senior credit default swaps, in an aggregate net amount of $32.8 billion."

185.    Also on November 10, 2008, the initial Government loan was restructured to include a $40 billion investment by the U.S. Treasury, through the Troubled Asset Relief Program ("TARP"), and a five-year credit facility with the Federal Reserve Bank of New York ("FRBNY") with a borrowing limit of up to $60 billion.  In addition, two financial entities, Maiden Lane II and Maiden Lane III, were created to acquire AIG's securities lending assets and AIG's multi-sector CDS assets, respectively.  The entities were funded primarily by the FRBNY, with a smaller capital contribution from AIG. Under this agreement, the majority of any appreciation in the securities held by the entities would go to the Government.

186.    As AIG's mark-to-market losses continued throughout the fourth quarter of 2008, even the $125 billion pledged and/or utilized as of that time was insufficient.

187.    On March 2, 2009, AIG and the Government announced a "new set of tools to help AIG achieve a comprehensive restructuring over the next several years."  This included an additional $30 billion committed by the Treasury through TARP to AIG, and the restructuring of the Federal Reserve's commitment to AIG.

R.    **Extensive Information Is Revealed After AIG's Bailout That Further Confirms The Falsity Of AIG's Representations To Investors**

188.    Following the initial $85 billion Government bailout, extensive information was revealed to the public about the events that led to AIG's demise and the enormous losses suffered by its shareholders and bondholders.  This information, certain of which is detailed herein, was disclosed in the FCIC Report; extensive Congressional hearings and other government investigations; investigative books, articles, and other widely-published media; and by AIG itself.

189.    The FCIC was a ten-member commission appointed by the U.S. Government to investigate the causes of the financial crisis.  The first public hearing was held on January 13, 2010, with the presentation of testimony from various banking officials, including those with firsthand knowledge of events alleged herein.  The hearings continued during 2010 with hundreds of other

1  persons in business, academia, and government testifying, including numerous current or former

2  executives and employees of AIG.

3       190.   The FCIC reported its findings in January 2011.  The 662-page FCIC Report, which

4  was available online and as a book, offered ten major conclusions, including that:  "This financial

5  crisis was avoidable" but that numerous warning signs were "ignored or discounted," and "dramatic

6  failures of corporate governance and risk management at many systemically important financial

7  institutions were a key cause of this crisis."  The FCIC Report also included the following major

8  conclusion:

9       **We conclude over-the-counter derivatives contributed significantly to this crisis.**

10      The enactment of legislation in 2000 to ban the regulation by both the federal and state
   governments of over-the-counter (OTC) derivatives was a key turning point in the march

11      toward the financial crisis.

12                                   * * *

13      OTC derivatives contributed to the crisis in three significant ways.  First, one type of
   derivative – credit default swaps (CDS)-fueled the mortgage securitization pipeline. CDS

14      were sold to investors to protect against the default or decline in value of mortgage-
   related securities backed by risky loans. . . . Second, CDS were essential to the creation

15      of synthetic CDOs.  These synthetic CDOs were merely bets on the performance of real
   mortgage-related securities.  They amplified the losses from the collapse of the housing

16      bubble by allowing multiple bets on the same securities and helped spread them

17      throughout the financial system. . . . *Finally, when the housing bubble popped and crisis*
   *followed, derivatives were in the center of the storm. AIG, which had not been required*

18      *to put aside capital reserves as a cushion for the protection it was selling, was bailed*
   *out when it could not meet its obligations.  The government ultimately committed more*

19      *than $180 billion because of concerns that AIG's collapse would trigger cascading*
   *losses throughout the global financial system.*

20

21      191.   With respect to AIG specifically, the FCIC Report found that the massive taxpayer

22 bailout of the Company was necessitated largely because of AIG's poor risk management of its

23 financial products and because deregulation of over-the-counter derivatives, including CDSs, let the

24 Company get away with its risky behavior:

25      *The Commission concludes AIG failed and was rescued by the government primarily*
   *because its enormous sales of credit default swaps were made without putting up initial*

26      *collateral, setting aside capital reserves, or hedging its exposure – a profound failure in*
   *corporate governance, particularly its risk management practices.*

27

28                                   * * *

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

AIG was so interconnected with many large commercial banks, investment banks, and other financial institutions through counterparty credit relationships on credit default swaps and other activities such as securities lending that its potential failure created systemic risk. The government concluded AIG was too big to fail and committed more than $180 billion to its rescue. Without the bailout, AIG's default and collapse could have brought down its counterparties, causing cascading losses and collapses throughout the financial system.[5]

192.    Similar condemnation of AIG has been levelled by numerous senior Government officials, including President Barack Obama, Federal Reserve Chairman Benjamin Bernanke, former Treasury Secretary Timothy Geithner, and former Chairman of the White House National Economic Council Lawrence Summers. For example, expressing outrage at massive bonuses to be paid to AIG executives notwithstanding the billions in taxpayer funds required to bailout the Company, President Obama stated: *This is a corporation that finds itself in financial distress due to recklessness and greed.*

193.    Likewise, the normally reserved Fed Chairman Bernanke, in a March 2009 interview with 60 Minutes, spoke with unusual candor of the frustration he felt in bailing out AIG:

> *[O]f all of the events and all of the things we've done in the last 18 months, the – the single one that makes me the angriest, that gives me the most angst, is the intervention with AIG. Here was a company that made all kinds of unconscionable bets. Then, when those bets went wrong, they had a – we had a situation where the failure of that company would have brought down the financial system. . . .* It makes me angry. I slammed the phone more than a few times on discussing AIG. . . . I understand why the American people are angry. It's absolutely unfair that taxpayer dollars are going to prop up a company that made these terrible bets – that was operating out of the sight of regulators, but which we have no choice but to stabilize, or else risk enormous impact, not just in the financial system, but on the whole U.S. economy.

---

[5] In a March 15, 2009 press release, AIG disclosed that between September 16 and December 31, 2008, there were four categories of counterparties who either received payments from AIG or for whom AIG had posted collateral stemming from (a) AIGFP's CDS contracts, (b) AIG's securities lending program, and (c) AIGFP's guaranteed investment agreements held primarily by municipalities but also by other entities such as hospitals, universities, housing agencies or similar issuers of bonds used to finance capital improvements. The sums involved were staggering. For example, (1) a total of $22.4 billion in additional collateral postings were made for the benefit of AIG's CDS counterparties, (2) a total of $27.1 billion in payments were made to CDS counterparties, and (3) a total of $43.7 billion in payments were made to AIG securities lending counterparties.

194. Similarly, on March 15, 2009, former Treasury Secretary and Chairman of the White House National Economic Council, Lawrence Summers, stated in a nationally televised broadcast on ABC's "This Week" that, *"there are a lot of terrible things that have happened in the last 18 months, but what's happened at AIG is the most outrageous."*

195. In addition to the FCIC Report and widespread criticism by Government officials, numerous investigative books and scholarly articles have been published that document the central role that AIG played in precipitating the financial crisis. Several of these books, which contain the corroborating accounts of numerous percipient witnesses, including multiple former AIG executives and employees, are cited herein. *See* ¶¶53-403. In addition, the misconduct alleged herein has been the subject of numerous articles and exposés in the mainstream news media, including, among others, *The New York Times*, *The Washington Post*, and *The Wall Street Journal*.

196. For example, on September 28, 2008, *The New York Times* published an article by Gretchen Morgenson titled, "The Reckoning: Behind Insurer's Crisis, Blind Eye to a Web of Risk." Morgenson's report highlighted, among other things, the massive amounts of compensation reaped by AIGFP executives and employees. According to the article, since 2001, compensation at AIGFP ranged from $423 million to $616 million each year (for a unit that employed less than 400 people), for a total of $3.56 billion from 2001 through 2008. Indeed, compensation expenses constituted 33% to 46% of AIGFP's total expenses on an annual basis.

197. On October 31, 2008, *The Wall Street Journal* published an extensive article, "Behind AIG's Fall, Risk Models Failed to Pass Real-World Test." As reported, the account of AIG's "risk-management blunders" identified in the article was based on more than two dozen interviews with current and former AIG executives, AIG's trading partners and others with direct knowledge of the firm, as well as internal AIG documents, regulatory filings and congressional testimony. The article disclosed that while AIG was relying on the models developed by Professor Gorton as the basis for issuing CDS contracts, AIG Executives knew that the models did not attempt to develop risk characteristics based on market forces and contract terms. As stated in the article: "AIG relied on those models to help figure out which swap deals were safe. But AIG didn't anticipate how market forces and contract terms not weighed by the models would turn the swaps, over the short term, into

1    huge financial liabilities. AIG didn't assign Mr. Gorton to assess those threats, and knew that his
2    models didn't consider them."

3        198.    As detailed above, AIG was aware that the CDS contracts exposed the Company to
4    three types of potentially devastating financial obligations: credit risk, valuation risk, and collateral
5    risk. As the article noted, if the value of the underlying CDOs declined, AIG would be obligated to
6    account for the contracts on its books based on their diminished value, meaning that AIG would have
7    to take current period write-downs that would impact its reported earnings as well as its assets. Thus,
8    while Professor Gorton's models used historical data to focus on the likelihood of default, "as AIG was
9    aware, his models didn't attempt to measure the risk of future collateral calls or write-downs, which
10    have devastated AIG's finances."

11        199.    *The Wall Street Journal* further reported in the October 31, 2008 article that AIG did
12    not apply effective models for valuing the swaps and for collateral risk until the second half of 2007,
13    long after the swaps were sold. It disclosed that Goldman Sachs had "pried from AIG $8 billion to $9
14    billion, covering virtually all of its exposure to AIG - most of it before the U.S. stepped in." The
15    article disclosed Goldman Sachs' initial collateral demand, for $1.5 billion, that was made in August
16    2007, and thereafter settled when AIG agreed to post $450 million to Goldman Sachs. However, by
17    late October 2007, "Goldman asked for even more collateral, $3 billion." AIG disagreed, but thereafter
18    posted another $1.5 billion as collateral. These amounts, and the identity of Goldman Sachs as the
19    initial counterparty that sought posting of collateral by AIG in August and October 2007 was first
20    revealed in the October 31, 2008 *The Wall Street Journal* article.

21        200.    On December 10, 2008, *The Wall Street Journal* published another article, "AIG Faces
22    $10 Billion In Losses On Bad Bets," which identified another source of exposure that AIG had faced.
23    The *Journal* article began: "American International Group Inc. owes Wall Street's biggest firms about
24    $10 billion for speculative trades that have soured, according to people familiar with the matter . . . ."
25    It continued:

26        The details of the trades go beyond what AIG has explained to investors about the nature
        of its risk-taking operations, which led to the firm's near-collapse in September. In the
27       past, AIG has said that its trades involved helping financial institutions and counterparties
        insure their securities holdings. The speculative trades, engineered by the insurer's
28       financial-products unit, represent the first sign that AIG may have been gambling with its
        own capital.

While an AIG spokesperson characterized the trades as "credit protection instruments" that had been disclosed and that amounted to less than $10 billion of AIG's $71.6 billion exposure to derivative contracts in its CDS portfolio as of September 30, 2008, the *Journal* article stated that the $10 billion owed by AIG was "particularly challenging because the terms of the current $150 billion rescue package for AIG don't cover those debts," and the Federal Reserve "has no immediate plans to help AIG pay off the speculative trades." The article further reported that there were "no actual securities backing the speculative positions that the insurer is losing money on."

201.   According to the December 10, 2008 *Journal* article, some of AIG's speculative bets were tied to a group of collateralized debt obligations named "Abacus," created by Goldman Sachs. As the article further explained: "The Abacus deals were investment portfolios designed to track the values of derivatives linked to billions of dollars of residential mortgage debt. In what amounted to a side bet on the value of those holdings, AIG agreed to pay Goldman if the mortgage debt declined in value and would receive money if it rose." Thus, as noted in the article, AIG would lose two ways if the value of residential mortgage debt fell: it would lose, and need to post additional collateral, if the CDOs underlying its CDS portfolio fell in value; and it would lose in the Abacus deals if the value of the residential mortgage debt fell. Of course, as is also now known, AIG would also lose on the value of its mortgage-related investments from cash obtained through its securities lending program.

202.   In addition to press articles, a great deal of information about AIG's collapse -- and the falsity of the statements that AIG (and its officers, directors and underwriters) made during the Offering Period -- was also disclosed through a series of Congressional hearings.  On October 7, 2008, the House of Representatives Committee on Oversight and Government Reform, chaired by Congressman Henry Waxman, held a full-day hearing. Highlights of that hearing included the following:

   a. Disclosure of the letter dated October 4, 2008, from **Joseph W. St. Denis**, who served as a Staff Accountant and an Assistant Chief Accountant in the Division of Enforcement of the SEC, and who later was employed as Vice President for Accounting Policy at AIGFP from June 2006 through October 1, 2007. Among other things, the St. Denis letter revealed that in early September 2007, he learned that AIGFP had received a multi-billion dollar margin call on certain of its Super Senior Credit Default Swaps (referred to in the letter as "SSCDS").  As the letter states: "I was gravely concerned about this, as the mantra at AIGFP had always been (in my experience) that there could *never* be losses on the SSCDS. I was questioning this mantra in light of the margin call, as were the professionals in FSD [AIG's Financial Services Division] and OAP [AIG's Corporate Office of Accounting

-64-

Policy], in my belief." When AIGFP attempted to value the CDS portfolio, AIGFP's chief executive, Joseph Cassano, informed Mr. St. Denis that he had been *"deliberately excluded"* from the valuation process because Cassano was concerned that Mr. St. Denis' efforts to bring transparency to the accounting policy process at AIGFP *"would pollute the process."* The letter further recounts other actions taken by Cassano to prevent Mr. St. Denis from performing his duties and injecting transparency into the accounting process at AIGFP, and his eventual resignation from the Company. As Mr. St. Denis wrote in his letter, he "could not continue in light of what I perceived to be Mr. Cassano's efforts to isolate me from OAP and FSP personnel, and in light of Mr. Cassano's decision to exclude me from the valuation of the SSCDS portfolio."

b. Other written testimony provided to the Committee by former CEO Greenberg stated that when he was AIG's CEO, AIG management closely monitored AIGFP and its risk portfolio, subjecting AIGFP to numerous internal risk controls, including credit risk monitoring by several independent units of AIG, review of AIGFP transactions by outside auditor and consultants, and scrutiny by AIGFP's and AIG's boards of directors. However, reports he had received indicated that the risk controls that Greenberg and his management team had put in place "were weakened or eliminated after my retirement," including, for example, weekly meetings they had conducted to review all AIG's investments and risks.

c. Lynn E. Turner, a former Chief Accountant of the SEC, also testified to the Committee. During his testimony, Mr. Turner noted the admissions made in AIG's Form 10-K for the year ended December 31, 2007, that internal "controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective" and that AIG had dedicated "insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007." Such disclosures, he stated, "immediately raises a question as to the values the company is reporting throughout its financial statements," and he specifically asked how the Company could expect to ensure that accurate, complete and transparent information was supplied to investors on a timely basis with these material weaknesses. He further questioned the accuracy of the statement in AIG's Form 10-Q for the second quarter 2007 that in the event of a downgrade in AIG's credit rating, counterparties would be permitted to call for approximately *$847 million* of collateral, in light of the statement six months later in the 2007 Form 10-K that AIGFP had posted collateral based on exposures, calculated in respect of the super senior CDS portfolio, in an aggregate amount of *approximately $5.3 billion*, and the further disclosure, made as of July 31, 2008, that AIGFP had posted collateral in an aggregate net amount of *$16.5 billion* and had unrealized market valuation losses of *$26.1 billion* recorded on the super senior CDS portfolio.

d. Mr. Turner further noted that when making its disclosures of counterparty collateral payments, the Company did not disclose the identity of the counterparties that had required the posting of the collateral. As Mr. Turner testified: "For example, if one of the counter parties was Goldman Sachs, a firm that has a reputation for excellence in valuation models, it might even further call into questions [sic] the amounts reported by the company." Among other things, he noted that with the amount of the Government bailout in September 2008, "it would seem that in light of this, the company had failed to provide investors with a clear view of the magnitude of the potential demands for collateral." As he further testified: *"I don't think the company ever was honest with the investors about the magnitude of the potential impact of these things. And I think that's what is grossly missing here."*

e. The Committee Hearing also brought to light the statements cited above that had been made by AIG's outside auditor, PwC, to the Company's senior executives on November 29, 2007, six days before the Company's December 5, 2007 investor meeting.

f.  Audit Committee minutes made public through the Hearing also show that PwC found that the "the process at AIG seemed to break down . . . unlike other companies where there was a good dialogue at appropriate levels of management on the approach, alternatives considered and key decisions, at AIG, only AIGFP was involved in a December valuation process."  In minutes of an Audit Committee meeting of January 15, 2008, the following statements show the concerns stated by PwC in advance of the December 5 investor meeting:

> Mr. Ryan . . . expressed PwC's concern that this weakness may have resulted in a material disclosure error and that it could result in an income statement and/or disclosure error in the future if it was not addressed.  Mr. Ryan said that *PwC believes that Management's oversight of AIG Investments is insufficient, due to lack of access and unclear delineation of roles and responsibilities, and performance management and transparency are not where they should be.*

g.  Minutes from an Audit Committee meeting of February 7, 2008, revealed further deficiencies in AIG's internal controls over the AIGFP unit generally, and specifically stated PwC's views that the AIGFP valuation process was "insular."  PwC recommended that AIG's experts be "more entwined in the process."  The items identified as material weaknesses included that oversight of the valuation process for the CDS portfolio was not effective "and lacked the appropriate challenge and debate," and that even after PwC raised concerns over the process, the controls put in place by AIG's management *did not operate effectively."*

h.  The minutes from a March 11, 2008 Audit Committee meeting also include significant other instances of internal control weaknesses at AIG and AIGFP, and specifically with respect to the valuation of the CDS portfolio, stated that there was *"a new material weakness in control over the super senior valuation process and oversight thereof and a new significant deficiency in control over access, roles and responsibilities of critical control functions. He said that the new material weakness resulted from the large errors in connection with the models used by AIGFP, the lack of timely elevation of key data on the negative basis and collateral issues to the AIG level, and the fact that AIGFP had designed a valuation process that did not allow the involvement of Enterprise Risk Management and the AIG Finance function in developing the approach."*

i.  The Hearing on October 7, 2008 also included statements made in a letter issued to AIG by the Office of Thrift Supervision on March 10, 2008.  The letter noted key internal control deficiencies, as noted in ¶156, above.

203.  On March 5, 2009, the United States Senate Committee on Banking, Housing and Urban Affairs held a hearing entitled: "American International Group: Examining what went wrong, government intervention, and implications for future regulation."  Among the speakers at the Hearing were Scott M. Polakoff, Acting Director, Office of Thrift Supervision, and Eric Dinallo, Superintendent, New York State Insurance Department. Superintendent Dinallo observed that AIG's actual insurance companies, which operated pursuant to the supervision of the New York State Insurance Department, had maintained adequate reserves, and appeared to have acted within prudent and reasonable standards for insurance companies.  However, the AIGFP unit was beyond the

1 supervision of State insurance departments, and it was this unit that had essentially placed the entire

2 Company in danger of bankruptcy.

3     204. Acting Director Polakoff made a number of observations in his sworn testimony.

4 Among other things, he testified that: (a) in 2005, OTS conducted several targeted, risk-focused

5 reviews of various lines of business, including AIGFP, and made numerous recommendations to AIG

6 senior management and the Board with respect to risk management oversight, financial reporting

7 transparency and corporate governance; specific to AIGFP, the OTS "identified and reported to AIG's

8 board weaknesses in AIGFP's documentation of complex structures transactions, in policies and

9 procedures regarding accounting, in stress testing, in communication of risk tolerances, and in the

10 company's outline of lines of authority, credit risk management and measurement;" (b) in 2006, OTS

11 noted only "nominal progress" on implementing corrective measures on the weaknesses noted in the

12 prior examination, and identified additional weaknesses requiring AIG's board to take corrective

13 action, including the establishment of timely and accurate accounting and reconciliation processes, and

14 enhancing and validating business line capital models; (c) during the summer of 2007, after a targeted

15 review of AIGFP, OTS instructed the company to revisit its modeling assumptions in light of

16 deteriorating subprime market conditions, and specifically questioned its valuation of CDS backed by

17 subprime mortgages; and (d) in the last quarter of 2007, OTS increased the frequency of meetings with

18 AIG's risk managers and PwC, and "[d]ue to the Agency's progressive concern with corporate

19 oversight and risk management, in October 2007 we required AIG's Board to: monitor remediation

20 efforts with respect to certain material control weaknesses and deficiencies." In connection with the

21 2007 annual examination, the Organizational Structure component of the CORE rating was

22 downgraded to reflect the identified weaknesses in the Company's control environment.

23     205. Finally, at a Hearing on March 25, 2009, of the House Financial Services Committee,

24 Ben Bernanke, the Chair of the Federal Reserve, testified concerning (a) the decision made by the U.S.

25 Treasury Department and the Federal Reserve in September 2008 to provide support to AIG rather

26 than allow it to file for protection under the U.S. bankruptcy laws, and (b) the Federal Reserve's on-

27 going involvement with AIG. Mr. Bernanke testified that as efforts to find a private-sector solution

28 proved unsuccessful, AIG "faced severe liquidity pressures that threatened to force it imminently into

bankruptcy." Allowing that to occur "would have posed unacceptable risks for the global financial system and for our economy." Mr. Bernanke concluded that:

> The AIG situation highlights the need for strong, effective consolidated supervision of all systemically important financial firms. *AIG built up its concentrated exposure to the subprime mortgage market largely out of the sight of its functional regulators. More-effective supervision might have identified and blocked the extraordinarily reckless risk-taking at AIG-FP.*

## VI.   SUMMARY OF AIG'S FALSE AND MISLEADING SECURITIES OFFERINGS

206.   During the Offering Period, AIG raised over $27 billion in capital through the issuance of equity and debt securities in registered public offerings, including the offerings identified in ¶¶217-224 below (the "Offerings").

207.   The Offerings coincided with a substantial rise in the Company's long-term borrowing level.  As reported in the Company's Form 10-K for 2005, long-term borrowing as of December 31, 2005, stood at approximately $105 billion.   Thereafter, long-term borrowings increased to approximately $140 billion and $167 billion, respectively, as of December 31, 2006, and December 31, 2007.

208.   Through public offerings from October 2006 through December 2007, AIG issued and sold debt securities with a face amount of over $8.5 billion in the form of medium-term notes designated as Series G and Series MP and junior subordinated debentures designated as Series A-1, A-2, and A-3.

209.   From November 2006 through April 2008, AIG raised another $3.6 billion in capital "to provide loans to AIGFP or certain AIGFP subsidiaries" through Offerings of debt and preferred securities designated as Series AIG-FP.

210.   On May 8, 2008, AIG announced its intention to raise another $12.5 billion in capital through a secondary offering of common stock and an offering of Equity Units.  AIG stated that the purpose of this capital raise was to "fortify its balance sheet" and enable the Company to "take advantage in a lot of the attractive emerging markets."  As a result of AIG's positive assurances to the market of "confidence in AIG's strong balance sheet" and its plans for the use of capital, AIG announced on May 22, 2008, that it had raised an additional $20 billion upon completion of its capital

1  raising program, which, according to AIG, exceeded the original target of $12.5 billion "due to strong

2  demand."

3      211.   Despite AIG's assurances that the capital raised in May 2008 was intended to "fortify

4  [AIG's] balance sheet and provide increased financial flexibility," in truth, AIG used a substantial

5  portion of the capital to satisfy collateral demands as a result of the negative bond rating it received on

6  May 8, 2008, and negative rating to CDOs it insured on May 9, 2008.  Only months later, during the

7  August 7, 2008 second quarter earnings call, in response to a question about AIG's use of the $20

8  billion of capital that had been raised, Bensinger admitted that "most of [the $20 billion] I would say

9  has been used for AIGFP purposes in terms of collateral."

10     A.    **The Registration Statements**

11     212.   Plaintiffs' purchases of the AIG securities at issue herein were made in or traceable to

12  Offerings conducted between October 18, 2006 and May 12, 2008.  These Offerings were conducted

13  under a shelf registration process.  In particular, Plaintiffs purchased these securities pursuant to one or

14  more of three shelf registration statements which AIG filed with the SEC on Form S-3 and/or Form S-

15  3MEF on June 12, 2003, June 22, 2007, or May 12, 2008.  The "effective date" of each of the shelf

16  registration statements, as that term is defined under the Securities Act, is the date of the relevant

17  Offering, not the earlier date on which the shelf registration statement itself was filed. *See* 17 C.F.R. §

18  230.415 and 17 C.F.R. § 229.512(a)(2).

19     213.   Form S-3 is a so-called "shelf registration," which permits an issuer to register

20  numerous different securities for later issuance in a single SEC filing.  Once this "shelf" is established,

21  the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a

22  later-filed prospectus, prospectus supplement, and/or pricing supplement that refers investors to the

23  underlying Form S-3.  Accordingly, each of the Offerings was also conducted pursuant to its own

24  prospectus, prospectus supplement, and pricing supplement.

25     214.   The shelf registration statements for the Offerings, and the prospectus and/or prospectus

26  supplement for the Offerings also expressly incorporate by reference numerous other SEC filings,

27  including certain of the Company's Forms 10-K, 10-Q, and 8-K filed with the SEC prior to the date of

28

1 | each of the Offerings. As set forth herein, AIG Forms 10-K, 10-Q, and 8-K made material untrue
2 | statements of fact and omitted to disclose material facts.

3 |       215.    For each Offering, the shelf registration statement, the prospectus or pricing supplement
4 | for that Offering, and all SEC filings incorporated therein are referred to collectively as the "Offering
5 | Materials." The particular SEC filings incorporated into the Offering Materials for each Offering are
6 | set forth in ¶¶219-224 and Section VII below.

7 |       216.    On June 12, 2003, AIG filed a shelf registration statement with the SEC on Form S-3
8 | which, as amended through all post-effective amendments, is referred to herein as the "2003
9 | Registration Statement."[6] On June 22, 2007, AIG filed a shelf registration statement with the SEC on
10 | Form S-3 which, as amended through all post-effective amendments, is referred to herein as the "2007
11 | Registration Statement."[7] On May 12, 2008, AIG filed a shelf registration statement on Form S-3MEF
12 | to register additional securities for an offering conducted pursuant to Rule 462(b) of the Securities Act,
13 | referred to herein as the "2008 Registration Statement."[8]

14 |     **B.**    **Plaintiffs' Purchases Under The Registration Statements**

15 |       217.    Pursuant to these three registration statements, AIG issued, among others, the following
16 | securities in the Offerings which form the basis of Plaintiffs' claims herein: (1) Equity Units; (2)
17 | 5.60% Notes; (3) 5.85% Notes; (4) Floating Rate Notes; (5) 4.875% Debentures; and (6) 6.25%
18 | Debentures. Plaintiffs purchased Equity Units in the May 12, 2008 Offering for such security and in
19 | the aftermarket; 5.60% Medium-Term Notes in the aftermarket for such security; 5.85% Medium-
20 | Term Notes in the Offering for such security and in the aftermarket; Floating Rate Notes in the

---

[6] The 2003 Registration Statement was assigned Commission File No. 333-106040. The 2003 Registration Statement was declared effective on December 9, 2004 and amended by Post-Effective Amendment No. 1, which was declared effective on July 24, 2006.

[7] The 2007 Registration Statement, which was assigned Commission File No. 333-143992, is an independent Registration Statement, but also constitutes Post-Effective Amendment No. 2 to the 2003 Registration Statement.

[8] The 2008 Registration Statement was assigned Commission File No. 333-150865. The May 12, 2008 Equity Unit Offering and May 12, 2008 Common Stock Offering offered securities previously registered under Commission File Nos. 333-143992 and 333-106040, in addition to those registered pursuant to the 2008 Registration Statement.

1   aftermarket for such security; 4.875% Debentures in the Offering for such security and in the

2   aftermarket; and 6.25% Debentures in the Offering for such security and in the aftermarket. Plaintiffs'

3   purchases of these securities were made in the United States, including at PIMCO's Orange County

4   offices, through U.S. broker-dealers registered as such under the Securities and Exchange Act of 1934

5   (the "Exchange Act"), and on the New York Stock Exchange.

6        218.   The table below shows the relationship of the securities and registration statements at

7   issue in this case:

| DATE OF OFFERING | SECURITY DESCRIPTION (CUSIP No.) | SIZE OF OFFERING |
|---|---|---|
| Offerings Pursuant to the 2008 Registration Statement | | |
| May 12, 2008 | Equity Units (026874115) | $5.88 billion |
| Offerings Pursuant to the 2007 Registration Statement | | |
| December 7, 2007 | 5.85% Notes (02687QDG0) | $2.5 billion |
| Offerings Pursuant to the 2003 Registration Statement | | |
| October 18, 2006 | 5.60% Notes (02687QBC1) | $750 million |
| March 15, 2007 | 4.875% Debentures (026874BG1) | $1.32 billion |
| March 13, 2007 | 6.25% Debentures (026874BE6) | $1 billion |
| October 18, 2006 | Floating Rate Notes (02687QBD9) | $400 million |

    C.    <u>Materials Incorporated By Reference Into The Registration Statements</u>

     219.   The Registration Statements for the Offerings included one or more prospectuses, which described the general terms that applied to the registered securities and the general manner in which they were to be offered. The specific terms of the securities being offered and the specific manner in which AIG offered the securities were included in a prospectus supplement or pricing supplement that became part of the respective prospectus and shelf registration statement pursuant to which that Offering was conducted. Specifically, AIG issued the following prospectuses, prospectus supplements, and pricing supplements in connection with the Offerings traceable to the 2003 and 2007 Registration Statements, each of which were filed with the SEC:

- Offerings made pursuant to the 2003 Registration Statement: (i) two prospectuses dated July 24, 2006, (ii) a prospectus supplement dated October 12, 2006, (iii) a prospectus supplement dated March 6, 2007, (iv) two prospectus supplements dated March 8, 2007, (v) a prospectus supplement dated May 31, 2007, and (vi) 42 pricing supplements; and

- Offerings made pursuant to the 2007 Registration Statement: (i) two prospectuses dated July 13, 2007, (ii) a prospectus supplement dated July 13, 2007, (iii) a prospectus supplement dated December 11, 2007, (iv) two prospectus supplements dated May 12, 2008, and (v) 47 pricing supplements.

220. The Registration Statements each expressly incorporate by reference AIG Forms 10-K, 10-Q, 8-K and Proxy Statements that were filed with the SEC prior to the date of each of the Offerings conducted pursuant to the Registration Statements, which contained untrue statements of material fact and material omissions. Specifically, the SEC filings incorporated by reference, including their financial statements and the footnotes thereto, contained untrue statements of material fact and material omissions in the following respects, among others: (a) they failed to disclose, until the Second Quarter 2007 10-Q, the decision to stop writing CDS contracts on multi-sector CDOs, and even thereafter, failed to disclose the reasons for that decision; (b) they failed to disclose the decision made by AIG Investments in late 2005 to change the mix of investments for the securities lending program to contain 75 percent in RMBS and other ABS, and failed to disclose (and materially misrepresented), until the 2007 10-K, the concentration of investments in RMBS and other ABS that was made through the securities lending program; (c) they failed to disclose that the CDS contracts frequently provided that AIGFP's CDS counterparties were the presumptive prevailing party in setting the value of the multi-sector CDOs underlying AIGFP's CDS contracts; and (d) they misrepresented, until the Second Quarter 2008 10-Q, the actual cash collateral payment requirement for the securities lending program; and (e) they failed, until the 2007 10-K, to adequately set forth AIG's concentration of credit risk in the U.S. residential housing and mortgage market, including the subprime market.

221. The Offering Materials further failed to disclose the material fact that many of the underwriters of securities and notes issued by AIG during the Offering Period were also counterparties of AIG with respect to its CDS portfolio and securities lending program, and therefore, that significant portions of the sums raised through the Offerings by the underwriters would or could be used to post collateral for the benefit of the underwriters, or to make payments to the underwriters, including but

-72-

1  not limited to the following: Société Générale, Deutsche Bank, Goldman Sachs, Calyon, Barclays,
2  UBS, Merrill Lynch, BMO, Bank of America, BNP Paribas, HSBC and Citigroup.

3          222.   With respect to the 2008 Offering Materials in particular, the incorporated 2007 Form
4  10-K contained numerous false and misleading statements concerning, among other subjects, liquidity,
5  risk management, the CDS portfolio, collateral posting requirements, and the securities lending
6  program.   In particular, the 2007 Form 10-K continued to mislead investors by creating the false
7  impression that the principal (but "remote") risk associated with the CDS portfolio was AIG's
8  obligation to make payments on the instruments, rather than any liquidity risks relating to valuation
9  declines and attendant collateral calls, together with parallel demands by securities lending borrowers
10 for the return of their cash collateral.   For example, the 2007 10-K maintained that losses resulting
11 from the CDS portfolio's valuation decline would ultimately "reverse," and that any "losses realized
12 over time by AIGFP as a result of meeting its obligations under these derivatives [would] not be
13 material to AIG's consolidated financial condition."   Additionally, the 2007 10-K continued to falsely
14 assure investors regarding the Company's risk management structures and processes. The 2008
15 Offering Materials themselves contained numerous material misrepresentations and omissions, in
16 addition to those contained in the 2007 Form 10-K, including: (a) falsely stating, in the prospectuses
17 for the May 2008 Offering, that the proceeds would be used for "general corporate purposes" rather
18 than to satisfy collateral calls; (b) failing to disclose the amount of collateral calls paid at the time of
19 the Offering, the amount of collateral calls outstanding at the time of the Offering, or any disputes or
20 disagreements with respect to collateral calls by CDS counterparties; (c) misstating material
21 information about AIG's securities lending program, specifically that AIG generally received cash
22 collateral equal to 102% of the fair value of the loaned securities; and (d) failing to disclose the full
23 impact of Project Max, a credit facility that AIG had entered into with Deutsche Bank in 2005, which
24 required AIGFP to issue 2a-7 puts on the super senior security issued by a CDO of CMBS up to a
25 notional amount of $7.5 billion, as well as a $5.4 billion put to AIG made under Project Max.

26          223.   Finally, the financial statements, including the footnotes thereto, included and/or
27 incorporated by reference within the Offering Materials were materially false and misleading, and
28 thus, the Offering Materials were materially false and misleading. Those financial statements, as

issued to the SEC and the investing public, were materially false and misleading because, *inter alia*, they were in violation of GAAP. As a result, AIG's financial statements for the years ending December 31, 2005, 2006, 2007, including the footnotes thereto, which were incorporated by reference into the Offering Materials, are "presumed to be misleading or inaccurate." Regulation S-X, SEC Rule 4-01(a), 17 C.F.R. § 210.4-01(a)(1).

224.    The incorporated documents included the following:

| Securit(ies) | Offering Date(s) | Incorporated Documents |
|---|---|---|
| Floating Rate Notes<br>5.60% Notes | October 13, 2006 | • 2005 Form 10-K<br>• 1Q06 and 2Q06 Forms 10-Q<br>• Accompanying Forms 8-Ks |
| 6.25% Debentures<br>4.875% Debentures | March 13, 2007 to March 15, 2007 | • 2005 Form 10-K<br>• 1Q06, 2Q06 and 3Q06 Forms 10-Q<br>• Accompanying Forms 8-Ks |
| 5.85% Notes | December 7, 2007 | • 2006 Form 10-K<br>• 1Q07, 2Q07 and 3Q07 Forms 10-Q<br>• Accompanying Forms 8-Ks<br>• Proxy statement filed April 6, 2007 |
| Equity Units | May 12, 2008 | • 2006 and 2007 Forms 10-Ks<br>• 1Q08 Form 10-Q<br>• Proxy statements dated April 6, 2007 and April 8, 2008<br>• Accompanying Form 8-Ks |

## VII.    FALSE AND MISLEADING STATEMENTS IN THE OFFERING MATERIALS

225.    As described above and more fully below, the Offering Materials pursuant to which AIG conducted the above Offerings incorporated certain of the Company's SEC filings, which in turn contained materially untrue statements of fact, and failed to disclose material facts, beginning with the Company's Form 10-K for 2005. Accordingly, as to each Offering, the Offering Materials contained untrue statements and omissions of material fact in violation of the Securities Act.

### A.    False Statements In Incorporated SEC Filings For Fiscal 2005

226.    On March 16, 2006, AIG filed its Form 10-K for the year ended December 31, 2005 (the "2005 10-K") and issued a press release announcing its results (the "March 16, 2006 press release"). AIG reported that it had a net income of $10.48 billion, or $3.99 per diluted share, for 2005.

227.  In the March 16, 2006 press release announcing the 2005 year-end financial results, Sullivan described AIG's financial position as sound despite AIG having restated its 2000-2004 financial results and the $1.15 billion after-tax charge incurred in 2005 resulting from settlements with various government regulators:

> AIG is financially strong, and our major business units remain focused on our strategic objectives. Our tradition of entrepreneurship and innovation will enable AIG to continue to perform successfully, enter new markets, develop new products and meet our clients' needs. There is every reason for us to be optimistic about our future. AIG today is a better company for all that we have been through.

228.  In its "Controls and Procedures" section, the 2005 10-K stated that AIG management had determined, while preparing the Company's 2004 10-K, five areas that had material weaknesses in internal controls over financial reporting: control environment, controls over the evaluation of risk transfer, controls over certain balance sheet reconciliations, controls over accounting for certain derivative transactions, and controls over income tax accounting. The 2005 10-K also stated that by December 31, 2005, only two areas (control environment and evaluation of risk transfer) had been remediated.

229.  The 2005 10-K also described further efforts AIG was undertaking to address the remaining weaknesses and to strengthen and redirect the Company's control environment and internal controls:

> AIG has taken several significant actions to improve its control environment, starting with the appointment of new senior management with a new tone and philosophy. AIG's Chief Executive Officer and Chief Financial Officer, together with other senior executives, are committed to achieving transparency and clear communication with all stakeholders through effective corporate governance, a strong control environment, high ethical standards and financial reporting integrity. To strengthen and enhance its overall financial reporting and internal control environment, AIG has increased resources for technical accounting, internal audit, enterprise risk management and compliance functions, hired additional staff with specialized financial and accounting expertise, and established stronger reporting lines within the financial reporting function.
>
> Among the specific actions taken by AIG to remediate this material weakness and to further strengthen overall controls over financial reporting were the following:
>
> AIG has established a Financial Disclosure Committee to assist the Chief Executive Officer and the Chief Financial Officer in fulfilling their responsibilities for oversight of the accuracy and timeliness of the disclosures made by AIG.

* * *

AIG has strengthened the position of Chief Risk Officer, responsible for enterprise-wide credit, market, and operational risk management and oversight of the corresponding functions at the business unit level and has empowered the Chief Risk Officer to work more closely with top executives at the corporate and major business unit levels to identify, assess, quantify, manage and mitigate risks to AIG.

AIG has established an Operational Risk Management department, reporting to the Chief Risk Officer, to engage in expanded risk self-assessment processes for more effective identification and management of operational and reputational risks.

AIG has expanded the scope and activities of the corporate level Complex Structured Finance Transaction Committee, to review and approve transactions that could subject AIG to heightened legal, reputational, regulatory or other risk or enable a third party to achieve an accounting or financial reporting result inconsistent with applicable accounting principles, to include the review and approval of AIG's accounting and financial reporting of identified transactions, including related party transactions. Also, AIG's major business units have implemented their own committees and processes to enhance their ability to identify, analyze and present for approval complex structured finance transactions to AIG's corporate level committee.

230.   Despite the 2005 10-K's recognition that accounting controls for certain derivative transactions was not entirely remediated, it represented the issue as being limited to a failure to "maintain effective controls over the evaluation and documentation of whether certain derivative transactions qualified under GAAP for hedge accounting."

231.   The 2005 10-K also represented that AIGFP's "credit derivatives transactions" had a risk of loss that was "remote, even in severe recessionary market scenarios." This analysis was made without any reference to "credit default swaps," the CDOs AIG insured, or AIG's residential mortgage market exposure. Instead, AIG's credit derivatives business was described in a footnote:

AIGFP enters into credit derivative transactions in the ordinary course of its business. The majority of AIGFP's credit derivatives require AIGFP to provide credit protection on a designated portfolio of loans or debt securities. AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses." *The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios.*

In certain cases, the credit risk associated with a designated portfolio is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies. Typically, there will be an equity layer covering the first credit losses in respect of the portfolio up to a specified percentage of the total portfolio, and then successive layers that are rated, generally a BBB-rated layer, an A-rated layer, an AA-rated layer, and an AAA-rated layer. In transactions that are rated, the risk layer or tranche that is

-76-

immediately junior to the threshold level above which AIGFP's payment obligation would generally arise is rated AAA by the rating agencies. In transactions that are not rated, AIGFP applies the same risk criteria for setting the threshold level for its payment obligations. Therefore the risk layer assumed by AIGFP with respect to the designated portfolio in these transactions is often called the "super senior" risk layer, defined as the layer of credit risk senior to a risk layer that has been rated AAA by the credit rating agencies or if the transaction is not rated, equivalent thereto. For example, in a transaction with an equity layer covering credit losses from zero to two percent of the total portfolio, a BBB-rated layer covering credit losses from two to four percent, an A-rated layer from four to six percent, an AA-rated layer from six to eight percent, and a AAA-rated layer from eight to 11 percent. AIGFP would cover credit losses arising in respect of the portfolio that exceeded an 11 percent first loss threshold amount and thereby bear risk that is senior to the AAA-rated risk layer.

AIGFP continually monitors the underlying portfolios to determine whether the credit loss experience for any particular portfolio has caused the likelihood of AIGFP having a payment obligation under the transaction to be greater than super senior risk. AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion. AIGFP has never had a payment obligation under these credit derivatives transactions where AIGFP is providing credit protection on the super senior risk. *Furthermore, based on portfolio credit losses experienced as of December 31, 2005 under all such outstanding transactions, no transaction has experienced credit losses in an amount that has made the likelihood of AIGFP having to make a payment, in AIGFP's view, to be greater than remote, even in severe recessionary market scenarios.* At December 31, 2005, the notional amount with respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $387.2 billion.

232.    The 2005 10-K also represented that AIG's financial statements recorded derivative financial instruments at fair value:

Derivative transactions are entered into in the ordinary course of Capital Markets operations. Therefore, income on interest rate, currency, equity, commodity, energy, and credit derivatives is recorded at fair value, determined by reference to the mark to market value of the derivative or their estimated fair value where market prices are not readily available. The resulting aggregate unrealized gains or losses from the derivative are reflected in the income statement in the current year. Where Capital Markets cannot verify significant model inputs to observable market data and verify the model value to market transactions, Capital Markets values the contract at the transaction price at inception and, consequently, records no initial gain or loss. . . .

233.    The bases for AIG's fair value determinations were also identified in the 2005 10-K:

Fair Value Determinations of Certain Assets and Liabilities (Financial Services)

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 95

- *Valuation models:* utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.
- *Pricing data:* AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its models. When such prices are not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable prices from trades occurring on dates nearest to the dates of the transactions.

234.   The 2005 10-K further represented that risk was managed by operating credit derivatives transactions within the strict guidelines established by AIG's Credit Risk Committee:

> A counterparty may default on any obligation to AIG, including a derivative contract. Credit risk is a consequence of extending credit and/or carrying trading and investment positions. Credit risk exists for a derivative contract when that contract has a positive fair value to AIG. To help manage this risk, AIGFP's credit department operates within the guidelines set by the AIG Credit Risk Committee. This committee establishes the credit policy, sets limits for counterparties and provides limits for derivative transactions with counterparties having different credit ratings. In addition to credit ratings, this committee takes into account other factors, including the industry and country of the counterparty. Transactions which fall outside these pre-established guidelines require the specific approval of the AIG Credit Risk Committee.

235.   The 2005 10-K also discussed AIG's credit ratings and recognized the potential impact those ratings would have on its liquidity. The 2005 10-K noted that the major rating agencies, including Standard & Poor's, Moody's Investors Service and Fitch Ratings, had downgraded AIG's long-term senior debt in March through June 2005. The 2005 10-K reported that these downgrades caused AIG "to post approximately $1.16 billion of collateral with counterparties to municipal guaranteed investment contracts and financial derivatives transactions." Ratings downgrades of an additional notch "would permit counterparties to call for approximately $962 million of additional collateral" and even further downgrades "could result in requirements for substantial additional collateral, which could have a material effect on how AIG manages its liquidity."

236.   The 2005 10-K discussed AIG's securities lending program and its accounting treatment in a footnote: "AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent. Invested collateral consists primarily of floating rate debt securities. Income earned on invested collateral, net of interest payable to the collateral provider, is recorded in net investment income."

-78-

237.   These statements in the 2005 Form 10-K were materially false and misleading in numerous ways:

(a)   AIG's control environment was not remediated because there remained undisclosed material weaknesses concerning the Company's accounting controls for derivative transactions. AIG's statements concerning AIG management's and credit committees' oversight of the CDS portfolio's risks were false because AIG's oversight of AIGFP's risk management was deficient. AIG failed to maintain adequate internal controls over financial reporting and oversight for the fair value valuations of its CDS portfolio. The valuation of the super senior CDS portfolio effectively weakened or overrode such controls, rather than strengthening them, while the valuation and risk management process effectively excluded key segments of both AIG and AIGFP. Cassano, Forster, and Frost, assisted by Alan Budnick, made independent financial reporting decisions concerning the AIGFP CDS portfolio while Company risk management and financial and accounting oversight functions were deliberately excluded from the valuation process relating to the CDS portfolio. According to Greenberg's testimony, after the period 1998 to March 2005, when AIG wrote approximately 200 CDS contracts, the controls governing the CDS portfolio weakened significantly and the total number of contracts more than doubled (to approximately 420 by the end of 2007), representing $379 billion.

(b)   Given the undisclosed material weakness in AIG's CDS portfolio valuation, and the fact that AIG did not properly reassess and make necessary adjustments on a regular or timely basis to the value of its CDS portfolio, AIG falsely and misleadingly represented its credit derivatives were carried at "fair value."

(c)   AIG's statements regarding its credit derivatives transactions were false and misleading because AIG failed to disclose that CDSs were written to insure CDOs, which exposed the Company to the U.S. residential housing and subprime mortgage markets, and because AIG failed to disclose that AIG had decided to stop writing new CDS contracts by the end of 2005 after an internal review found Professor Gorton's model, which had been used to evaluate CDS contracts, to be unreliable. As underwriting standards deteriorated, the model became unreliable, as evidenced in the pools of mortgages underlying the 2005 multi-sector CDOs and the high correlation among the

-79-

Case 8:15-cv-00687-DOC-DFM   Document 1-1   Filed 04/30/15   Page 92 of 151   Page ID #:101

subprime debt included within the CDOs. Additionally, the models failed to factor in the risk of an AIG credit rating downgrade or that collateral calls might arise from credit rating downgrades or valuation declines in the CDOs referenced by the CDS portfolio.

238.  The statement in the 2005 10-K that the possibility of "any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios" was false and misleading because it focused almost entirely on the default risk of the referenced CDOs and did not disclose other, more significant risks related to the CDS portfolio. AIG failed to disclose that rating downgrades or a decline in the market value of the referenced CDOs could require AIG to post significant additional collateral and strain the Company's liquidity. Additionally, pursuant to the CDS contracts, counterparties (and not AIGFP) were frequently the calculating agents in determining when the referenced CDOs had declined in value to the point that it was necessary to post collateral. The discussion of possible collateral posting requirements if AIG's credit rating was downgraded was also false and misleading because it did not disclose that counterparties could also demand additional collateral if there were ratings downgrades and/or valuation declines of the CDOs insured by the CDS portfolio, and that the counterparties were entitled to determine the value of the referenced CDOs for this purpose. Additionally, AIG should have disclosed, because it knew or should have known, that such downgrades and valuation declines were probable, given AIG's conclusion that the U.S. residential housing and subprime mortgage markets were deteriorating. AIG was aware of a substantial likelihood that the referenced CDO securities would have market rating cuts and market valuation declines because AIG had already determined that the U.S. residential housing market was contracting, along with the fact that there was great deterioration in the underwriting standards on the mortgages underlying the CDO securities.

239.  The statement in the 2005 10-K that "AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion" was false and misleading because it did not disclose that most or all of AIGFP's CDS transactions were unhedged, which greatly increased the risk inherent in these contracts. The statement was also false and misleading because it did not disclose that AIGFP had decided to leave the CDS portfolio predominantly unhedged because hedging

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933   Exhibit A Page 98

1 would have eroded the Company's profitability and, thereby, diminished the compensation of Cassano,

2 Forster and Frost.

3    240.    AIG's discussion about its securities lending program was false and misleading because

4 it did not disclose that AIG attempted to boost income generated from securities lending in late

5 December 2005 and, as part of that effort, decided to invest 75% of all cash collateral received from

6 borrowers in asset-backed securities including RMBS. AIG did not disclose that it became heavily

7 exposed to the growing risks of the U.S. residential housing and mortgage markets by expanding its

8 RMBS investments (which carried significantly greater risk than the traditional securities lending

9 business investments in Treasury bonds or short-term debt) and also dramatically increasing the

10 number of CDSs it wrote throughout 2005.

11    241.    Sullivan and Bensinger expressly certified the reported results in the 2005 10-K. These

12 certifications falsely stated, in part, that: (1) the Form 10-K "does not contain any untrue statement of

13 a material fact or omit to state a material fact necessary to make the statements made, in light of the

14 circumstances under which such statements were made, not misleading;" (b) the financial statements

15 "fairly present in all material respects the financial condition, results of operations and cash flows" of

16 AIG; and (c) "[a]ll significant deficiencies and material weaknesses in the design or operation of

17 internal control over financial reporting which are reasonably likely to adversely affect [AIG's] ability

18 to record, process, summarize and report financial information" were "disclosed."

19    242.    The certifications further represented that Sullivan and Bensinger were "responsible for

20 establishing and maintaining disclosure controls and procedures … and internal control over financial

21 reporting for [AIG]" under applicable Exchange Act Rules, and that they had (1) "Designed such

22 disclosure controls and procedures … to ensure that material information relating to [AIG], including

23 its consolidated subsidiaries, is made known to us by others within those entities," particularly during

24 the period in which this report is being prepared; (2) "Designed such internal control over financial

25 reporting … to provide reasonable assurance regarding the reliability of financial reporting and the

26 preparation of financial statements for external purposes in accordance with generally accepted

27 accounting principles;" (3) "Evaluated the effectiveness of [AIG's] disclosure controls and procedures

28 and presented in this report our conclusions about the effectiveness of the disclosure controls and

1  procedures ...  based on such evaluation;" and (4) "Disclosed in this report any change in [AIG's]

2  internal control over financial reporting that occurred during [AIG's] most recent fiscal quarter ... that

3  has materially affected, or is reasonably likely to materially affect, the registrant's internal control over

4  financial reporting."

5  **B.**    **False Statements In Incorporated SEC Filings For Fiscal 2006**

6      243.    AIG filed a Form 10-Q on May 10, 2006, for the first quarter ended March 31, 2006

7  ("1Q06 10-Q") and issued a press release announcing its first quarter financial results. AIG reported

8  that its net income for the first quarter of 2006 was $3.20 billion, or $1.22 per diluted share.

9      244.    AIG filed a Form 10-Q for the second quarter ended June 30, 2006 ("2Q06 10-Q") on

10  August 9, 2006, and issued a press release announcing second quarter financial results.  The Company

11  reported 2006 second quarter net income of $3.19 billion, or $1.21 per diluted share. Commenting on

12  the results in the press release, Sullivan remarked: "AIG had a very good quarter. Once again, our

13  performance underscored the strength of AIG's widely diversified business portfolio, both

14  domestically and overseas."

15      245.    AIG filed a Form 10-Q for the third quarter ended September 30, 2006 ("3Q06 10-Q")

16  on November 9, 2006, and issued a press release announcing third quarter financial results. The

17  Company reported 2006 third quarter net income of $4.2 billion, or $1.61 per diluted share. In the

18  press release, Sullivan stated that these results demonstrated a "very good quarter."

19      246.    In the "Controls and Procedures" section of the 2006 10-Qs for all three quarters, the

20  2005 10-K's identification of material weaknesses in internal controls was referenced, and all three

21  stated that there had been "no change in AIG's internal control over financial reporting" during the

22  particular quarter.

23      247.    Additionally, the three 10-Qs represented that AIG's financial statements recorded the

24  derivative financial instruments at fair value:

25      Derivative transactions are entered into in the ordinary course of Capital Markets
        operations.  Therefore, income on derivatives is recorded at fair value, determined by
26      reference to the mark to market value of the derivative or their estimated fair value where
        market prices are not readily available.  The resulting aggregate unrealized gains or losses
27      from the derivative are reflected in the income statement. Where Capital Markets cannot
        verify significant model inputs to observable market data and verify the model value to
28

market transactions, Capital Markets values the contract at the transaction price at inception and, consequently, records no initial gain or loss. . . .

248.   The bases for the fair value determinations were identified in three 10-Qs:

Fair Value Determinations of Certain Assets and Liabilities (Financial Services – Capital Markets)

- *Valuation models:* utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.

- AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its model[s].  When such [data is] not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable prices from trades occurring on dates nearest to the dates of the transactions.

249.   The three 10-Qs similarly stated that senior management of AIGFP's parent company, AIG, closely oversaw and managed risk exposure arising from AIGFP's operations:

The senior management of AIG defines the policies and establishes general operating parameters for Capital Markets operations.  AIG's senior management has established various oversight committees to review the various financial market, operational and credit risk attendant to the Capital Markets operations.  The senior management of AIGFP reports the results of its operations to and reviews future strategies with AIG's senior management.

AIG actively manages the exposures to limit potential losses, while maximizing the rewards afforded by these business opportunities.  In doing so, AIG must continually manage a variety of exposures including credit, market, liquidity, operational and legal risks.

250.   The three 10-Qs stated, as did the 2005 10-K, that AIGFP's credit derivatives transactions occurred in accordance with strict guidelines established by AIG's Credit Risk Committee to manage risk carefully:

A counterparty may default on any obligation to AIG, including a derivative contract. Credit risk is a consequence of extending credit and/or carrying trading and investment positions.  Credit risk exists for a derivative contract when that contract has a positive fair value to AIG.  To help manage this risk, AIGFP's credit department operates within the guidelines set by the AIG Credit Risk Committee.  This committee establishes the credit policy, sets limits for counterparties and provides limits for derivative transactions with counterparties having different credit ratings. In addition to credit ratings, this committee takes into account other factors, including the industry and country of the counterparty. Transactions which fall outside these pre-established guidelines require the specific approval of the AIG Credit Risk Committee.

-83-

251. Each 2006 10-Q further reiterated the 2005 10-K's disclosure concerning AIG's rating downgrades in 2005 and that, as a consequence, AIG had to post $1.16 billion in collateral. AIG represented in the 1Q06 10-Q that, based on its outstanding municipal guaranteed investment agreements and financial derivatives transactions as of April 30, 2006, it would be subject to approximately $896 million of collateral calls if its ratings declined another notch. In the 2Q06 10-Q, the amount was $873 million as of July 31, 2006. And in the 3Q06 10-Q, the amount was $1.1 billion as of October 31, 2006. Each 2006 10-Q stated that "additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIG manages its liquidity."

252. Sullivan and Bensinger certified the results in each of the 2006 10-Qs, with nearly identical language to the 2005 10-K discussed above.

253. The statements in the three 2006 10-Qs were materially false and misleading in at least the following ways: AIG's control environment was not remediated because there were undisclosed material weaknesses concerning the Company's accounting controls for derivative transactions. AIG's representations concerning AIG management's and credit committees' oversight of risks regarding the CDS portfolio were false and misleading because AIG's oversight of AIGFP's risk management was deficient. AIG did not have adequate internal controls over financial reporting and oversight regarding the fair value valuations of its CDS portfolio. Such controls were weakened or overridden, rather than strengthened, with respect to the valuation of the CDS portfolio, and the valuation and risk management processes excluded crucial segments of both AIG and AIGFP. Cassano, Forster, and Frost, assisted by Alan Budnick, independently made financial reporting decisions concerning the AIGFP CDS portfolio, while Company risk management and financial and accounting functions were deliberately excluded from the valuation process relating to the CDS portfolio. As Greenberg testified, the controls governing the CDS portfolio were weakened significantly after the period 1998 through mid-March 2005, when approximately 200 CDS contracts were written. By the end of 2005, with weakened controls, the number of contracts more than doubled, reaching approximately 420.

254. AIG's representation that credit derivatives were carried at "fair value" was false and misleading because there were undisclosed material weaknesses regarding the valuation of its CDS

-84-

portfolio and AIG failed to properly reassess and make necessary adjustments for the CDS portfolio's value on a regular or timely basis.

255.    AIG's representations concerning its credit derivatives transactions were false and misleading because they did not disclose that CDSs were written to insure CDOs, a substantial portion of which exposed AIG to the U.S. residential housing and subprime mortgage market.  AIG further failed to disclose that, by the end of 2005, AIGFP had decided to stop writing such CDS contracts after an internal review found that the model used to assess potential CDS contracts was not reliable in light of, among other things, the deterioration in underwriting standards that was apparent in the mortgage pools underlying the 2005 multi-sector CDOs. Indeed, the models did not even endeavor to consider the risks that AIG's credit rating may be downgraded or that collateral calls might arise from rating downgrades or declines in the valuations of the CDOs referenced by AIGFP's CDS portfolio.

256.    Also false and misleading was the 2006 10-Qs' discussion of possible additional collateral posting requirements in the event of AIG's credit rating downgrades.  This discussion failed to disclose that the CDS contract counterparties could also demand additional collateral if there were rating downgrades and/or declines in the valuations of the CDOs insured through the CDS portfolio, and that the counterparties could determine the value of the referenced CDOs for that purpose.  AIG should have disclosed that downgrades and valuation declines were likely, considering AIGFP's determination that the U.S. residential housing and subprime mortgage markets were deteriorating.

257.    On March 1, 2007, AIG filed its Form 10-K for the year ended December 31, 2006 (the "2006 10-K") and issued a press release announcing its year-end financial results. AIG reported 2006 net income of $14.05 billion, or $5.36 per diluted share, compared to $10.48 billion, or $3.99 per diluted share, for 2005.

258.    Sullivan was quoted in the March 1, 2007 press release as stating:

> 2006 was a remarkable year beginning with the resolution of our significant regulatory challenges and ending with excellent financial results. . . .  We also made significant progress throughout the year in improving our financial control environment, providing greater transparency in our financial disclosures and remaining on the forefront of good corporate governance.

259.    The 2006 10-K stated that the material weaknesses relating to balance sheet reconciliations and accounting for certain derivative transactions had been remediated and that the material weakness in regard to income tax accounting was subject to further remedial efforts. The 2006 10-K further represented that a Steering Committee, which was directed by the Company's Chief Risk Officer and included AIG's Chief Executive Officer, Chief Financial Officer and Comptroller, governed the remediation and that the Audit Committee of the Board of Directors reviewed the status of the remediation of each material weakness.

260.    As with the 2005 10-K, the 2006 10-K similarly described AIG's credit derivatives transactions, however without using the term "credit default swap" and without discussing the CDOs they insured or the significant portion of them that exposed AIG to the U.S. residential housing and subprime mortgage markets.  The Company again stated that the risk of loss on its "credit derivatives transactions" was "remote, even in severe recessionary market scenarios":

> AIGFP enters into credit derivative transactions in the ordinary course of its business. The majority of AIGFP's credit derivatives require AIGFP to provide credit protection on a designated portfolio of loans or debt securities. AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses."  *The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios.*
>
> *  *  *
>
> AIGFP continually monitors the underlying portfolios to determine whether the credit loss experience for any particular portfolio has caused the likelihood of AIGFP having a payment obligation under the transaction to be greater than super senior risk.  AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion.  At December 31, 2006, the notional amount with respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $483.6 billion.

261.    The 2006 10-K represented that AIG's financial statements recorded derivative financial instruments at fair value:

> Derivative transactions are entered into in the ordinary course of AIGFP operations. Derivatives are recorded at fair value, determined by reference to the mark to market value of the derivative or their estimated fair value where market prices are not readily

-86-

available. The resulting aggregate unrealized gains or losses from the derivatives are reflected in the consolidated income statement. Where AIGFP cannot verify significant model inputs to observable market data and cannot verify the model value to market transactions, AIGFP values the contract at the transaction price at inception and, consequently, records no initial gain or loss . . . .

262. In language almost identical to that set forth in the 2005 10-K, the 2006 10-K similarly identified the bases for AIG's fair value determinations.

263. The 2006 10-K included statements praising AIG's ability to manage risks. The 2006 10-K first represented that the Company's corporate structure assured that risks were kept at levels that were manageable:

Corporate Risk Management:

AIG's major risks are addressed at the corporate level through the Enterprise Risk Management Department (ERM). ERM is headed by AIG's Chief Risk Officer (CRO) and is responsible for assisting AIG's business leaders, executive management and the Board of Directors to identify, assess, quantify, manage and mitigate the risks incurred by AIG. *An important goal of ERM is to ensure that once appropriate governance, authorities, procedures and policies have been established, aggregated risks do not result in inappropriate concentrations.*

264. The 2006 10-K further explained that established various oversight committees had been established by senior management to monitor risks attendant to its businesses, including:

- The Credit Risk Committee (CRC) is responsible for (i) approving credit risk policies and procedures for use throughout AIG; (ii) delegating credit authority to business unit credit officers and select business unit managers; (iii) approving transaction requests and limits for corporate, sovereign and cross-border credit exposures that exceed the delegated authorities; (iv) establishing and maintaining AIG's risk rating process for corporate, financial and sovereign obligors; and (v) regular reviews of credit risk exposures in the portfolios of all credit-incurring business units; and

- The Financial Risk Committee (FRC) oversees AIG's market risk exposures to interest rates, foreign exchange and equity prices and provides strategic direction for AIG's asset-liability management. *The FRC meets monthly and acts as a central mechanism for AIG senior management to review comprehensive information on AIG's financial exposures and to exercise broad control over these exposures.*

265. The 2006 10-K also stated that AIG had "established a corporate-level Operational Risk Management Department (ORM) to oversee AIG's operational risk management practices." Under the ORM, "[e]ach business [within AIG] is responsible for implementing the components of AIG's

1  operational risk management program to ensure that effective operational risk management practices
2  are utilized throughout AIG," which includes "developing and implementing policies, procedures,
3  management oversight processes, and other governance-related activities consistent with AIG's overall
4  operational risk management process."

5      266.    The 2006 10-K represented that the senior management of AIGFP's parent company,
6  AIG, closely oversaw the risk exposure arising from AIGFP's operations:

> The senior management of AIG defines the policies and establishes general operating parameters for Capital Markets operations. AIG's senior management has established various oversight committees to monitor on an ongoing basis the various financial market, operational and credit risk attendant to the Capital Markets operations. The senior management of AIGFP reports the results of its operations to and reviews future strategies with AIG's senior management.
>
> ***AIG actively manages its exposures to limit potential losses, while maximizing the rewards afforded by these business opportunities. In doing so, AIGFP must continually manage a variety of exposures including credit, market, liquidity, operational and legal risks.***

14      267.    The 2006 10-K represented that AIG's Credit Risk Committee oversaw AIG's credit
15  derivatives transactions in order to manage risk carefully:

> A counterparty may default on any obligation to AIG, including a derivative contract. Credit risk is a consequence of extending credit and/or carrying trading and investment positions. Credit risk exists for a derivative contract when that contract has a positive fair value to AIG.... To help manage this risk, AIGFP's credit department operates within the guidelines set by the CRC [*i.e.* AIG's Credit Risk Committee]. Transactions which fall outside these pre-established guidelines require the specific approval of the CRC.
>
>                             \* \* \*
>
> AIGFP independently evaluates the counterparty credit quality by reference to ratings from rating agencies or, where such ratings are not available, by internal analysis consistent with the risk rating policies of the CRC. In addition, AIGFP's credit approval process involves pre-set counterparty and country credit exposure limits and, for particularly credit-intensive transactions, requires approval from the CRC. AIG estimates that the average credit rating of Capital Markets derivative counterparties, measured by reference to the fair value of its derivative portfolio as a whole, is equivalent to the AA rating category.

27      268.    The 2006 10-K also discussed AIG's credit ratings and the potential impact such ratings
28  have on the Company's liquidity. The 2006 10-K noted the 2005 downgrades of AIG's credit rating by

the major rating agencies and that, as a result of those downgrades, AIG had to post collateral with counterparties to municipal guaranteed investment contracts and financial derivatives transactions totaling approximately $1.16 billion. AIG represented that, based on its municipal guaranteed investment contracts and derivatives transactions outstanding as of February 15, 2007, another rating downgrade "would permit counterparties to call for approximately $864 million of additional collateral" and that further downgrades "could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity."

269. The 2006 10-K included a financial statement footnote that described AIG's securities lending program and its accounting treatment:

> AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent. *Invested collateral consists primarily of floating rate bonds.* Income earned on invested collateral, net of interest payable to the collateral provider, is recorded as net investment income.

270. Sullivan and Bensinger certified the 2006 10-K reported results, using the same certification set forth above in the 2005 10-K. The statements referred to in the 2006 Form 10-K were materially false and misleading for the same reasons set forth above concerning the 2005 10-K.

271. Also materially false and misleading was Sullivan's statement in the March 1, 2007 press release that AIG had made "significant progress" in improving its control environment and in "providing greater transparency in our financial disclosures" because it did not disclose that there was material weakness in AIG's internal controls over its CDS portfolio valuation and because AIG's financial disclosures lacked sufficient transparency to allow investors to discern AIG's exposure to the U.S. residential housing and mortgage markets, including the subprime market.

C.     **False Statements In Incorporated SEC Filings For Fiscal 2007**

272. AIG filed its Form 10-Q for the first quarter ending March 31, 2007 ("1Q07 10-Q") on May 10, 2007, and issued an accompanying press release ("1Q07 Press Release"). AIG represented that its first quarter 2007 net income was $4.13 billion or $1.58 per diluted share.

273. As with the 10-Qs filed in 2005 and 2006, the 1Q07 10-Q similarly stated that AIG's financial statements recorded derivative financial instruments at "fair value," and explained the bases for its fair value determination in a manner substantially similar to prior filings.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 107

274.   The 1Q07 10-Q states that a credit rating downgrade of AIG's long-term senior debt would permit its counterparties "to call for approximately $902 million of collateral," adding that "additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity."

275.   The 1Q07 10-Q also represents that, "in light of the previously identified material weakness in internal control over financial reporting, as of December 31, 2006 [addressed in the 2006 10-K], relating to controls over income tax accounting . . . AIG's [CEO and CFO] concluded that, as of March 31, 2007, AIG's disclosure controls and procedures were ineffective.  In addition, there has been no change in AIG's internal control over financial reporting . . . that occurred during the quarter ended March 31, 2007 that has materially affected, or is reasonably likely to materially affect, AIG's internal control over financial reporting."

276.   Sullivan and Bensinger certified the statements and results contained in the 1Q07 10-Q with the same language that appears in the 2006 10-Qs.

277.   Sullivan is quoted in the 1Q07 Press Release as stating, "AIG Financial Products experienced slower transaction flow compared to a strong first quarter of 2006.  While the slowdown in the U.S. residential real estate market affected American General Finance's results, prior action taken to limit certain geographic and product exposures has helped AIGFP avoid some of the significant credit deterioration currently facing the real estate lending industry."

278.   These statements in the 1Q07 10-Q and 1Q07 Press Release were materially false and misleading for the same reasons explained above concerning the 2006 10-Qs.

279.   On August 8, 2007, AIG filed its Form 10-Q for the second quarter ending June 30, 2007 ("2Q07 10-Q") and issued an accompanying press release ("2Q07 Press Release").  AIG stated that its 2007 second quarter net income was $4.28 billion or $1.64 per diluted share.

280.   Sullivan remarked in the 2Q07 Press Release that, "We remain focused on creating *long-term opportunities to grow* at attractive rates of return and, ultimately, driving even greater shareholder value."  He stated further, "We continue to be *very comfortable with our exposure to the U.S. residential mortgage market*, both in our operations and our investment activities. However, in

recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call."

281.    The 2Q07 10-Q is AIG's first public filing directly referring to AIGFP's CDS portfolio and its insurance of CDOs exposed to RMBS, including "subprime collateral." It represented that AIG stopped its practice of writing swaps on CDOs backed by subprime mortgage debt in December 2005. The filing assured investors, "AIGFP's portfolio of credit default swaps is carefully structured, undergoes regular monitoring, modeling and analysis and contains significant protection through collateral subordination." AIG further represented that, while it was monitoring the U.S. residential mortgage market's unstable condition and its "serious disruption" by deteriorating loan quality, regulatory intervention, and a slowing pace, that market's impact was "not expected to be material" to the Company's investments or AIGFP's CDS portfolio:

> The downward cycle in the U.S. housing market is not expected to improve until residential inventories return to a more normal level and the mortgage credit market stabilizes. AIG expects that this downward cycle will continue to adversely affect UGC's operating results for the foreseeable future, although UGC is beginning to experience improved credit quality trends on new production. *The effect of the downward cycle in the U.S. housing market on AIG's other operations, investment portfolio and overall consolidated financial position, is not expected to be material due to AIG's disciplined underwriting and active risk management, as well as the high credit ratings for assets collateralized by subprime and non-prime mortgages and the structural protections against loss afforded AIG by its senior position in the investments and exposures that it holds.*

282.    AIG represented in its 2Q07 10-Q that it invests in RMBS and CDOs, that as of June 30, 2007, its investment portfolio included RMBS and CDO securities with an amortized cost of $98.5 billion and an estimated fair value of $97.9 billion, and that the gross unrealized gains related to these securities were $134 million and gross unrealized losses related to these securities were $747 million as of June 30, 2007. AIG also represented that its holdings in RMBS amounted to approximately 11% of AIG's total invested assets, as well as $3.6 billion in CDOs including subprime exposure. AIG assured investors that, despite this large exposure, its RMBS investments were "predominantly in highly-rated tranches that contain substantial protection features through collateral subordination" and "[a]t June 30 2007, approximately 91 percent of these investments were rated AAA

and approximately 7 percent were rated AA," adding that AIG's BBB or below-rated investments totaled less than 1% of its invested assets. Significantly, AIG also assured the market that:

> "[N]one of AIG's RMBS with some level of subprime collateral had been downgraded as a result of recent rating agency actions, and a small amount of AIG's RMBS investments with subprime collateral had been upgraded. AIG currently intends to hold these securities to full recovery and/or full payment of principal and interest, and therefore expects that any mark to market effect will result in *only a temporary adjustment to shareholders' equity*."

283. As with the Form 10-Qs filed for 2005 and 2006, the 2Q07 10-Q stated that AIG's financial statements recorded derivative financial instruments at "fair value," and explained the bases for its fair value determinations in a manner substantially similar to those prior filings.

284. AIG further represented in the 2Q07 10-Q that a credit rating downgrade of AIG's long-term senior debt would permit its counterparties "to call for approximately $847 million of collateral," adding that "additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity."

285. The 2Q07 10-Q also represented,

> "in light of the previously identified material weakness in internal control over financial reporting, as of December 31, 2006 [addressed in the 2006 10-K], relating to controls over income tax accounting . . . AIG's [CEO and CFO] concluded that, as of June 30, 2007, AIG's disclosure controls and procedures were ineffective. In addition, there has been no change in AIG's internal control over financial reporting . . . that occurred during the quarter ended June 30, 2007 that has materially affected, or is reasonably likely to materially affect, AIG's internal control over financial reporting."

286. Sullivan and Bensinger certified the statements and results reported in the 2Q07 10-Q, using the same language set forth above in the 2006 Form 10-Qs.

287. Statements made in the 2Q07 10-Q and 2Q07 Press Release were materially false and misleading in at least the following respects:

(a) In contrast to representations in the 2006 10-K, AIG's control environment was not remediated;

(b) There were additional, undisclosed material weaknesses relating to the AIG's valuation of its CDS portfolio;

(c) AIG failed to properly reassess and make necessary adjustments for the value of its CDS portfolio on a regular or timely basis;

-92-

(d)     Despite disclosing in its 2Q07 10-Q that it had ceased writing new contracts insuring CDOs based on subprime collateral, AIG failed to disclose that the decision to do so was based on the fact that the model used to assess potential CDS contracts had been determined to be unreliable or unable to account for all required variables, in light of the deterioration of mortgage underwriting standards apparent in the pools of mortgages underlying the CDOs insured in 2005;

(e)     AIG's CDS portfolio was subject to risks apart from the risk of default, including valuation risk and collateral risk, which could lead to a debilitating liquidity crisis for AIG; and further, these risks were likely to affect the CDS portfolio because of the deteriorating mortgage underwriting standards and subprime mortgage market generally, which were the reasons AIGFP ceased writing swaps on subprime collateral in 2005;

(f)     The oversight, review and analysis processes AIG employed in connection with the CDS portfolio were substantially less rigorous and less effective than the statements in these materials represent; and

(g)     Neither AIG nor AIGFP established reserves for their CDS portfolio exposures and AIGFP failed to hedge its exposure on that portfolio; and AIG did not disclose that most AIG RMBS investments were made with cash collateral received from borrowers in connection with AIG's securities lending program, and further failed to disclose that AIG planned to invest up to 75% of the cash collateral received from borrowers in RMBS which significantly increased AIG's liquidity risk.

288.     AIG reported its financial results for third quarter 2007 in its Form 10-Q for the period ended September 30, 2007 ("3Q07 10-Q") on November 7, 2007, and issued a press release covering the same period ("3Q07 Press Release"). The Company reported net income of $3.09 billion or $1.19 per diluted share.

289.     In the 3Q07 Press Release, Sullivan touted AIG's various lines of business and ability to grow, stating that even with the "volatile market environment that challenged many financial institutions," AIG's third quarter 2007 results "once again confirm[] the benefits of our diversified portfolio of global businesses." He noted that, "U.S. residential mortgage and credit market conditions adversely affected our results," but added that *"our active and strong risk management processes helped contain the exposure. Our balance sheet remains strong with the financial resources to*

-93-

*weather continued uncertainty* as well as to take advantage of attractive market opportunities as they emerge." Sullivan also summarized the losses in AIG's specific divisions, such as AIGFP which "reported an operating loss in the quarter due principally to the unrealized market valuation loss related to its super senior credit default swap portfolio." Sullivan softened the blow by stating, "[a]lthough GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives."

290. The 3Q07 10-Q stated that its CDS portfolio market valuation loss of $352 million "represented a decline in the fair value of [the] super senior credit derivatives." AIG also announced an "estimate[d]" further unrealized market valuation loss through October 2007 of $550 million," even while acknowledging that fair value estimates had become difficult due to the limited availability of market observable data for these derivatives:

> The ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP. Although it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of market observable data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since September 30, 2007 is approximately $550 million as of October 31, 2007. The fair value of these derivatives is expected to fluctuate, perhaps materially, in response to changing market conditions, and AIG's estimates of the value of AIGFP's super senior credit derivative portfolio at future dates could therefore be materially different from current estimates. *AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.*

291. Elsewhere in the 3Q07 10-Q, AIG discussed its methodologies for valuing its CDS portfolio and disclosed, for the first time, that counterparties to the CDS transactions had made demands on AIG to post collateral as a result of disagreements between the counterparties' estimates of fair value and AIG's estimates:

> AIGFP values its super senior credit default swaps using internal methodologies that utilize available market observable information and incorporate management estimates and judgments when information is not available. It also employs the Binomial Expansion Technique (BET) model where appropriate to help estimate the fair value of these derivatives. The BET model utilizes credit spreads for the collateral pool obtained from an independent source. The model also utilizes diversity scores, weighted average lives, recovery rates and discount rates. The BET model does not adequately quantify the

benefit of certain structural mitigants, such as triggers that accelerate the amortization of the more senior tranches, that AIGFP believes are important to the appropriate valuation of its transactions. AIG believes that the value of these mitigants could range from zero to $50 million, but is not able to reliably estimate their value at this time. Therefore, AIG's estimate of the fair value of AIGFP's super senior credit default swaps as of September 30, 2007 does not attribute value to these features.

The valuation of the super senior credit derivatives has become increasingly challenging given the limitation on the availability of market observable information due to the lack of trading and price transparency in the structured finance market. These market conditions have increased the reliance on management estimates and judgments in arriving at an estimate of fair value for financial reporting purposes. Further, disparities in the valuation methodologies employed by market participants and the varying judgments reached by such participants when assessing volatile markets *has increased the likelihood that the various parties to these instruments may arrive at significantly different estimates as to their fair values.*

*As of October 31, 2007, AIG is aware that estimates made by certain AIGFP counterparties with respect to the fair value of certain AIGFP super senior credit default swaps and the collateral required in connection with such instruments differ significantly from AIGFP's estimates.*

292.    The 3Q07 10-Q also stated that AIG's RMBS and CDO investments were made "[a]s part of its strategy to diversify its investments." AIG stated that the estimated fair value of such securities in its insurance operations investment portfolio represented approximately $91 billion, which constituted about 10% of AIG's total invested assets. The 3Q07 10-Q also stated that, while some RMBS held by AIG had been downgraded or placed on watch for a downgrade, AIG "currently intends to hold these securities to full recovery and/or full payment of principal and interest, and therefore expects that any mark to market effect will result in only a *temporary adjustment* to shareholders' equity." The 3Q07 10-Q assured investors that "AIG's underwriting practices for investing in RMBS, other asset-backed securities and CDOs takes into consideration the quality of the originator, the manager, the servicer, security credit ratings, underlying characteristics of the mortgages, borrower characteristics, and the level of credit enhancement in the transaction."

293.    The 3Q07 10-Q also noted AIG's securities lending operations: "At September 30, 2007, AIG's securities lending payables totaled $88.4 billion, $14.6 billion of which was one-day tenor, with the balance maturing within the next six months. Collateral held for this program at

1  September 30, 2007 included interest bearing cash equivalents with overnight maturities of $17.4
2  billion."

3      294.   Regarding potential credit rating downgrades to AIG or its securities, the 3Q07 10-Q
4  stated that, based on AIGFP's outstanding municipal Guaranteed Investment Agreements ("GIAs")
5  and financial derivatives transactions as of October 31, 2007, a downgrade of AIG's long-term senior
6  debt would "permit counterparties to call for approximately $830 million of collateral" and that
7  "additional downgrades could result in requirements for substantial additional collateral, which could
8  have a material effect on how AIGFP manages its liquidity."

9      295.   Under the heading "Controls and Procedures," the 3Q07 10-Q referenced the 2006 10-
10  K's identification of a material weakness relating to internal control over income tax accounting.  AIG
11  further stated that there had been "no change in AIG's internal control over financial reporting" during
12  the third quarter of 2006.

13      296.   Sullivan and Bensinger certified the statements and results reported in the 3Q07 10-Q,
14  using the same language set forth in prior Forms 10-Q filed during 2006 and 2007.

15      297.   On December 7, 2007, AIG filed a Form 8-K/A with the SEC ("December 7 Form 8-
16  K").  In the December 7 Form 8-K, AIG informed the market that the value of its CDS portfolio had
17  declined between $1.05 billion and $1.15 billion since September 30, 2007.  Taking the disclosure of
18  these losses together with the $352 million loss reported for the third quarter of 2007, the market
19  understood that the total decline in value of the CDS portfolio through November was $1.4 billion to
20  $1.5 billion.

21      298.   The December 7 Form 8-K stated that unrealized losses in AIG's RMBS holdings were
22  preliminarily estimated at $2.6 billion for the first two months of the fourth quarter 2007.

23      299.   The statements made in the 3Q07 10-Q, 3Q07 Press Release, and in the December 7
24  Form 8-K, were materially false and misleading in at least the following respects:

25          (a)    As AIG would later admit, the cumulative market valuation loss on the CDS
26  portfolio *was materially understated by at least $4.3 billion.*  AIG failed to disclose that in arriving at
27  its reported "loss" of approximately $1.5 billion, it had included for the first time the benefits of "cash
28  flow diversion features" and "negative basis adjustments" in valuing the additional losses on the CDS

-96-

portfolio for the month of November 2007. These "benefits" were not previously included in AIG's estimate of market valuation losses on the CDS portfolio as of September 30, 2007, and for the month of October 2007, as presented in the Company's 3Q07 10-Q. Thus, when AIGFP for the first time acknowledged that it was required to report a substantial valuation adjustment on its CDS portfolio, Cassano and his associates (which controlled the risk management and valuation functions for the Asset/Credit business) manipulated the valuation model in order to minimize the amount of that valuation adjustment. Whereas AIG presented the cumulative loss amount as of November 30, 2007, as $1.4 - 1.5 billion, in fact, the actual loss by that point was at least $5.96 billion. As AIG would later admit, there was an insufficient basis for including the value of "negative basis" adjustments in its estimates of fair value. The use of such negative basis adjustments in the loss estimate presented in the December 7, 2007 Form 8-K resulted in understating the cumulative market valuation loss by over $5 billion.

(b)     As AIG would also later admit, the calculations of the decline in value of the CDS portfolio for September-October 2007, as disclosed in the 2007 3Q07 10-Q, were calculated using a BET methodology that incorporated "generic" inputs such as "credit spreads on asset-backed securities," rather than market-based inputs, including "cash bond prices provided by the managers of the underlying CDO collateral pools" that AIG later adopted. As later revealed, if the "generic" inputs had not been used to calculate the valuation loss as of November 30, 2007, the resulting reported loss would have been 57 percent greater in the 3Q07 10-Q. As such, the description in the 3Q07 10-Q of how AIGFP valued its CDS portfolio according to the BET methodology failed to disclose the model's use of generic inputs that materially understated the market valuation loss of the CDS portfolio.

(c)     AIG's statements pertaining to the valuation of the CDS portfolio and AIG internal controls were false and misleading because AIG's control environment was not remediated, as represented in the 2006 10-K, and because there were additional, undisclosed material weaknesses relating to AIG's accounting for derivative transactions. Indeed, on October 1, 2007, St. Denis, who had been hired to assist in formulating and implementing correct accounting policies for AIGFP, and had received two extremely positive performance evaluations, resigned his position based, in large measure, on his having been deliberately excluded by Cassano from the CDS valuation process - a fact

that was made known directly to AIGFP's Chief Risk Officer and AIG's General Counsel. Moreover, on November 29, 2007, just days before the December 7, 2007 Form 8-K, PwC had advised AIG's senior management (including Sullivan and Bensinger) that there were significant deficiencies and possibly a material weakness with AIG's internal controls over financial reporting and oversight relating to the "fair value" valuations of the CDS portfolio.

(d)     As set forth above, the deterioration of the U.S. residential housing and subprime mortgage markets would result in continuing and worsening valuation losses in its CDS portfolio and that AIG was at risk for having to post tens of billions of dollars in collateral. AIGFP had not established any reserves for the CDS portfolio and did not hedge most of its CDS transactions. Indeed, in late 2006, various AIGFP personnel had suggested hedging the CDS portfolio, but the strategy was rejected by Cassano, Forster and Frost due to the adverse effect it would have had on AIGFP's profitability and their own compensation. Moreover, by failing to disclose the extent of collateral calls already made on the Company and through repeated assurances regarding AIG's financial strength, capital position and liquidity, AIG misled investors to believe that AIG had sufficient resources to meet any collateral calls and that the CDS portfolio posed no risks to the Company's liquidity.

(e)     In making the statements referenced above, AIG also omitted to disclose the fact that its decision to stop writing new CDS contracts based on CDOs supported by subprime collateral by the end of 2005 was based on the following facts: (i) the model used to assess potential CDS contracts had been deemed unreliable in light of the deterioration in underwriting standards that was evident in the pools of mortgages underlying the 2005 multi-sector CDOs, and (ii) AIGFP senior management's conclusion that there was a high correlation across pools of subprime mortgages that could not be eliminated by "multi-sector" diversification, meaning the risk presented by these securities was systematic rather than isolated. AIG also failed to disclose that AIGFP "continued to work on [CDS] deals that were in the pipeline" through July 2006, including CDOs backed almost entirely by subprime assets.

(f)     AIG's repeated assurances that there was only a "remote" risk or "highly unlikely" probability that AIG would be required to make payments on its CDS contracts were

1 | materially false and misleading because, as described above, they failed to disclose the considerable

2 | risk that the Company would be faced with billions of dollars of collateral calls.

3 |         (g)    AIG's representations in its 3Q07 10-Q regarding AIG's securities lending

4 | program were false and misleading because AIG failed to disclose that the overwhelming majority of

5 | the cash collateral received from borrowers was invested in RMBS and other asset-backed securities,

6 | which greatly increased AIG's overall exposure to the U.S. residential housing subprime and mortgage

7 | markets, and increased the Company's liquidity risks.

8 |         (h)    AIG's representation in its 3Q07 10-Q that AIG's RMBS investments were

9 | made "[a]s part of [AIG's] strategy to diversify its investments" was false and misleading because

10 | AIG failed to disclose that, in late 2005, it had set a goal of investing 75% of the cash collateral

11 | received from borrowers through its securities lending program in RMBS and that such investments

12 | were not made for the purpose of diversification, but as an attempt to boost the income of the

13 | investment portfolio.

14 |         (i)    AIG's representations in its 3Q07 10-Q that the Company "currently intends to

15 | hold these [RMBS] securities to full recovery and/or full payment of principal and interest, and

16 | therefore expects that any mark to market effect will result in only a temporary adjustment to

17 | shareholders' equity" were false and misleading because the 10-Q failed to disclose that, under

18 | adverse market conditions, an increasing number of borrowers would demand the return of their cash

19 | collateral, forcing AIG to either sell its relatively illiquid RMBS investments at unacceptable prices or

20 | raise cash from other sources.

21 |     300.    AIG filed a Form 8-K on February 11, 2008 (the "February 2008 8-K") in which it

22 | acknowledged that its CDS portfolio losses were understated, and that material information previously

23 | disseminated in the related December 7, 2007 Form 8-K, required correction.  The corrective

24 | information provided in the February 2008 8-K did not correct all prior misrepresentations and

25 | omissions, nor did it present the market with an accurate depiction of the risks posed to AIG by its

26 | CDS portfolio or its securities lending program.

27 |

28 |

301.    The February 2008 8-K did correct previously reported losses on the CDS portfolio, however, stating that AIG's cumulative loss on its CDS portfolio through the end of November 2007 was $5.96 billion rather than the $1.5-1.6 billion reported to the market in December 2007.

302.    The February 2008 8-K disclosed that the valuation of the CDS portfolio provided on December 7, 2007 was carried out differently than were previous valuations. The February 2008 8-K disclosed that it was in the December 2007 valuation that AIG for the first time netted its losses in that portfolio against "cash flow diversion features" and "negative basis" adjustments.   Prior to the December 2007 valuation (including in the 3Q07 10-Q), AIG told the market that its valuation of the CDS portfolio did not include the benefit of certain "structural mitigants" since their value could not be ascertained.   The February 2008 8-K reported that, after the 3Q07 10-Q was filed and based on the development of additional modeling, AIG was able to reliably estimate the value of these features. When AIG told investors in December 2007 that it estimated a further decline in its CDS portfolio of $500 million to $600 million, that estimate included the benefit of the cash diversion features and negative basis adjustments.  As reported in the February 2008 8-K, the respective benefits of the cash flow diversion features and negative basis adjustment were $732 million and $3.63 billion.  If AIG had used the same methods to value its portfolio as it had historically done, it would have reported a further decline in value of more than $4.3 billion, which instead only came out in the February 2008 8-K.

303.    The February 2008 Form 8-K acknowledged that there was no adequate basis for using negative basis adjustments, and stated that AIG would not include such adjustments when reporting the "fair value" of the CDS portfolio in its forthcoming 2007 Form 10-K.

304.    The February 2008 8-K further reported that AIG's calculations for the decline in value of its CDS portfolio for September 2007 and October 2007, which were provided in the 3Q07 10-Q, were calculated using BET methodology that incorporated "generic" inputs rather than market-based inputs, which AIG later adopted.  The February 2008 8-K admitted that if these "generic" inputs had not been used to calculate the valuation loss as of the end of November 2007, the resulting reported loss would have been 57% greater.

305.   The February 11, 2008 Form 8-K also disclosed that AIG had been advised by PwC that it had "concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio."

306.   Despite these disclosures and corrections, AIG was still far from candid.  The market had not yet, by February 11, 2008, been made aware of the full extent of AIG's losses on its CDS portfolio and related investments or the collateral calls made by AIG's counterparties, which would soon contribute to a severe liquidity crisis and U.S. Government bailout of the Company.

307.   On February 28, 2008, AIG filed its Form 10-K for the year ended December 31, 2007 ("2007 10-K") and issued a press release ("4Q07 Press Release").  These documents reported a fourth quarter 2007 decline in the value of AIG's CDS portfolio amounting to $11.12 billion, resulting in a fourth quarter net loss of nearly $5.3 billion, the Company's largest-ever quarterly loss.  For full-year 2007, AIG reported net income declined to $6.20 billion or $2.39 per diluted share, down from $14.05 billion or $5.36 per diluted share in 2006.

308.   Notwithstanding these devastating results, Sullivan maintained in the 4Q07 Press Release that unrealized losses in the CDS portfolio would ultimately be reversed and any realized losses would be minimal:

> AIG continues to believe that the unrealized market valuation losses on [the AIGFP] super senior credit default swap portfolio are not indicative of the losses AIGFP may realize over time.  Under the terms of most of these credit derivatives, losses to AIG would generally result from the credit impairment of any bonds AIG would acquire in satisfying its swap obligations.  ***Based upon its most current analyses, AIG believes that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial condition, although it is possible that such realized losses could be material to AIG's consolidated results of operations for an individual reporting period.*** Except to the extent of any such credit impairment losses, ***AIG expects AIGFP's unrealized market valuation losses to reverse over the remaining life of the super senior credit default swap portfolio.***

309.   Sullivan also explained in the 4Q07 Press Release that AIG had the financial wherewithal to ride out the upheaval in the market, and grow, even in the face of additional unrealized losses:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

During 2008, we expect the U.S. housing market to remain weak and credit market uncertainty will likely persist.  Continuing market deterioration would cause AIG to report additional unrealized market valuation losses and impairment charges.  *However, with a diverse portfolio of global businesses, a strong capital base and outstanding talent, AIG has the ability to absorb the current volatility while committing the resources to grow and take advantage of opportunities.*  We continue to invest in improvements in internal controls, processes, systems and overall effectiveness and will continue to assign the highest priority to remediation efforts over our material weakness in internal control and oversight over the fair value valuation of AIGFP's super senior credit default swap portfolio.  At the same time, we are looking to better leverage our significant scale, promote efficiency and improve margins.  *We are confident AIG is pursuing the right strategies, and has the global franchise and financial strength to meet our performance goals and build long-term shareholder value.*

310.    In connection with the release of AIG's year-end financial results, Sullivan announced to the market that Cassano was resigning.  AIG did not disclose at this time that Cassano would remain a consultant to AIGFP and that he would be paid $1 million per month for his services.

311.    In the 2007 10-K, AIG represented that it carried the CDS portfolio on its books at "fair value," while also noting that its valuation methodologies had "evolved in response to the deteriorating market conditions and the lack of sufficient market observable information."  AIG described its use of a modified BET model for the valuation of the CDS portfolio.  AIG stated that the use of "negative basis" adjustments which were used in computing the numbers disclosed in the December 7, 2007 8-K, was inappropriate since "AIGFP was unable to reliably verify this negative basis due to the accelerating severe dislocation, illiquidity and lack of trading in the asset backed securities market."

312.    AIG also stated that risk analyses of the CDS portfolio conducted by Enterprise Risk Management and AIGFP had concluded that there "is currently no probable and reasonably estimable realized loss in this portfolio at December 31, 2007."  AIG further stated that, based on its analyses and stress tests, "AIG believes that any losses realized over time by AIGFP as a result of meeting its obligations under these derivatives *will not be material to AIG's consolidated financial condition,* although it is possible that such realized losses could be material to AIG's consolidated results of operations for an individual reporting period."

313.    The 2007 10-K includes a letter from AIG auditor PwC, and AIG's endorsement of the content of the letter, explaining that AIG's internal controls, relating to the AIGFP super senior CDS portfolio valuation process, had a material weakness and were ineffective:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 120

Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO) *because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date.* A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. . . .

\* \* \*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

314.    AIG stated in the 2007 10-K that its internal controls over the AIGFP super senior CDS portfolio valuation process and oversight thereof "were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements."

315.    The 2007 Form 10-K specifically explained AIG's material weakness:

During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified. As a result of this material weakness, described more fully below, AIG's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2007, AIG's disclosure controls and procedures were ineffective.

\* \* \*

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting. AIG's internal control over financial reporting is a process, under the supervision of AIG's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial

reporting and the preparation of AIG's financial statements for external purposes in
accordance with GAAP.

\* \* \*

As of December 31, 2007, controls over the AIGFP super senior credit default swap
portfolio valuation process and oversight thereof were not effective. *AIG had
insufficient resources to design and carry out effective controls to prevent or detect
errors and to determine appropriate disclosures on a timely basis with respect to the
processes and models introduced in the fourth quarter of 2007. As a result, AIG had
not fully developed its controls to assess, on a timely basis, the relevance to its
valuation of all third party information. Also, controls to permit the appropriate
oversight and monitoring of the AIGFP super senior credit default swap portfolio
valuation process, including timely sharing of information at the appropriate levels of
the organization, did not operate effectively.* As a result, controls over the AIGFP super
senior credit default swap portfolio valuation process and oversight thereof *were not
adequate to prevent or detect misstatements in the accuracy of management's fair
value estimates and disclosures on a timely basis,* resulting in adjustments for purposes
of AIG's December 31, 2007 consolidated financial statements.  In addition, this
deficiency could result in a misstatement in management's fair value estimates or
disclosures that could be material to AIG's annual or interim consolidated financial
statements that would not be prevented or detected on a timely basis.

316.   The 2007 10-K also stated that AIGFP had received collateral calls from counterparties
to certain CDS contracts and that "AIG is aware that valuation estimates made by certain of the
counterparties with respect to certain super senior credit default swaps or the underlying reference
CDO securities, for the purposes of determining the amount of collateral required to be posted by
AIGFP in connection with such instruments, differ significantly from AIGFP's estimates."  AIG
further stated that:

AIGFP has been able to successfully resolve some of the differences, including in certain
cases entering into compromise collateral arrangements, some of which are for specified
periods of time.  AIGFP is also in discussions with other counterparties to resolve such
valuation differences.  As of February 26, 2008, AIGFP had posted collateral (or had
received collateral, where offsetting exposures on other transactions resulted in the
counterparty posting to AIGFP) based on exposures, calculated in respect of super senior
default swaps, in an aggregate amount of approximately $5.3 billion.  *Valuation
estimates made by counterparties for collateral purposes were considered in the
determination of the fair value estimates of AIGFP's super senior credit default swap
portfolio.*

317.   AIG also disclosed for the first time in its 2007 10-K that these collateral calls could
"impair AIG's liquidity":

Certain of the credit default swaps written by AIGFP contain collateral posting
requirements. The amount of collateral required to be posted for most of these
transactions is determined based on the value of the security or loan referenced in the
documentation for the credit default swap. Continued declines in the values of these
referenced securities or loans will increase the amount of collateral AIGFP must post
which *could impair AIG's liquidity*.

318.    The 2007 10-K stated further that additional collateral calls could be made if AIG's
credit ratings were downgraded. This statement addressed the fact that the major agencies had revised
their ratings outlook on AIG to "negative" after the February 2008 8-K's corrections. The additional
collateral calls that AIG may face if downgraded were said to represent approximately $1.39 billion in
additional collateral.

319.    The 2007 10-K also addressed the credit crunch that had rendered numerous AIG
investments, including certain structured securities, private equities, limited partnerships, hedge funds,
mortgage loans, flight equipment, finance receivables and real estate, as well as the RMBS portfolio,
"relatively illiquid." The 2007 10-K disclosed that AIG would have "difficulty selling these
investments" if required to post collateral in connection with its CDS portfolio, which could have a
"significant" effect on "AIG's overall liquidity."

320.    Despite discussing the possible effects of additional collateral calls on AIG's liquidity,
the 2007 10-K reported that "AIG's liquid assets, cash provided by operations and access to the capital
markets will enable it to meet its anticipated cash requirements, including the funding of increased
dividends under AIG's current dividend policy." Indeed, the 2007 10-K announced that "[a]s a result
of market disruption in the credit markets, AIG took steps to enhance the liquidity of its portfolios"
and had "created an interdisciplinary Liquidity Risk Committee to measure, monitor, control and
aggregate liquidity risks across AIG." While describing the Liquidity Review Committee's
responsibilities as "broad," the 2007 10-K explained that its focus initially was on portfolios with
shorter-term contractual liabilities, including securities lending in the United States.

321.    The 2007 10-K provided the following description of AIG's securities lending program:

AIG's securities lending program is a centrally managed program facilitated by AIG
Investments primarily for the benefit of certain of AIG's Insurance companies. Securities
are loaned to various financial institutions, primarily major banks and brokerage firms.
*Cash collateral equal to 102 percent of the fair value of the loaned securities is*

*received.* The cash collateral is invested in highly-rated fixed income securities to earn a net spread.

The 2007 10-K reported that AIG's liability to borrowers for collateral received under the securities lending program was $82.0 billion, and that the fair value of collateral reinvested by AIG was $75.7 billion. Nearly $50 billion of the reinvested collateral was invested in mortgage-backed, asset-backed and collateralized securities. AIG reported that as of December 31, 2007, its invested collateral had a net unrealized loss of $5 billion and a net realized loss of $1 billion, primarily related to other-than-temporary impairments. The 2007 10-K also represented that "during 2007, AIG took steps to enhance the liquidity of its portfolios, including increasing the liquidity of the collateral invested in the securities lending program."

322.    The 2007 10-K further disclosed that for full-year 2007, AIG's investment portfolio had net realized capital losses of nearly $3.6 billion, including an other-than-temporary impairment charge of approximately $4.1 billion. AIG attributed the impairment charge to the "significant disruption in the U.S. residential mortgage and credit markets," primarily with respect to AIG's RMBS investments and other structured securities. The 2007 10-K also noted that AIG held $84.4 billion in RMBS (approximately 10% of its total invested assets).

323.    The 2007 10-K repeatedly referred to AIG's corporate structures to address risk management policies and practices throughout the Company. Beneath the heading "Corporate Risk Management," AIG represented that its:

> major risks are addressed at the corporate level through [the Enterprise Risk Management Department] ERM, which is headed by AIG's Chief Risk Officer (CRO). ERM is responsible for assisting AIG's business leaders, executive management and the Board of Directors to identify, assess, quantify, manage and mitigate the risks incurred by AIG. . . . An important goal of ERM is to ensure that once appropriate governance, authorities, procedures and policies have been established, aggregated risks do not result in inappropriate concentrations

324.    The 2007 10-K also discussed that senior management had established other oversight and monitoring committees focusing on the risks attendant to AIG's businesses. These committees included, among others:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 124

- The Financial Risk Committee (FRC) oversees AIG's market risk exposures to interest rates, foreign exchange and . . . equity investments and provides strategic direction for AIG's asset-liability management. The FRC meets monthly and acts as a central mechanism for AIG senior management to review comprehensive information on AIG's financial exposures and to exercise broad control over these exposures.

- The Liquidity Risk Committee is responsible for liquidity policy and implementation at AIG Parent and exercises oversight and control of liquidity policies at each AIG entity.

- The [Credit Risk Committee (CRC)] is responsible for . . . (i) approving credit risk policies and procedures for use throughout AIG; (ii) delegating credit authority to business unit credit officers and select business unit managers; (iii) approving transaction requests and limits for corporate, sovereign and cross-border credit exposures that exceed the delegated authorities; (iv) establishing and maintaining AIG's risk rating process for corporate, financial and sovereign obligors; and (v) conducting regular reviews of credit risk exposures in the portfolios of all credit-incurring business units.

325. According to the 2007 10-K, AIG senior management purportedly exercised close oversight and management of risk exposure arising from AIGFP's operations:

The senior management of AIG defines the policies and establishes general operating parameters for Capital Markets operations. AIG's senior management has established various oversight committees to monitor on an ongoing basis the various financial market, operational and credit risk attendant to the Capital Markets operations. The senior management of AIGFP reports the results of its operations to and reviews future strategies with AIG's senior management.

AIGFP actively manages its exposures to limit potential losses, while maximizing the rewards afforded by these business opportunities even though some products or derivatives may result in operating income volatility. In doing so, AIGFP must continually manage a variety of exposures including credit, market, liquidity, operational and legal risks.

326. The 2007 10-K, as part of its discussion of risk management structures and processes, also stated:

AIG believes that strong risk management practices and a sound internal control environment are fundamental to its continued success and profitable growth. Failure to manage risk properly exposes AIG to significant losses, regulatory issues and a damaged reputation.

\* \* \*

AIG's major risks are addressed at the corporate level through ERM, which is headed by AIG's Chief Risk Officer (CRO). ERM is responsible for assisting AIG's major business leaders, executive management and the Board of Directors to identify, assess, quantify, manage and mitigate the risks incurred by AIG.

-107-

327.    The 2007 10-K also represented that various standing committees oversaw AIG's credit derivatives transactions to help manage risk:

> A counterparty may default on any obligation to AIG, including a derivative contract. Credit risk is a consequence of extending credit and/or carrying trading and investment positions. Credit risk exists for a derivative contract when that contract has a positive fair value to AIG. The maximum potential exposure will increase or decrease during the life of the derivative commitments as a function of maturity and market conditions. To help manage this risk, AIGFP's credit department operates within the guidelines set by the CRC [*i.e.* AIG's Credit Risk Committee]. Transactions which fall outside these pre-established guidelines require the specific approval of the CRC.

328.    The statements and results reported in the 2007 10-K were certified by Sullivan and Bensinger using the same language set forth in the 2005 and 2006 10-Ks.

329.    The statements made in the 2007 10-K, the 4Q07 Press Release, and at the earnings conference call on February 29, 2008 were materially false and misleading in at least the following respects:

(a)    As described more fully above, AIG faced a significant risk of being required to post tens of billions of dollars in additional collateral arising from its CDS portfolio. The overwhelming portion of the cash collateral received from borrowers under AIG's securities lending program was invested in RMBS and other asset-backed securities, such securities were becoming increasingly illiquid, and demands by borrowers for the return of their cash collateral would severely strain AIG's liquidity.

(b)    AIG made statements that failed to disclose material facts concerning AIG's material weakness in the valuation of its CDS portfolio. AIG's description of the material weakness in the 2007 10-K was materially misleading because it failed to disclose that key elements of AIG's risk management, financial and accounting functions were deliberately excluded from the process of valuing the CDS portfolio. Moreover, AIG failed to announce that Cassano was resigning, that Cassano would be retained as a consultant to AIGFP, and that he would be paid $1 million per month for his services. Such disclosures about AIG's material weakness and the terms of Cassano's resignation would have been critical to investors' views of the veracity and trustworthiness of AIG's management.

(c)     All of the statements in the 2007 10-K and the 4Q08 Press Release that realized losses on the CDS portfolio would not have a material effect on AIG's financial condition were false and misleading because, as described above, they created a misleading impression that the principal risk exposure arising from the CDS portfolio was the risk of making payments arising from credit losses (as opposed to liquidity issues arising from ratings downgrades and valuation declines of the referenced CDOs and concomitant requirement to post tens of billions of dollars of additional collateral).

(d)     Statements in the 2007 10-K concerning the Company's ability to meet its "anticipated cash requirements, including the funding of increased dividends under AIG's new dividend policy," were false and misleading, given the demands that were likely to be made through collateral calls and payments required by obligations undertaken in connection with the securities lending program.

(e)     AIG misrepresented its securities lending program in the 2007 10-K by stating that "[c]ash collateral equal to 102 percent of the fair value of the loaned securities is received." AIG failed to disclose that the Company did not, in fact, always receive the full 102 percent of cash collateral on loaned securities. Rather, AIG, as the parent company, had agreed to deposit funds into the collateral pool to maintain the collateral received at 102 percent. By August 31, 2008, such deposits amounted to $3.3 billion.

**D.      False Statements In Incorporated SEC Filings For Fiscal 2008**

330.    On May 8, 2008, AIG filed with the SEC its 2008 Form 10-Q for the First Quarter ended March 31, 2008 ("1Q08 10-Q") and issued a press release announcing its first quarter financial results. The 1Q08 10-Q disclosed a new record quarterly loss for AIG of $7.8 billion – the worst-performing quarter in the Company's history – largely stemming from a $9.11 billion net unrealized market valuation loss on the CDS portfolio. By this point in time, the cumulative reported loss in the CDS portfolio exceeded $20 billion.

331.    AIG further disclosed that its investment portfolio had sustained net realized capital losses of $6.09 billion, due to other-than-temporary impairment charges from declines in the market value of its RMBS holdings and other structured securities.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 127

332.   The May 8, 2008 press release announced that AIG intended to raise $12.5 billion in new capital "to fortify its balance sheet and provide increased financial flexibility" – despite Sullivan's assurances two months earlier that AIG was not seeking to raise additional capital.  Similar to previous quarters, Sullivan continued to assert that "AIG's results do not reflect the underlying strengths and potential of AIG. . . .  With the support of the newly added capital, we have every confidence in our ability to respond to today's market conditions and opportunities that may arise."

333.   In addition to its release of the 1Q08 10-Q, AIG also issued a press release on May 8, 2008, announcing that the Board of Directors had elected to *increase* AIG's dividend by 10% to $0.22 per share.

334.   AIG's 1Q08 10-Q outlined several methods for analyzing potential credit impairment losses from its CDS portfolio.  AIG acknowledged in the 1Q08 10-Q that methodologies by outside parties showed potential losses greatly exceeding its own estimates.  However, AIG continued to assert that its "credit-based" analysis was preferable to other "market-based" analyses:

> Under the terms of most of these credit derivatives, losses to AIG would generally result from the credit impairment of the referenced CDO bonds that AIG would acquire in satisfying its swap obligations.  Based upon its most current analyses, AIG believes that any credit impairment losses which may emerge over time at AIGFP will not be material to AIG's consolidated financial condition, but could be material to the manner in which AIG manages its liquidity.  In making this assessment, AIG uses a credit-based analysis to estimate potential realized credit impairment losses from AIGFP's super senior credit default swap portfolio.  This analysis makes various assumptions as to estimates of future stresses on the portfolio resulting from further downgrades by the rating agencies of the CDO collateral.  In addition, during the first quarter of 2008, AIG introduced another methodology called a roll rate analysis.  This methodology rolls forward current and estimated future delinquencies and defaults underlying mortgages in the CDO collateral pools to estimate potential losses in the CDOs.  Due to the dislocation in the market for CDO collateral, AIG does not use the market values of the underlying CDO collateral in estimating its potential realized credit impairment losses.  The use of factors derived from market-observable prices in models used to determine the estimates for future realized credit impairment losses would result in materially higher estimates of realized credit impairment losses.  AIG's credit-based analyses estimate potential realized credit impairment pre-tax losses at approximately $1.2 billion to approximately $2.4 billion. . . .  AIG is aware that other market participants have used different assumptions and methodologies to estimate the potential realized credit impairment losses on AIGFP's super senior credit default swap portfolio, resulting in a significantly higher estimate than that resulting from AIG's credit-based analysis.  For example, a third-party analysis provided to AIG, that AIG understands uses credit and market value inputs, estimates the potential realized pre-tax losses on AIGFP's super senior credit default swap portfolio at between approximately $9 billion and approximately $11 billion.

-110-

335. The 1Q08 10-Q also discussed AIG's fair value estimate of the CDS portfolio, noting that:

> The valuation of the super senior credit derivatives has become increasingly challenging given the limitation on the availability of market observable information due to the lack of trading and price transparency in the structured finance market, particularly during and since the fourth quarter of 2007. These market conditions have increased the reliance on management estimates and judgments in arriving at an estimate of fair value for financial reporting purposes. Further, disparities in the valuation methodologies employed by market participants and the varying judgments reached by such participants when assessing volatile markets has increased the likelihood that the various parties to these instruments may arrive at significantly different estimates as to their fair values.
>
> AIGFP's valuation methodologies for the super senior credit default swap portfolio have evolved in response to the deteriorating market conditions and the lack of sufficient market observable information. AIG has sought to calibrate the model to market information and to review the assumptions of the model on a regular basis.

336. However, in the 1Q08 10-Q, AIG acknowledged that the material weakness in the internal control of the fair value valuation of the CDS portfolio had not been remediated:

> AIG is actively developing and implementing a remediation plan to address the material weakness in internal control relating to the fair value valuation of the AIGFP super senior credit default swap portfolio, and the oversight thereof . . . . AIG is developing new systems and processes to reduce reliance on certain manual controls that have been established as compensating controls over valuation of this portfolio and in other areas, and is strengthening the resources required to remediate this weakness.

337. The 1Q08 10-Q also discussed collateral calls that had been received from counterparties to the CDS transactions as a result of declines in the values of the underlying reference CDO securities:

> As of April 30, 2008, AIGFP had received collateral calls from counterparties in respect of certain super senior credit default swaps (including those entered into by counterparties for regulatory capital relief purposes and those in respect of corporate debt/CDOs). At times, valuation estimates made by certain of the counterparties with respect to certain super senior credit default swaps or the underlying reference CDO securities, for purposes of determining the amount of collateral required to be posted by AIGFP in connection with such instruments, have differed significantly from AIGFP's estimates. In almost all cases, AIGFP has been able to successfully resolve the differences or otherwise reach an accommodation such that collateral posting levels are not currently the subject of ongoing negotiations, including in certain cases entering into compromise collateral arrangements, some of which are for specified periods of time. AIGFP is currently in active discussions with a small number of other counterparties to resolve such valuation differences. As of April 30, 2008, AIGFP had posted collateral (or had received collateral, where offsetting exposures on other transactions resulted in the counterparty posting to AIGFP) based on exposures, calculated in respect of super

-111-

senior credit default swaps, in an aggregate net amount of $9.7 billion. Valuation estimates made by counterparties for collateral purposes were considered in the determination of the fair value estimates of AIGFP's super senior credit default swap portfolio.

338.    The 1Q08 10-Q also acknowledged AIG's requirement to post collateral in the event of a downgrade to its credit ratings by the major ratings agencies. The 1Q08 10-Q was filed before another subsequent downgrade of AIG's ratings. AIG represented that:

[I[t is estimated that, as of the close of business on April 30, 2008, based on AIGFP's outstanding municipal guaranteed investment agreements (GIAs) and financial derivatives transactions at that date, a downgrade of AIG's longer-term senior debt ratings to 'Aa3' by Moody's Investors Service (Moody's) or 'AA-' by Standard & Poor's (S&P) . . . would permit counterparties to call for approximately $1.8 billion of collateral, while a downgrade to 'A1' by Moody's or 'A+' by S&P would permit counterparties to call for approximately $9.8 billion of additional collateral. Further downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity. The actual amount of additional collateral that AIGFP would be required to post to counterparties in the event of such downgrades depends on market conditions, the fair value of the outstanding affected transactions and other factors prevailing at the time of the downgrade. Additional obligations to post collateral would increase the demands on AIGFP's liquidity.

339.    The 1Q08 10-Q addressed AIG's overall liquidity, stating: "[m]anagement believes that AIG's liquid assets, cash provided by operations and access to the capital markets will enable it to meet its anticipated cash requirements, *including the funding of increased dividends under AIG's current dividend policy.*"

340.    The 1Q08 10-Q also acknowledged that AIG had recognized a $4.1 billion other-than-temporary impairment charge in its investment portfolio, primarily stemming from loss on investments in RMBS and other structured securities.

341.    The 1Q08 10-Q stated the following with respect to AIG's securities lending program:

AIG's securities lending program is a centrally managed program facilitated by AIG Investments primarily for the benefit of certain of AIG's insurance companies. Securities are loaned to various financial institutions, primarily major banks and brokerage firms. *Cash collateral generally equal to 102 percent of the fair value of the loaned securities is received.* The cash collateral is invested in highly-rated fixed income securities to earn a net spread.

AIG further reported that it had $77.8 billion in borrowed collateral liability, with $64.3 billion reinvested. Almost $41 billion of the reinvested collateral was invested in mortgage-backed, asset-

-112-

backed and collateralized securities. AIG further stated that as of March 31, 2008, its invested collateral had a "net unrealized loss . . . [of] $9.4 billion" and a "net realized losses of $2.9 billion . . . predominantly related to other-than-temporary impairments."

342.   Sullivan and Bensinger certified the results reported in the 1Q08 10-Q in language almost identical to the certifications in prior Form 10-Qs filed in 2006 and 2007.

343.   The statements in the 1Q08 10-Q press release were materially false and misleading in at least the following respects:

(a)   AIG's statements about the adequacy of AIG's liquidity to meet "anticipated cash requirements" falsely conveyed that AIG's financial condition was strong and liquidity sufficient to meet the risks confronting the Company.

(b)   The statement in the 1Q08 10-Q that "AIG believes that any credit impairment losses which may emerge over time at AIGFP will not be material to AIG's consolidated financial condition" and Bensinger's statement that "the substantial risk that AIGFP covers for the CDO investors is the risk of suffering actual realized losses, not the variance in fair value of the CDOs," conveyed a false and misleading impression that the principal risks arising from the CDS portfolio were outright defaults (as opposed to collateral calls resulting from ratings downgrades or diminished valuations of the referenced CDOs).

(c)   The statement in the 1Q08 10-Q concerning AIG's securities lending program that cash collateral generally equal to 102 percent of the fair value of the loaned securities "is received," was materially false and misleading for the reasons stated above with respect to the same statement made in the 2007 Form 10-K.

(d)   AIG's 1Q08 10-Q, as AIG's prior public disclosures, failed to disclose the full impact of Project Max, a credit facility contract that AIG had entered into with Deutsche Bank in 2005, which required AIGFP to issue 2a-7 puts on the super senior security issued by a CDO of CMBS up to a notional amount of $7.5 billion.

344.   On May 12, 2008, AIG filed an 8-K disclosing that the major rating agencies took actions regarding the credit ratings of AIG and its subsidiaries on May 8 and 9, 2008:

- [S&P] downgraded the counterparty credit ratings and long-term debt ratings of AIG and certain AIG subsidiaries and placed these ratings as well as certain short-term

-113-

debt ratings and the counterparty and financial strength ratings on AIG's core insurance operating subsidiaries on CreditWatch with negative implications;

- [Moody's] placed the long-term debt ratings of AIG and certain subsidiaries and the financial strength ratings on certain AIG insurance operating subsidiaries on review for possible downgrade; and

- [Fitch] downgraded the issuer default and senior debt ratings of AIG and certain subsidiaries and kept these ratings on Rating Watch Negative. All debt and financial strength ratings not previously on Rating Watch have been placed on Rating Watch Negative.

345. On May 9, 2008, Fitch placed a negative rating watch on several CDO classes that were insured by AIG CDS contracts.

346. On May 16, 2008, AIG filed an 8-K announcing that it had closed the sale of 196,710,525 shares of its common stock, par value $2.50 per share, at a public offering price of $38.00 per share and 78,400,000 equity units, initially consisting of purchase contracts and junior subordinated debentures, at a public offering price of $75.00 per equity unit.

347. On May 20, 2008, AIG filed an 8-K announcing that it had closed the sale of $4,000,000,000 of AIG's 8.175% Series A-6 Junior Subordinated Debentures offered pursuant to Rule 144A and Regulation S under the Securities Act.

348. On May 22, 2008, AIG filed an 8-K announcing that it had closed the sale of €750,000,000 of AIG's 8.000% Series A-7 Junior Subordinated Debentures and £900,000,000 of AIG's 8.625% Series A-8 Junior Subordinated Debentures, each offered pursuant to Rule 144A and Regulation S under the Securities Act.

349. On May 23, 2008, AIG filed an 8-K announcing that on May 21 and 22, 2008, the major rating agencies took actions regarding the credit ratings of AIG and its subsidiaries, as follows:

- [Moody's] downgraded AIG's long-term debt rating from "Aa2" to "Aa3" and removed it from "under review" status. The outlook on the long-term debt rating is negative. Also, Moody's downgraded the financial strength ratings of many of AIG's insurance subsidiaries by one notch to either "Aa2" or "Aa3." The outlook on the financial strength ratings is stable. The Moody's ratings of certain other AIG subsidiaries remain on "under review" status.

- [S&P] affirmed AIG's "AA-" long-term debt rating and removed it from CreditWatch Negative. The outlook on AIG's counterparty credit rating is negative. Also, S&P

maintained the "AA+" financial strength ratings on AIG's insurance subsidiaries. The outlook on the financial strength ratings is negative.

- [Fitch] affirmed AIG's "AA-" long-term debt rating and removed it from Rating Watch Negative. The outlook on the long-term debt rating is negative. Also, Fitch maintained the "AA+" financial strength ratings of AIG's insurance subsidiaries. The outlook on the financial strength ratings is negative.

## VIII.   AIG VIOLATED GAAP AND SEC RULES

350.   AIG's financial statements contained or incorporated by reference in the Offering Materials, including the related footnote disclosures thereto, as of and for the years ended December 31, 2005, December 31, 2006 and December 31, 2007, and related Forms 10-K, (the "relevant annual financial statements"), interim financial statements as of and for the quarterly periods ended March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007, September 30, 2007, March 31, 2008 and June 30, 2008, and related Forms 10-Q (the "relevant interim financial statements"), as well as Forms 8-K (collectively, the "relevant financial statements"), were prepared in violation of GAAP and SEC Rules. The relevant financial statements did not present the Company's financial position and results of operations fairly and in conformity with GAAP and SEC rules.

351.   GAAP are the rules, principles, conventions, standards and procedures recognized by the accounting profession which define acceptable accounting practices and techniques. GAAP are the official standards accepted and endorsed by the SEC and other regulators and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP includes several components, such as the Financial Accounting Standards Board's ("FASB") Statements of Financial Accounting Standards ("FAS"), FASB Interpretations ("FIN"), FASB Statements of Position ("FSP"), FASB Concept Statements ("FASCON"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP").

352.   SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC but not prepared in compliance with GAAP are presumed misleading and inaccurate, despite footnote disclosures or other disclosure statements. Regulation S-X also requires interim financial statements to comply with GAAP, although they are not required to include

1    disclosures duplicative of disclosures accompanying the most recent annual financial statements. (17

2    C.F.R. § 210.10-01(a)).

3        353.    The CDS portfolio contained derivative instruments but AIG did not designate them as

4    hedges under FAS 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133").

5    FAS 133 required the CDS portfolio to be reported at "fair value," and to report changes in fair value

6    recognized in net income during the period of the change.  (FAS 133 ¶¶ 17, 18).  Reported declines in

7    the fair value of AIG's CDS portfolio would, therefore, reduce, among other things, net income and

8    shareholders' equity in the period of the decline.

9        354.    Under GAAP, specifically FAS 133 and FAS 107, *Disclosures about Fair Value of*

10   *Financial Instruments* ("FAS 107"), the fair value of AIG's CDS portfolio was the amount for which it

11   could have been exchanged between willing parties, other than in a forced or liquidation sale. (FAS

12   133 ¶540, FAS 107 ¶5).  Fair value is determined with reference to quoted market prices in active

13   markets or, absent that information, based on the best information available under the circumstances.

14   The estimates must consider the prices of similar financial instruments and the results of valuation

15   techniques.  The valuation technique must include assumptions that market participants would use in

16   their estimates, including assumptions about risk and uncertainty.   One example of such a valuation

17   technique is the net present value of estimated future cash flows (inflows and outflows) using a

18   discount rate proportionate to the risks involved. (FAS 133 ¶540; FAS 107 ¶¶11, 20-29).

19       355.    FAS 157, *Fair Value Measurements* ("FAS 157"), superseded the guidance provided by

20   FAS 133 and FAS 107 for defining and estimating fair value.  FAS 157 consolidated, clarified and

21   enhanced the existing definitions and techniques for determining fair value.  For example, FAS 157

22   provides:

23       [FAS 157] emphasizes that fair value is a market-based measurement, not an entity-
         specific measurement.  Therefore, a fair value measurement should be determined based
24       on the assumptions that market participants would use in pricing the asset or liability.  As
         a basis for considering market participant assumptions in fair value measurements, [FAS
25       157] establishes a fair value hierarchy that distinguishes between (1) market participant
         assumptions developed based on market data obtained from sources independent of the
26       reporting entity (observable inputs) and (2) the reporting entity's own assumptions about
         market participant assumptions developed based on the best information available in the
27       circumstances (unobservable inputs).  The notion of unobservable inputs is intended to
         allow for situations in which there is little, if any, market activity for the asset or liability
28

-116-
COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 134

at the measurement date. In those situations, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions. However, *the reporting entity must not ignore information about market participant assumptions that is reasonably available without undue cost and effort.*

[FAS 157] clarifies that market participant assumptions include assumptions about risk, for example, the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique. A fair value measurement should include an adjustment for risk if market participants would include one in pricing the related asset or liability, even if the adjustment is difficult to determine. Therefore, *a measurement (for example, a "mark-to-model" measurement) that does not include an adjustment for risk would not represent a fair value measurement if market participants would include one in pricing the related asset or liability.* (FAS 157, Summary, Differences between This Statement and Current Practice).

356.    FAS 5, *Accounting for Contingencies* ("FAS 5"), requires disclosures of losses actually incurred and loss contingencies that exist as of the date of the financial statements. Specifically, FAS 5 provides:

If no accrual is made for a loss contingency . . . or if an exposure to loss exists in excess of the amount accrued . . . *disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.* The disclosure shall indicate the nature of the contingency *and shall give an estimate of the possible range of loss or state that such an estimate cannot be made.* (FAS 5 ¶10).

357.    If the value of AIG's CDS portfolio was impaired, this constituted a "loss" under FAS 5. Therefore, AIG was required to either record the amount of the impairment (as a loss) or, if the measure of the impairment could not reasonably be estimated, but it was nevertheless reasonably possible that a loss or an additional loss may have occurred, AIG was required to disclose this loss contingency.

358.    By February 2007 at the latest the market prices of the CDOs and RMBS containing or referencing subprime debt had fallen significantly as a result of various factors, including the decline in housing values and increasing default rates for subprime mortgages. As the subprime crisis deepened throughout 2007, indicators such as the ABX and TABX indexes declined, reflecting the market value decline of CDS contracts on RMBS and CDOs. Yet, AIG failed to record any valuation adjustments to reflect the impairment of its subprime-based assets until the third quarter of 2007. Even then, as subsequently disclosed in AIG's 2007 10-K (filed in February 2008), the valuation

adjustments were substantially less than AIG should have recorded and were based on faulty models and methodology that concealed the true extent to which these assets were impaired.

359.   AIG's valuation models and methodology were faulty and AIG ignored important indicators of the market price of their CDO and CDS portfolios, including the ABX and TABX indexes, the collateral calls they were receiving, write-offs taken by their counterparties, and other readily available indicators.  Because AIG was required to carry its CDO and CDS assets at fair value and did not adjust its income to reflect any changes in the valuation of these assets, its financial statements for all three quarters of 2007 violated GAAP (FAS 5, 107, 133) and were materially false and misleading.

360.   AIG's financial statements also violated GAAP in other ways.  FAS 107 requires disclosure of significant concentrations of credit risk, including (a) information about the characteristic that identifies the concentration, (b) the maximum amount of gross losses related to credit risk that would be incurred if the parties to the financial instruments comprising the concentration failed completely to perform, and (c) the related policy of requiring collateral or other security and of entering into master netting agreements to mitigate the credit risk.  (FAS 107, as amended by FAS 133 ¶15A).  AIG violated FAS 107 when it failed to disclose in its 2005 and 2006 financial statements that it was exposed to a significant concentration of credit risk because it decided to invest up to 75% of its securities lending portfolio in RMBS, including subprime-backed RMBS, and the rapid expansion of its CDS portfolio, which was heavily exposed to subprime RMBS.

361.   GAAP also provides measures to safeguard and assure the reliability of financial statements.  One of the fundamental principles of financial accounting provides:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASCON 1 ¶42).

362.   Additionally, FASCON 2 provides that reliability requires information to have *representational faithfulness* as well as be verifiable and neutral. (FASCON 2 ¶¶58-59, 62).  FASCON 2, paragraph 79 also provides that a financial statement is "complete" only if nothing material is

1   omitted from the information that may be necessary to ensure that the financial statements validly

2   represent underlying events and conditions.

3        363.    Footnote disclosures are an essential element of financial statements that are required to

4   be prepared in accordance with GAAP and often serve to satisfy the "completeness" requirement.

5   FASCON 5 ¶7, specifically states:

6         Information disclosed in notes . . . amplifies or explains information recognized in the
          financial statements.   That sort of information is essential to understanding the
7        information recognized in financial statements and has long been viewed as an integral
          part of financial statements prepared in accordance with generally accepted accounting
8        principles. (Footnote omitted).

9

10        364.    Additionally, APB No. 22, *Disclosure of Accounting Policies* ("APB 22"), states:

11         The Board concludes that information about the accounting policies adopted by a
          reporting entity is essential for financial statement users.  When financial statements are
12        issued purporting to present fairly financial position, cash flows, and results of operations
          in accordance with generally accepted accounting principles, a description of all
13        significant accounting policies of the reporting entity should be included as an integral
          part of the financial statements. (APB 22 ¶8, as amended by FAS 95 [1987]).
14

15        365.    AIG also failed to comply with FIN 45, *Guarantor's Accounting and Disclosure*

16   *Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* ("FIN 45"),

17   which requires disclosure of guarantees, or groups of similar guarantees, regardless of whether the

18   likelihood of having to make payments is deemed remote, including:

19          a.     The nature of the guarantee, including the approximate term of the guarantee,

20   how the guarantee arose, and the events or circumstances that would require the guarantor to

21   perform under the guarantee.

22          b.     The maximum potential amount of future payments (undiscounted) the

23   guarantor could be required to make under the guarantee. That maximum potential amount of

24   future payments shall not be reduced by the effect of any amounts that may possibly be

25   recovered under recourse or collateralization provisions in the guarantee (which are addressed

26   under (d) below). If the terms of the guarantee provide for no limitation to the maximum

27   potential future payments under the guarantee, that fact shall be disclosed. If the guarantor is

28   unable to develop an estimate of the maximum potential amount of future payments under its

guarantee, the guarantor shall disclose the reasons why it cannot estimate the maximum potential amount.

    c.    The current carrying amount of the liability, if any, for the guarantor's obligations under the guarantee.

    d.    The nature of (1) any recourse provisions that would enable the guarantor to recover from third parties any of the amounts paid under the guarantee and (2) any assets held either as collateral or by third parties that, upon the occurrence of any triggering event or condition under the guarantee, the guarantor can obtain and liquidate to recover all or a portion of the amounts paid under the guarantee. The guarantor shall indicate, if estimable, the approximate extent to which the proceeds from liquidation of those assets would be expected to cover the maximum potential amount of future payments under the guarantee. (FIN 45 ¶13).

366.    AIG's financial statements during the Offering Period failed to comply with these requirements because the Company did not disclose the full amount of its obligations to post collateral under its CDS contracts. With respect to its CDS portfolio, AIG provided, in essence, credit protection (or guarantee) on the referenced CDO (*i.e.*, the Company assumed the credit risk held by the counterparties to its CDS portfolio). In most cases, if the referenced CDO had a single instance of non-payment, AIG was obligated to purchase the referenced CDO at its par value. This portfolio also included liquidity puts written by AIG to acquire the referenced CDO at par value, prior to default.

367.    Moreover, the CDS contracts written by AIGFP frequently designated the counterparty banks as the calculation agent for valuing the referenced CDOs for purposes of determining whether AIG was required to post collateral. Pursuant to FIN 45 and GAAP, AIG was required – but failed – to disclose the existence of these provisions and their potential significant effect on the valuation of its CDS portfolio and its collateral posting obligations.

368.    SEC regulations require issuers to provide management's perspective on the company's financial condition. Regulation S-K, for instance, requires Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), which includes provision of any information "necessary to an understanding of [the issuer's] financial condition, changes in financial condition and results of operations." (17 C.F.R. § 229.303(a)) The SEC issued *Interpretation:*

*Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* in December 2003, clarifying the three principal objectives of the MD&A requirements:

- to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

369.    The MD&A requires specific disclosures including information related to the registrant's results of operations and liquidity.   Regulation S-K discusses the importance of such disclosures and provides guidance on what the SEC expects to see in such filings.   It requires the MD&A to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues, the change in the relationship shall be disclosed. (17 C.F.R. § 229.303(a)(3)(ii)).

> Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.  If a material deficiency is identified, indicate the course of action that the registrant had taken or proposes to take to remedy the deficiency.  Also identify and separately describe internal and external sources of liquidity, and briefly discuss any material unused sources of liquid assets. (17 C.F.R. § 229.303(a)(1)).

370.    AIG's CDS portfolio, as discussed above, required the Company to provide significant collateral in connection with its potential obligations, which could -- and did -- impact AIG's liquidity position in a material way.  As such, and as indicated above, AIG was required to disclose in these liquidity concerns in the MD&A section of its SEC filings, as required by Regulation S-K.

371.    AIG stated repeatedly that its exposure to collateral risks in the event of a lowering in its debt ratings was relatively small.  However, such statements failed to disclose that other factors,

including lowering its counterparties' ratings or a decline in the value or ratings of the CDO tranches referenced by its CDS contracts, could result in substantially greater collateral calls.

372. Under GAAP and SEC regulations, AIG was obligated to discuss and describe the potential unfavorable impact of various economic and industry factors on carrying value of its investment portfolio and the risks to which it was subject through its CDS portfolio and RMBS investments.

373. Ultimately, former SEC chief accountant, Lynn E. Turner, highlighted these shortcomings in testimony to the U.S. Congress on October 7, 2008:

> Trust and confidence in markets and any company begins with, and ends with, transparency. Transparency that *ensures investors can fully understand and assess the risks* and rewards of investing in a company. Yet *time and time again AIG had failed to provide the requisite transparency to investors.*

374. Finally, AIG lacked adequate disclosure controls and procedures, and internal control over financial reporting, throughout the Offering Period, despite AIG's obligations under the Securities Act, the Exchange Act, and its certifications and assertions to the contrary. The SEC defines "disclosure controls and procedures" as:

> [C]ontrols and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange Act] is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure information required to be disclosed by an issuer in the reports that it files or submits under the [Exchange Act] is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. (17 C.F.R. § 240.13a-15(e), 240.15d-15(e)).

375. The SEC defines "internal control over financial reporting" as a process "to provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with [GAAP].*" (17 C.F.R. § 240.13a-15(f), 240.15d-15(f)).

376. AIG's management, including its principal executive and financial officers, are obligated to evaluate (a) the effectiveness of its disclosure controls and procedures as of the end of each fiscal quarter-end, (b) the effectiveness of its internal control over financial reporting as of the

end of each fiscal year-end, and (c) any changes in internal control over financial reporting that materially affected, or were reasonably likely to materially affect, its internal control over financial reporting during each fiscal quarter. (17 C.F.R. § 240.13a-15, 240.15d-15). Under Regulation S-K, AIG's principal executive and financial officers must disclose the conclusions of their evaluations at the end of each quarter and year. (17 C.F.R. § 229.307, 229.308).

377.   AIG's disclosure controls and procedures, and internal control over financial reporting, were not effective throughout the Offering Period as AIG issued financial statements that failed to comply with the GAAP and SEC rules alleged herein. Specifically, AIG maintained ineffective disclosure controls and procedures, and internal control over financial reporting, concerning the valuation and disclosure of the CDS portfolio and RMBS investments. As more fully described below, it was not until the 2007 10-K was filed on February 28, 2008, that the material weaknesses concerning financial reporting of the CDS portfolio and its valuation were disclosed.

378.   The OTS documented numerous accounting and internal control issues at AIG during the Offering Period. On March 18, 2009, the Acting Director of OTS, Polakoff, testified to the House Subcommittee on Capital Markets that in March 2006 "OTS identified and reported to AIG's board weaknesses in AIGFP's documentation of complex structured transactions, in policies and procedures regarding accounting, in stress testing, in communication of risk tolerances, and in the company's outline of lines of authority, credit risk management and measurement." Polakoff also testified that: "After a 2007 targeted review of AIGFP, OTS instructed the company to revisit its modeling assumptions in light of deteriorating market conditions. In the summer of 2007, after continued market deterioration, OTS questioned AIG about the valuation of CDS backed by subprime mortgages."

379.   As alleged herein, the Asset/Credit Group of AIGFP made all valuation decisions on its own while deliberately excluding AIG's corporate accounting and risk management representatives – including, for example, St. Denis, who was specifically responsible for monitoring, supervising, and reporting on this process to corporate management. AIG's internal control system was not functioning properly and relevant, material risk and valuation information was not being "accumulated and communicated to management."

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 141

380.    AIG violated SEC rules when it failed to maintain its internal controls and misrepresented their adequacy in the Company's 2005 and 2006 10-Ks.

381.    As such, throughout the Offering Period, AIG misled investors regarding the effectiveness of its disclosure controls and procedures, and internal control over financial reporting. The ineffectiveness of these controls materially impacted the Company's financial statements throughout the Offering Period.

IX.    FACTS RELEVANT TO AIG'S KNOWLEDGE FOR STATEMENTS CONCERNING MATTERS OF "OPINION" OR "BELIEF"

382.    As set forth more fully above, at all relevant times herein AIG and its senior executives knew that AIG's publicly reported financial results issued during the Offering Period (and/or incorporated by reference in the Offering Materials), as well as statements concerning the Company's exposure to collateral calls stemming from its CDS portfolio and securities lending program in its SEC filings and press releases, were materially false and misleading.

383.    AIG and its senior executives, including Sullivan, Bensinger, Herzog, Lewis, Cassano, Frost, and Forster, knew that the Company faced a massive unhedged concentration of risk involving hundreds of billions of dollars of investments in the U.S. residential housing and subprime debt markets across the Company's units, most particularly, AIGFP and AIG's securities lending program. Moreover, even after these AIG and its senior executives became aware in mid to late 2006 that losses related to ABS and CDOs backed by subprime loans were all but inevitable, AIGFP knowingly decided to *not* hedge or restructure the CDS portfolio, in order to keep the income from these existing deals flowing into the Company and, in particular, to the AIGFP executives through their lavish compensation arrangements with AIG.

384.    Numerous facts establish a plausible (and strong) inference that AIG, AIGFP, and their executives, including Sullivan, Bensinger, Herzog, Lewis, Cassano, Frost, and Forster, did not genuinely believe in the Company's statements concerning matters of opinion or belief, that such statements were materially misleading for omitting key facts about the Company's and the executive's inquiry or knowledge concerning the statements of opinion, and that such facts conflicted with what a reasonable investor would draw from the statements themselves.  These statements concerned, among other things,

-124-

AIG's concentration of credit risk in the U.S. residential housing and subprime mortgage markets, and AIG's assurances that the Company's financial statements complied with GAAP, including FIN 45's requirement that AIG disclose the full amount of its obligation to post collateral under its CDSs. Facts supporting the false and materially misleading nature of such purported statements of "opinion" and "belief" include:

(1)     The enormous magnitude of AIG's and AIGFP's exposure to losses and/or collateral calls in their CDS portfolio and securities lending program;

(2)     Knowledge of the decision made within AIGFP to stop writing new CDS contracts based on multi-sector CDOs by the end of 2005, which AIG failed to disclose to investors until August 2007;

(3)     Knowledge that there would have been analyses of the CDS portfolio in the latter half of 2005, and that the Company faced enormous exposure to collateral calls and losses in its CDS portfolio;[9]

(4)     AIG's awareness of demands for collateral calls from counterparties to certain super senior CDSs dating back to at least August 2007, as well as the magnitude of the potential demands for collateral posting and that the CDS contracts provided for the counterparties to be the presumptive prevailing party entitled to set the valuation marks for the underlying CDOs;

(5)     PwC informed AIG at least by November 29, 2007, that the Company had significant deficiencies and could have a material weakness in internal controls over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior CDS portfolio, yet the Company's presentation to investors on December 5, 2007,

---

[9] These analyses include those presented by Park to senior AIGFP executives in the latter half of 2005, which recognized that (i) underwriting practices and standards for subprime mortgages had deteriorated significantly in 2005 (thereby making the Company's statements touting its relative lack of exposure within the CDS portfolio to 2006 and 2007 "vintages" highly misleading), (ii) the correlation factor, described above, meant that once certain CDOs began to lose value, there was no reasonable basis to believe that others, with similar subprime exposure, would not also lose value, and (iii) the Company faced enormous exposure to collateral calls and losses in its CDS portfolio.

presented the Company's position as secure and did not disclose the potential for a material weakness in its valuation models and processes;

(6) The resignation of St. Denis in 2007 as a result of being deliberately excluded from the valuation of AIGFP's liabilities because Cassano believed St. Denis would "pollute the process";

(7) The receipt of the OTS Letter on March 10, 2008, detailing a material weakness within AIG's management and oversight of AIGFP's super senior CDS valuation process and financial reporting;

(8) Acknowledgement by PwC to AIG's audit committee in March 2008 that the Company's risk control groups did not have "appropriate access" to AIGFP;

(9) Even though AIG was not writing new CDS contracts after 2005, managers of the CDOs underlying existing CDS contracts were still able to substitute collateral of 2006-2007 vintages with pre-2005 vintages and the 2005 vintage included subprime mortgages that carried far higher risks than their credit rating would have suggested;

(10) AIGFP's preference for "mezzanine" deals, which were typically smaller but were based on greater percentages of subprime debt;

(11) AIGFP's valuation of its CDO portfolio varied from AIGFP's counterparties, certain of which had strong reputations for reliability in valuations, and that AIGFP's formulas consistently produced higher valuations;

(12) AIGFP's responsibility for, and issuance of, false "fair value" and loss figures in the presentation concerning the CDS portfolio at the December 5, 2007 investor meeting, which, as PwC indicated, were based on "adjustments" that Cassano and Forster, among others, made for the first time in the fourth quarter of 2007 in order to minimize the losses that AIG would have to disclose at the investor meeting;

(13) The Company's substantial exposure to the U.S. residential mortgage market in the investment portfolios created through its securities lending program;

(14)  AIG had "made up" the difference if participants in the securities lending program put up less than 102% of the value of the securities, which was not made public until issuance of the Second Quarter 2008 Form 10-Q;

(15)  AIG Investments ramped up its investments in asset-backed securities, including RMBS that included subprime debt, in furtherance of its "10-cubed" goal established in or about December 2005 to realize an additional $1 billion in annual profits; and

(16)  The inadequate internal controls that had contributed to the Company's previous restatement and disclosure deficiencies and, as the Company was aware, had not been cured.

385.  AIG's most senior executives, including Sullivan, Bensinger, Herzog and Lewis, were further aware, or recklessly disregarded, that the Company's risk management, corporate oversight, and financial reporting processes were ineffective and subject to increasing deterioration after being told repeatedly by the OTS as early as March 2006 that these weaknesses existed and needed to be remediated. In testimony to the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises on March 18, 2009, Polakoff, Acting Director of the OTS, explained that, through protracted reviews and examinations of AIG and its subsidiaries during the Offering Period, the OTS directed numerous criticisms and corrective actions to the AIG Executives and the Board, which criticisms displayed an increasing level of severity with respect to AIG's risk management and corporate oversight, among other areas.

386.  For instance, in 2005, after conducting several targeted, risk-focused reviews of various lines of AIG's business, including AIGFP, the OTS identified a variety of weaknesses and made numerous recommendations to AIG's executives and Board members regarding AIG's risk management oversight, financial reporting transparency, and corporate governance, which were communicated in a report to the AIG Board in March 2006.  In testimony before the House Subcommittee, Polakoff explained: "With respect to AIGFP, OTS identified and reported to AIG's Board weaknesses in AIGFP's documentation of complex structured transactions, in policies and procedures regarding accounting, in stress testing, in communication of risk tolerances, and in the company's outline of lines of authority, credit risk management and measurement."

387.   Moreover, in 2007, in the midst of deterioration in the U.S. mortgage finance markets, the OTS increased its scrutiny of AIGFP, including the valuation of CDS backed by subprime mortgages, and instructed AIG to "revisit its modeling assumptions in light of deteriorating subprime market condition." Polakoff testified to the House Subcommittee that:

- In the summer of 2007, after continued market deterioration, OTS questioned AIG about the valuation of CDS backed by subprime mortgages. In the last quarter of 2007, OTS increased the frequency of meetings with AIG's risk managers and PwC. Due to the Agency's progressive concern with corporate oversight and risk management, in October 2007 we required AIG's Board to . . . monitor remediation efforts with respect to certain material control weaknesses and deficiencies;

- Ensure implementation of a long-term approach to solving organizational weaknesses and increasing resources dedicated to solving identified deficiencies;

- Monitor the continued improvement of corporate control group ability to identify and monitor risk;

- Complete the holding company level risk assessment, risk metrics, and reporting initiatives and fully develop risk reporting;

- Increase involvement in the oversight of the firm's overall risk appetite and profile and be fully informed as to AIG Catastrophic Risk exposures, on a full-spectrum (credit, market, insurance, and operational) basis; and

- Ensure the prompt, thorough, and accountable development of the Global Compliance program, a critical risk control function where organizational structure impediments have delayed program enhancements.

388.   In connection with this 2007 review, the OTS further emphasized to AIG management and Board members that the Company should give the "highest priority to the financial reporting process remediation and the related long-term solution to financial reporting weaknesses," according to Polakoff. The OTS's ongoing review and recommendations to AIG culminated in the March 2008 Supervisory Letter, which downgraded AIG's examination rating and detailed the Company's risk management failures.

389.   AIG's most senior executives, including Sullivan, Bensinger, Herzog and Lewis, were further aware, or recklessly disregarded, that the "Assets/Credit" group within AIGFP, within which the CDS business was written, was maintained separately from all other operations of the AIGFP unit, and that while there were risk management, accounting, and technology systems groups that supported the entire organization, Cassano excluded such personnel from involvement with the CDS line of

-128-

business.  Indeed, former employees have confirmed that the lack of internal controls and risk management systems with respect to the Assets/Credit group made it possible for Cassano and other AIGFP personnel, including Forster and Frost, to control the flow of information pertaining to AIGFP's super senior CDS portfolio and unilaterally make risk management and valuation decisions.

390.   AIG Executives were also aware, or recklessly disregarded, that AIGFP did not request potential counterparties to provide underlying loan detail, such as "loan level evaluation or analysis materials" regarding the mortgages or other instruments that made up the CDOs they insured.

391.   AIG Executives were also aware, or recklessly disregarded, that even though the assets underlying high grade CDOs were of higher quality, a majority of AIGFP's multi-sector CDSs with subprime exposure were written on mezzanine CDOs in which the underlying collateral contained up to 100% of subprime risk exposure.  AIGFP had "notional limits," and since the mezzanine deals tended to be smaller than the high grade deals, AIGFP could write more of the mezzanine deals. While the mezzanine deals carried higher attachment points than the high grade deals, the AIG Executives recklessly ignored the fact that these CDOs would fall in value much faster – since they included overall lesser credit-worthy loans – and would result in even faster collateral calls.

392.   AIG Executives were further aware, or recklessly disregarded, that the financial model created by Professor Gorton, and utilized by AIGFP in determining whether to issue CDS contacts, did not analyze the impact of the potential for AIG rating downgrades and/or market valuations that might require collateral calls to be paid on CDS contracts.  Indeed, the actuarial model did not take into account certain crucial data, such as collateral trigger points, because that information was not provided to Professor Gorton, nor was it within the parameters of the model he was instructed to create.  Frost and Forster were responsible for overseeing the modeling process, but failed to provide Professor Gorton with data such as loan level variables, instructing him instead to simply use summary level statistics on the collateral.  As the *Wall Street Journal* reported in an October 31, 2008 article titled, *Behind AIG's Fall, Risk Models Failed to Pass Real-World Test*, AIG did not instruct Gorton to assess how market forces and contract terms could turn the CDS into huge financial liabilities, even though it "knew that his models didn't consider them."  Indeed, the *Wall Street Journal* reported, AIG

1   "didn't apply effective models for valuing the swaps and for collateral risk until the second half of

2   2007, long after the swaps were sold."

3       393.    In addition to the specific facts discussed above, the knowledge of the AIG Executives,

4   including the Company's most senior officers, that statements issued by AIG concerning matters of

5   "opinion" and "belief" were both objectively and subjectively false, and were materially misleading

6   for omitting key facts about the Company's and the executive's inquiry or knowledge concerning the

7   statements of opinion, is further established by the following additional facts:

8       394.    Sullivan:   In his capacity as President and CEO of AIG from March 2005 to June 2008,

9   Sullivan helped prepare the false statements identified herein and repeated their contents to the market.

10   He signed the 2007 and 2008 Registration Statements and signed and certified AIG's 2005-2007 10-

11   Ks, the interim 10-Qs from the first quarter of 2006 through the first quarter of 2008, attesting to the

12   accuracy of the financial information contained therein and representing that AIG had designed,

13   established and maintained an effective set of internal controls.   Sullivan also participated in

14   conference calls with analysts on numerous occasions throughout the Offering Period and beyond,

15   where AIG's financial stability and CDS risks were discussed, including on March 17, 2006, May 11,

16   2006, August 10, 2006, November 10, 2006, March 2, 2007, May 11, 2007, August 9, 2007,

17   November 8, 2007, December 5, 2007, February 29, 2008, and May 9, 2008.

18       395.    Sullivan knew that the risks assumed by AIG, through the CDS portfolio, were

19   unhedged (or largely unhedged).   Sullivan was instrumental in weakening the strict controls that his

20   predecessor Greenberg had established to review AIG and AIGFP's credit exposures and risks.   For

21   example, Sullivan eliminated the weekly meetings that Greenberg had instituted to keep the CEO

22   abreast of AIGFP's credit exposure.

23       396.    Sullivan was warned by PwC prior to the December 5, 2007 investor meeting that AIG

24   had significant deficiencies and possibly a material weakness in its CDS valuation processes and,

25   according to the book *In Fatal Risk: A Cautionary Tale of AIG's Corporate Suicide*, author Roddy

26   Boyd explains "that however imperfect a market-price methodology might be, it was preferable to

27   whatever [AIGFP] had at that point."   Sullivan nonetheless represented that AIG had "a high degree of

28   certainty in" the losses it had already booked and that its RMBS exposure levels "are manageable

-130-

given [AIG's] size, financial strength and global diversification." Sullivan also stated that AIGFP's models "have proven to be very reliable" and provide AIG "with a very high level of comfort," even though he was aware that the models were deficient.

397.   Sullivan also knew, or recklessly disregarded, that the extensive risk that AIG assumed through the CDSs were entirely or substantially unhedged.   Certain employees within AIGFP had encouraged Sullivan and other senior management to use ABX indices and hedge against the risk that the underlying securities would not be repaid as expected.   Sullivan declined to do so.

398.   As CEO, Sullivan eliminated weekly meetings to review AIG's investments and risks, and, in particular, to assess the work of the AIGFP unit.   According to AIG's prior CEO, Greenberg, these meetings kept "the CEO abreast of AIGFP's credit exposure."   As a September 28, 2008 *Portfolio* magazine article entitled, "AIG's House of Cards," reported:   Sullivan "rarely questioned or sought to rein in the [AIGFP] unit," according to a person formerly close to the company, and eliminated the weekly meetings because he "wasn't really interested in the AIGFP business."

399.   <u>Bensinger</u>:   In his capacity as Executive Vice President and Chief Financial Officer of AIG throughout the Offering Period, Bensinger helped prepare the false financial statements described herein and repeated their contents to the market.   He signed the 2007 and 2008 Registration Statements and signed and certified AIG's 2005-2007 10-Ks, the interim 10-Qs from the first quarter of 2006 through the second quarter of 2008, attesting to the accuracy of the financial information contained therein and representing that AIG had designed, established and maintained an effective set of internal controls.   Bensinger also participated in conference calls with analysts on numerous occasions throughout the Offering Period and beyond, where AIG's financial stability and CDS risks were discussed, including on March 17, 2006, May 11, 2006, August 10, 2006, November 10, 2006, March 2, 2007, May 11, 2007, November 8, 2007, December 5, 2007, February 29, 2008, May 9, 2008, and August 7, 2008.

400.   In *Fatal Risk: A Cautionary Tale of AIG's Corporate Suicide*, Boyd explains that "Bensinger and a handful of other colleagues, starting in early 2006, began to scrutinize AIG for sources of 'excess capital' and for ways to 'leverage the balance sheet' in the hunt for easy carry-trade profits in what seemed like an attractive interest rate environment." On November 29, 2007, however,

-131-

1   Bensinger was informed by PwC that AIG had significant deficiencies and possibly a material
2   weakness in its CDS valuation processes and, according to Boyd, "that however imperfect a market-
3   price methodology might be, it was preferable to whatever [AIGFP] had at that point."

4       401.   <u>Herzog</u>:  In his position as the Senior Vice President and Comptroller and the Principal
5   Accounting Officer of AIG from June 2005 until October 2008 (when he replaced Bensinger as Chief
6   Financial Officer of AIG), Herzog helped prepare the false financial statements described herein and
7   repeated their contents to the market.  Specifically, Herzog signed AIG's 2005-2007 10-Ks, the interim
8   10-Qs from the first quarter of 2006 through the second quarter of 2008, and the 2007 and 2008
9   Registration Statements.  He also spoke on AIG's conference calls with analysts during the Offering
10   Period and beyond, including on May 9, 2008 and August 7, 2008.

11       402.   <u>Lewis</u>:  Lewis was AIG's Senior Vice President and Chief Risk Officer throughout the
12   Offering Period.  In *Fatal Risk: A Cautionary Tale of AIG's Corporate Suicide*, Boyd explains that
13   Lewis "saw everything [AIGFP] did in real time and had plenty of authority to force at least a
14   reevaluation," but that Lewis "did nothing" despite his critical oversight responsibility.  Lewis spoke
15   on AIG's conference calls with investors and analysts on numerous occasions throughout the Offering
16   Period, including on August 9, 2007, when he explained that the risk "actually undertaken [through the
17   CDS portfolio] is very modest and remote, and has been structured and managed effectively."  He also
18   described the risk to AIG from the CDS portfolio as a "very remote risk, which is defined and
19   calculated not just by rating agency models, but also by our own very rigorous internal models used on
20   each deal AIG-FP structures," which Lewis knew (or recklessly disregarded) was deficient.

21       403.   <u>Cassano</u>:  In his capacity as President of AIGFP from before the start of the Offering
22   Period until AIG announced his resignation on February 29, 2008, Cassano oversaw and was
23   intimately familiar with the rapid expansion of AIGFP's CDS portfolio.  Cassano's control over the
24   Assets/Credit group also informed him of all studies involving the CDS portfolio.  As reported in a
25   December 31, 2008 article, *"Downgrades and Downfall,"* in the *Washington Post*, Cassano
26   participated in conference calls twice a month where Frost discussed CDS contracts sold that month.
27   According to the book, *Unholy Alliance: PricewaterhouseCoopers And Its Relationship With AIG and*
28   *Goldman Sachs During The Financial Crisis*, by Francine McKenna, Cassano told "PwC about the

growing risks and 'required' accounting adjustments in the credit default swaps portfolio early in 2007." Nevertheless, Cassano excluded others within AIGFP and AIG, including but not limited to St. Denis and other accounting, risk management, and technical support personnel within AIGFP, from the valuation process of the CDS portfolio.

404.    Cassano knew, or should have known, that there was a likelihood of extensive collateral calls after AIG lost its AAA credit rating in 2005, especially if its debt was downgraded again. According to a March 19, 2009 *Time Magazine* article titled, "How AIG Became Too Big to Fail," based on an interview with former CEO Greenberg, "Cassano's unit doubled down after the spring of 2005, writing more and more subprime-linked swaps as the ratings plunged, which made the possible need for collateral enormous in the event its debt was downgraded." Greenberg stated that AIGFP should have stopped writing CDS and hedged, or reinsured, its existing CDS when it lost its AAA rating. If they did not, "[o]f course they were going to run out of money."

405.    Cassano made numerous materially misleading statements to analysts and investors on AIG's conference calls, including on March 17, 2006, August 9, 2007, November 7, 2007, and December 5, 2007, during which he demonstrated his involvement in the evaluation and management of risk. For example, Cassano explained on August 9, 2007, that "it is hard for us, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing one dollar in any of those transactions." He also stated, "we see no issues at all emerging. We see no dollar loss associated with any of that [CDS] business." Nevertheless, Cassano was aware: (i) that certain factors, such as AIG's credit rating weakness and the rapidly diminishing price of the CDOs, had not been factored into the model AIGFP relied upon when assessing CDS contracts; (ii) that AIG had already decided to stop writing CDS contracts specifically because of the high risk of loss; and (iii) that, should CDO valuations decline or suffer a downgrade, AIG would be forced to post billions of dollars in collateral.

406.    <u>Forster:</u>  Forster had been AIGFP's Executive Vice President of Asset Trading & Credit Products since before the Offering Period and had responsibility for running AIGFP's global credit division, which contracted to sell many CDS contracts at issue herein. He was within the small number of AIGFP personnel who directed the information flow regarding the CDS portfolio. In that

1 capacity, he was aware that AIGFP did not ask for loan-level detail from counterparties even though
2 such information would have been necessary to assess the risks of the CDS transactions.

3        407.    According to the FCIC Report, Forster was involved personally in matters such as
4 Park's analysis of the CDS and subprime markets, credit risk exposures, negotiating with
5 counterparties concerning collateral calls, and developing valuation models for CDS contracts.
6 According to the FCIC Report, in July 2005, Forster emailed Frost, the AIG salesman primarily
7 responsible for the company's booming CDS business, and Professor Gorton: "We are taking on a
8 huge amount of subprime mortgage exposure here . . . Everyone we have talked to says they are
9 worried about deals with huge amounts [of high-risk mortgage] exposure yet I regularly see deals with
10 80% [high-risk mortgage] concentrations currently. Are these really the same risk as other deals?"
11 Also according to the FCIC Report, Forster rejected the idea of purchasing a hedge from UBS
12 "because it would cost more than the fees that AIG Financial Products was receiving to write the CDS
13 protection. 'We're not going to pay a dime for this,' Forster told Park." Forster was therefore very
14 familiar with the CDS portfolio, the risks involved, and the absence of any effective controls or hedges
15 for those risks.

16        408.    Forster frequently participated in AIG's conference calls with analysts throughout the
17 Offering Period, including on May 31, 2007, November 8, 2007, and December 5, 2007, wherein he
18 made specific, affirmative statements regarding the CDS portfolio. For instance, Forster stated during
19 a May 31, 2007 presentation: "Given the conservatism in that we've built these [CDS] portfolios, we
20 haven't had to do a huge amount of hedging over the years." He further represented that if the CDS
21 portfolio "did start to deteriorate, it would be very easy for us to go out, buy an extra layer of
22 protection to make sure that we maintain the sort of super senior portfolio still."

23 X.    NO SAFE HARBOR

24        409.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-
25 looking statements under certain circumstances does not apply to any of the false and misleading
26 statements pleaded in this Complaint.

27        410.    First, none of the statements complained of herein was a forward-looking statement.
28 Rather they were historical statements or statements of purportedly current facts and conditions at the

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 152

1   time the statements were made. Second, the statutory safe harbor does not apply to statements included

2   in financial statements which purport to have been prepared in accordance with GAAP.

3       411.    To the extent any of the false or misleading statements alleged herein can be construed

4   as forward-looking, the statements were not accompanied by meaningful cautionary language

5   identifying important facts that could cause actual results to differ materially from those in the

6   statements. As set forth above in detail, then-existing facts contradicted AIG's statements regarding the

7   Company's business and financial condition and its purported compliance with GAAP.

8   **XI.   TOLLING OF THE STATUTE OF LIMITATIONS**

9       412.    Between May 21, 2008 and January 15, 2009, numerous class actions were filed against

10   AIG asserting claims under the federal securities laws on behalf of purchasers of publicly traded AIG

11   securities asserting the same or substantively similar claims and misconduct as that alleged by

12   Plaintiffs herein.  These securities class actions were consolidated under *In re American International*

13   *Group, Inc. 2008 Securities Litigation*, No. 1:08-cv-04772 (LTS) (HBP) (S.D.N.Y.).  Prior to opting

14   out of the Class Action, Plaintiffs were members of the putative class and benefit from the *American*

15   *Pipe* tolling doctrine.

16       413.    On May 21, 2008, Jacksonville Police and Fire Pension Fund, on behalf of itself and all

17   others similarly situated, filed a class action complaint on behalf of purchasers of publicly traded AIG

18   securities against AIG (and others) alleging violations of Sections 10(b) and 20(a) of the Exchange

19   Act.  *See Jacksonville Police and Fire Pension Fund v. American International Group, Inc. et al.*, No.

20   1:08-cv-4772 (S.D.N.Y.) ("*Jacksonville*").  During the next eight months, at least seven additional

21   class action complaints were filed on behalf of purchasers of publicly traded AIG securities against

22   AIG alleging violations of Section 10(b) and 20(a) of the Exchange Act and/or Sections 11, 12(a)(2),

23   and 15 of the Securities Act and relating to the same or substantially similar misconduct, including, but

24   not limited to: *Connolly v. AIG International Group, Inc. et al.*, No. 1:08-cv-5072 (S.D.N.Y.); *Maine*

25   *Public Employees Retirement System v. AIG International Group, Inc. et al.*, No. 1:08-cv-8659

26   (S.D.N.Y.); *Ontario Teachers' Pension Plan Board v. AIG International Group, Inc. et al.*, No. 1:08-

27   cv-8659 (S.D.N.Y.); *Margaret Carroll v. AIG International Group, Inc. et al.*, No. 1:08-cv-8659

28   (S.D.N.Y.); *Harriet Bernstein and Janet Levine Cotter v. AIG International Group, Inc. et al.*, No.

-135-

1   1:08-cv-9162 (S.D.N.Y.); *Fire and Police Pension Association of Colorado and M. Clay Ragsdale, IV*

2   *v. AIG International Group, Inc. et al.*, No. 1:08-cv-10586 (S.D.N.Y.); and *Epstein Real Estate*

3   *Advisory v. AIG International Group, Inc. et al.*, No. 1:08-cv-428 (S.D.N.Y.).

4        414.   On March 20, 2009, these actions were consolidated.  On May 19, 2009, the court-

5   appointed Lead Plaintiff in the Class Action filed a Consolidated Class Action Complaint

6   ("Consolidated Complaint") against Defendant AIG (and others) asserting claims under, *inter alia*,

7   Sections 10(b) and 20(a) of the Exchange Act and Sections 11 and 15 of the Securities Act.  The

8   Consolidated Complaint alleged that AIG and several AIG executive defendants made materially false

9   and misleading statements and omitted material information from AIG's securities Offering Materials

10  and public reports and statements about AIG's accumulated exposure to the subprime mortgage market

11  through its securities lending program and its CDS portfolio.  As a result of these misrepresentations,

12  Lead Plaintiff alleged that the prices of AIG securities during the putative class period were artificially

13  inflated, and that once the truth about these risks began to emerge, the price of AIG publicly traded

14  securities declined in value and class members suffered losses.  On September 27, 2010, United States

15  District Judge Laura T. Swain denied defendants' motions to dismiss the Consolidated Complaint,

16  including Lead Plaintiff's claims for violations of Sections 10(b) and 20(a) of the Exchange Act and

17  Sections 11 and 15 of the Securities Act.

18       415.   The class action complaints referenced above, including all of the class action

19  complaints listed in Paragraph 426, were filed less than one year after Plaintiffs discovered or

20  reasonably could have discovered the facts upon which the Securities Act claims asserted herein are

21  based, and less than three years after the securities upon which such claims are based were bona fide

22  offered to the public and sold to Plaintiffs in the relevant transactions.  The filing of these class action

23  complaints, or certain of them, served to toll any applicable statute of limitations and repose for the

24  claims set forth in this Complaint pursuant to the doctrine announced in *Am. Pipe & Constr. Co. v.*

25  *Utah*, 414 U.S. 538, 552 (1974).  Plaintiffs have thus timely filed their claims.

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 Exhibit A Page 154

## XII.   CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

#### (By All Plaintiffs Against AIG)

Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

416.   This claim is brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Plaintiffs against AIG.

417.   Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the Offerings (including in the Offering Materials) are alleged to have been materially misstated statements of opinion or belief when made and, as applicable, restated at the time of the Offerings.  Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

418.   Plaintiffs purchased or acquired AIG securities in or traceable to the Offerings, as set forth in ¶¶33, 217-18 herein.  The Offerings were conducted pursuant to the 2003, 2007 and 2008 Registration Statements, and amendments and supplements thereto.

419.   Each of these Registration Statements, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

420.   AIG is the issuer of the securities purchased by Plaintiffs pursuant or traceable to the Registration Statements.  AIG is, therefore, strictly liable to Plaintiffs for the materially untrue statements and omissions alleged herein.

421.   The facts misstated in or omitted from the Registration Statements at issue herein would have been material to a reasonable person reviewing the Registration Statements.

422.   Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material fact in the Registration Statements and incorporated Offering Materials when they purchased or acquired the securities at issue.

1     423.    The value of the securities purchased by Plaintiffs declined substantially subsequent to

2    the consummation of the Offerings and Plaintiffs have sustained damages.

3     424.    This claim does not sound in fraud. For purposes of asserting this claim, Plaintiffs do

4    not allege that AIG acted with scienter or fraudulent intent, which are not elements of a Section 11

5    claim, except that challenged statements of opinion or belief made in connection with the Offerings are

6    alleged to have been materially misstated statements of opinion or belief when made. Such statements

7    of opinion or belief were objectively false and not honestly believed by AIG and its responsible

8    directors and officers at the time they were made, included embedded misstatements of material fact,

9    and omitted to state material facts necessary to make the statements of opinion not misleading to a

10    reasonable investor.

11     425.    By reason of the foregoing, AIG is liable to Plaintiffs for violations of Section 11 of the

12    Securities Act.

13  **XIII.  PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

15    A.    Awarding all damages and other remedies set forth in the Securities Act in favor of

16    Plaintiffs against Defendant in an amount to proven at trial, including all interest thereon;

17    B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

18    including counsel fees and expert fees; and

19    C.    Awarding such other and further relief as the Court may deem just and proper.

1    XIV.   JURY TRIAL DEMAND

2         Plaintiffs hereby demand a jury trial.

3    Dated: March 27, 2015                    Respectfully submitted,

4                                             BERNSTEIN LITOWITZ BERGER
5                                                 & GROSSMANN LLP

6

7                                             BLAIR A. NICHOLAS  (Bar No. 178428)
8                                             TIMOTHY A. DELANGE (Bar. No. 190768)
                                              DAVID R. KAPLAN (Bar No. 230144)
9                                             LUCAS E. GILMORE (Bar No. 250893)
                                              BRANDON MARSH (Bar No. 268316)
10                                            12481 High Bluff Drive, Suite 300
                                              San Diego, CA 92130
11                                            Tel: (858) 793-0070
                                              Fax: (858) 793-0323
12

13                                            *Counsel for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28